# 24-3120-cr

## United States Court of Appeals

**FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

MIGUEL RIVERA,
AKA Macho,
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

**APPENDIX**

TERENCE S. WARD
*Federal Defender*
*District of Connecticut*
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
(860) 493-6260

TABLE OF CONTENTS

DOCKET SHEET ..........A 1

INDICTMENT (09/22/2020)..........A 23

SUPERSEDING INDICTMENT (08/15/2023)..........A 25

PRETRIAL CONFERENCE TRANSCRIPT EXCERPT (09/27/2023)..........A 28

ORDER DENYING MOTION TO DISMISS THE SUPERSEDING INDICTMENT(10/03/2023)..........A 42

STATUS CONFERENCE TRANSCRIPT EXCERPT (10/16/2023)..........A 49

TRIAL-DAY ONE TRANSCRIPT EXCERPT (10/17/2023) ..........A 52

TRIAL-DAY TWO TRANSCRIPT EXCERPT (10/18/2023) ..........A 138

TRIAL-DAY THREE TRANSCRIPT EXCERPT (VERDICT) (10/19/2023) A 245

GOVERNMENT EXHIBIT-EX_008 (PHOTO SCENE 1)..........A 257

GOVERNMENT EXHIBIT-EX_010 (PHOTO SCENE 3)..........A 258

GOVERNMENT EXHIBIT-EX_011 (PHOTO SCENE 4)..........A 259

GOVERNMENT EXHIBIT-EX_013 (PHOTO-WRITTEN RIGHTS WAIVER CARD 1) ..........A 260

GOVERNMENT EXHIBIT-EX_031 (20-2984 SUPPLEMENTAL DNA REPORT) ..........A 261

GOVERNMENT EXHIBIT-EX_038 (PHOTO SCENE-GATE & PARKING ENTRANCE BETWEEN 29 & 35 WILLIAMS..........A 263

DEFENDANT EXHIBIT-EX_1007 (VIDEO IMAGE OR VIDEO FROM JULY 4, 2020)..........A 264

JURY VERDICT (10/19/2023) ..........A 265

MARKED WITNESS LIST (10/20/2023) ....................................................A 266

MARKED EXHIBIT LIST (10/20/2023).....................................................A 267

JUDGMENT (11/26/2024) ......................................................................A 269

NOTICE OF APPEAL (11/26/2024)..........................................................A 274

APPEAL,CLOSED,EFILE,MOTREF,SDV

# U.S. District Court
# District of Connecticut (New Haven)
# CRIMINAL DOCKET FOR CASE #: 3:20−cr−00168−JCH−1

Case title: USA v. Rivera

Date Filed: 09/22/2020

Date Terminated: 11/26/2024

Assigned to: Judge Janet C. Hall
Referred to: Judge S. Dave Vatti

**Defendant (1)**

**Miguel Rivera**
*TERMINATED: 11/26/2024*
*also known as*
Macho
*TERMINATED: 11/26/2024*

represented by

**Ashley Meskill**
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
860−808−5117
Fax: 860−772−1709
Email: ashley.meskill@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Tracy Hayes**
Federal Public Defender's Office − NH
265 Church St., Suite 702
New Haven, CT 06510−7005
203−498−4200
Fax: 203−498−4207
Email: tracy_hayes@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Josh B Ewing**
Federal Defender of Connecticut
10 Columbus Blvd.
Floor 6
Hartford, CT 06106
860−493−6260
Email: josh_ewing@fd.org
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| UNLAWFUL TRANSPORT OF FIREARMS, ETC. (Unlawful Possession of a Firearm by a Felon)<br>(1) | Dismissed by Government Motion. |
| UNLAWFUL TRANSPORT OF FIREARMS, ETC. (Unlawful Possession of a Firearm and Ammunition by a Felon)<br>(1s) | The defendant is sentenced to a term of imprisonment of 60 months. Upon release the defendant shall be placed on supervised release for a total term of 3 years. Special assessment of $100.00 shall be paid immediately. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Witness**

**Angelique Julian** represented by **James I. Glasser**
Wiggin & Dana−NH
One Century Tower
265 Church Street P.O. Box 1832
New Haven, CT 06508−1832
203−498−4313
Email: jglasser@wiggin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

---

**Plaintiff**

**USA** represented by **Leonard C. Boyle**
U.S. Attorney's Office−NH
157 Church St., 25th Floor
New Haven, CT 06510
203−821−3700
Email: leonard.boyle@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael J. Gustafson**
Michael Gustafson
121 Elm Street
New Haven, CT 06510
203−503−6800
Email: mgustafson165@gmail.com
*TERMINATED: 07/14/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Natasha Freismuth**
U.S. Attorney's Office−NH
157 Church St., 25th Floor
New Haven, CT 06510
203−821−3700
Fax: 203−773−5389
Email: Natasha.freismuth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia Stolfi Collins**
United States Attorney Office −CT
157 Church Street

New Haven, CT 06510
203−821−3740
Fax: 203−773−5389
Email: Patricia.Stolfi.Collins@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/22/2020 | 1 | SEALED INDICTMENT returned before Judge Thomas O. Farrish with the signature of the foreperson redacted. Grand jury number H−19−1. Warrant to issue as to Miguel Rivera (1) count 1. (Reis, Julia) (Entered: 09/23/2020) |
| 09/22/2020 | 2 | Unredacted document with FOREPERSON'S SIGNATURE regarding 1 Indictment (Sealed) as to defendant Miguel Rivera. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Reis, Julia) (Entered: 09/23/2020) |
| 11/09/2020 | | NOTICE regarding hearing via Zoom as to Miguel Rivera: The Detention Hearing scheduled for 11/10/2020 at 2:00 p.m. will be conducted via Zoom. The video link is https://www.zoomgov.com/j/1617057208?pwd=Z3hJZHFwS1ZYcCsvNzFNQ241eXJwQT09 and call in number is 1 646 828 7666.<br><br>Meeting ID: 161 705 7208<br><br>Meeting Password: 283566<br><br>The public may also join by following the zoom video link. Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Wood, R.) (Entered: 11/09/2020) |
| 11/09/2020 | | "Entered in Error" Docket Entry Correction as to Miguel Rivera re Notice Regarding Hearing Via Zoom,,, This notice was entered in error & was not to be docketed in this case. (Wood, R.) (Entered: 11/09/2020) |
| 11/09/2020 | | Arrest of Miguel Rivera (Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | 4 | Minute Entry for proceedings held before Judge Thomas O. Farrish:Initial Appearance as to Miguel Rivera held on 11/9/2020, Arraignment as to Miguel Rivera (1) Count 1 held on 11/9/2020, Bond Hearing as to Miguel Rivera held on 11/9/2020, Plea entered by Miguel Rivera Not Guilty on count 1, indictment. Time 43 minutes(Court Reporter J. Monette.)(Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | | CASE UNSEALED as to Miguel Rivera (Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | | INDICTMENT UNSEALED as to Miguel Rivera (Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | 5 | ELECTRONIC FILING ORDER FOR COUNSEL as to Miguel Rivera − PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet C. Hall on 11/9/2020. (Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | 6 | ORDER as to Miguel Rivera pursuant to the Due Process Protections Act of 2020, P.L. 116−182, to be codified as Fed. R. Crim. P. 5(f).<br><br>Counsel for the defendant shall ensure that the defendant receives a copy of this order within ten days.<br><br>Signed by Judge Thomas O. Farrish on 11/9/2020. (Wood, R.) (Entered: 11/10/2020) |
| 11/09/2020 | 7 | SCHEDULING ORDER as to Miguel Rivera; Substantive Motions due 11/30/2020, Government Response due 12/7/2020, Proposed Voir Dire Questions due 12/14/2020, Proposed Jury Instructions due 12/14/2020, Jury Selection set for 1/4/2021 at 8:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. |

| | | |
|---|---|---|
| | | Signed by Judge Thomas O. Farrish on 11/9/2020. (Wood, R.) (Entered: 11/10/2020) |
| 11/12/2020 | 8 | USM Return of Service on Arrest Warrant executed as to Miguel Rivera on 11/9/2020 (Reis, Julia) (Entered: 11/16/2020) |
| 12/23/2020 | 9 | Consent MOTION to Continue *Jury Selection and Filing Deadlines* by Miguel Rivera. (Meskill, Ashley) (Entered: 12/23/2020) |
| 12/28/2020 | 10 | ORDER granting 9 Consent MOTION to Continue Jury Selection and Filing Deadlines by Miguel Rivera. It appearing more time is necessary due to the Superseding Standing Order In Re: Court Operations Under the Exigent Circumstances Created by COVID−19, need to review discovery, and for defendant to confer with counsel, the jury selection in this matter is continued until 4/5/2021. The time period between 12/28/2020 to 4/5/2021 is excluded under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7)(A), the Court finds that the ends of justice served by this continuance outweigh the best interests of the public and the defendant in a speedy trial. SO ORDERED by Judge Janet C. Hall on 12/28/2020. (DeRubeis, B.) Modified on 9/28/2021 (Lewis, D). (Entered: 12/28/2020) |
| 12/28/2020 | 11 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 1/4/2021* Jury Selection set for 4/5/2021 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (DeRubeis, B.) (Entered: 12/28/2020) |
| 01/28/2021 | 12 | ATTORNEY APPEARANCE Natasha Freismuth appearing for USA (Freismuth, Natasha) (Entered: 01/28/2021) |
| 02/23/2021 | 13 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Status Conference set for 3/9/2021 12:00 PM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Janet C. Hall. Counsel are requested to use the following dial−in for this call: 1−877−873−8017; Access Code: 6415663#. (Lewis, D) (Entered: 02/23/2021) |
| 03/09/2021 | 17 | ORAL MOTION to Continue Jury Selection by Miguel Rivera. (Lewis, D) (Entered: 03/15/2021) |
| 03/09/2021 | 18 | Minute Entry for proceedings held before Judge Janet C. Hall: Motion Hearing/Status Conference as to Miguel Rivera held on 3/9/2021; granting 17 Oral MOTION to Continue filed by Miguel Rivera. Oral Motion to Continue Jury Selection is granted; Jury Selection is continued to Oct. 4, 2021; FPD Atty Tracy Hayes will be taking over the defendant's representation; Speedy Trial Act Findings made on the record; the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 3/9/2021 to and including 10/4/2021 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7). 08 minutes(Court Reporter Terri Fidanza.) (Lewis, D) (Entered: 03/15/2021) |
| 03/09/2021 | 19 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 4/5/2021* Jury Selection has been changed to 10/4/2021 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 03/15/2021) |
| 03/10/2021 | 14 | ATTORNEY APPEARANCE: Tracy Hayes appearing for Miguel Rivera (Hayes, Tracy) (Entered: 03/10/2021) |
| 03/11/2021 | 15 | Consent MOTION to Modify Conditions of Release by Miguel Rivera. (Hayes, Tracy) (Entered: 03/11/2021) |
| 03/11/2021 | 16 | ORDER granting 15 Motion to Modify Conditions of Release as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 3/11/2021. (DeRubeis, B.) (Entered: 03/11/2021) |
| 07/29/2021 | 20 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE |

| | | |
|---|---|---|
| | | COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 10/4/2021* Jury Selection has been changed to 10/5/2021 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 07/29/2021) |
| 08/09/2021 | 21 | Consent MOTION to Continue *Jury Selection* by Miguel Rivera. (Hayes, Tracy) (Entered: 08/09/2021) |
| 08/10/2021 | 22 | ORDER granting 21 Motion to Continue as to Miguel Rivera (1). It appearing more time is necessary due to new counsel appearing, the need to prepare for trial, and for counsel to confer with the government and the defendant, the jury selection in this matter is continued until 12/6/2021. The court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 08/10/2021 to and including 12/6/2021 is hereby excluded pursuant to Title 18, U.S.C. 3161(h)(7). SO ORDERED by Judge Janet C. Hall on 8/10/2021. (Lewis, D) (Entered: 08/10/2021) |
| 08/10/2021 | 23 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 10/5/2021* Jury Selection has been changed to 12/6/2021 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 08/10/2021) |
| 08/18/2021 | 24 | Unsecured Surety Bond Entered as to Miguel Rivera in amount of $100,000.00. (Wood, R.) (Entered: 08/18/2021) |
| 08/18/2021 | 25 | ORDER Setting Conditions of Release as to Miguel Rivera.<br>Signed by Judge Thomas O. Farrish on 8/18/2021. (Wood, R.) (Entered: 08/18/2021) |
| 08/18/2021 | 26 | SEALED BAIL INFORMATION SHEET by Miguel Rivera (Wood, R.) (Entered: 08/18/2021) |
| 08/18/2021 | 27 | SEALED SURETY INFORMATION SHEET by Miguel Rivera (Wood, R.) (Entered: 08/18/2021) |
| 10/26/2021 | 28 | Consent MOTION to Continue *Jury Selection* by Miguel Rivera. (Hayes, Tracy) (Entered: 10/26/2021) |
| 10/27/2021 | 29 | Probation Form 8 Petition for Action on Conditions of Pretrial Release as to Miguel Rivera. Signed by Judge Thomas O. Farrish on 10/27/2021. (Wood, R.) (Entered: 10/27/2021) |
| 10/27/2021 | 30 | PS Violation Report No Action as to Miguel Rivera Signed by Judge Thomas O. Farrish on 10/27/2021. (Rafferty, M.) (Entered: 10/27/2021) |
| 10/27/2021 | 31 | ORDER granting 28 Motion to Continue as to Miguel Rivera (1). It appearing that further time is necessary to review the case and determine if going to trial, and for counsel to confer with the government and the defendant, the jury selection in this matter is continued until 2/7/2022. The court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 10/27/2021 to and including 2/7/2022 is hereby excluded pursuant to Title 18, U.S.C. 3161(h)(7). SO ORDERED by Judge Janet C. Hall on 10/27/2021. (Lewis, D) (Entered: 10/27/2021) |
| 10/27/2021 | 32 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 12/6/2021* Jury Selection has been changed to 2/7/2022 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 10/27/2021) |
| 01/13/2022 | 33 | Consent MOTION to Continue *Jury Selection* by Miguel Rivera. (Hayes, Tracy) (Entered: 01/13/2022) |
| 01/14/2022 | 34 | ORDER granting 33 Motion to Continue as to Miguel Rivera (1) on the condition that a Speedy Trial waiver be filed within 21 days from the date of this order. It appearing more time |

| | | |
|---|---|---|
| | | is necessary due to the Superseding Standing Order In Re: Court Operations Under the Exigent Circumstances Created by COVID−19 and the impact of COVID on the ability to prepare for trial, the need to prepare and file appropriate pretrial motions and hold any necessary hearing in connection with the motions, and the need to confer with the client, the jury selection in this matter is continued until 8/1/2022. The court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 1/14/2022 to and including 8/1/2022 is hereby excluded pursuant to Title 18, U.S.C. 3161(h)(7). SO ORDERED by Judge Janet C. Hall on 1/14/2022. (Lewis, D) (Entered: 01/14/2022) |
| 01/14/2022 | 35 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 2/7/2022* Jury Selection has been changed to 8/1/2022 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 01/14/2022) |
| 06/17/2022 | 36 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Status Conference set for 6/29/2022 12:00 PM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference, via telephone. Please use the following dial−in for this call: 1−877−873−8017; Access Code: 6415663#. (Lewis, D) (Entered: 06/17/2022) |
| 06/24/2022 | 37 | Probation Form 8 Petition for Action on Conditions of Pretrial Release as to Miguel Rivera Signed by Judge Thomas O. Farrish on 6/24/2022. (Ogilvie, E) (Entered: 06/24/2022) |
| 06/28/2022 | 39 | MOTION to Suppress by Miguel Rivera. (Hayes, Tracy) (Entered: 06/28/2022) |
| 06/29/2022 | 40 | Minute Entry for proceedings held before Judge Janet C. Hall:Telephone Status Conference as to Miguel Rivera held on 6/29/2022. Government has 21 days to respond to the pending Motion to Suppress; Speedy Trial Act Findings made on the record including the pending motion to suppress that will likely require a hearing and post hearing briefing, and absent any objection, the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 6/29/2022 to and including 1/9/2023 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7). Jury selection set for 1/9/2023; pretrial order and calendar to issue. 12 minutes(Court Reporter Terri Fidanza.)(Lewis, D) (Entered: 06/30/2022) |
| 06/29/2022 | 41 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 8/1/2022* Jury Selection has been changed to 1/9/2023 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 06/30/2022) |
| 07/12/2022 | 42 | MOTION for Pretrial Detention by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 07/12/2022) |
| 07/12/2022 | 43 | MOTION for Pretrial Detention *Revised* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 07/12/2022) |
| 07/12/2022 | | Arrest of Miguel Rivera (Nuzzi, Tiffany) (Entered: 07/12/2022) |
| 07/12/2022 | 44 | Minute Entry for proceedings held before Judge S. Dave Vatti: Initial Appearance as to Miguel Rivera held on 7/12/2022; Detention Hearing and Motion Hearing as to Miguel Rivera held on 7/12/2022, finding as moot 42 Motion for Pretrial Detention as to Miguel Rivera (1); granting 43 Motion for Pretrial Detention as to Miguel Rivera (1). Defendant detained.Total Time: 17 minutes(Court Reporter Courtsmart.) (Nuzzi, Tiffany) (Entered: 07/12/2022) |
| 07/12/2022 | 45 | ORDER as to Miguel Rivera pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No.116−182, 134 Stat. 894 (Oct. 21, 2020). Signed by Judge S. Dave Vatti on 7/12/2022. (Nuzzi, Tiffany) (Entered: 07/12/2022) |

| | | |
|---|---|---|
| 07/13/2022 | 46 | MOTION for Michael J. Gustafson to Withdraw as Attorney by USA as to Miguel Rivera. (Leaming, Brian) (Entered: 07/13/2022) |
| 07/13/2022 | 47 | Order of Revocation of Release and Detention Pending Trial. On July 12, 2022, the Court conducted an initial appearance in connection with the defendant's arrest pursuant to a warrant issued on a Petition for Action on Conditions of Pretrial Release, ECF No. 37 . The government also filed a motion for detention at the time of the defendant's initial appearance following his arrest and sought revocation of the defendant's prior release on conditions. The defendant stipulated to an order of revocation and detention without prejudice. Further, pursuant to 18 U.S.C. Section 3148(b), and for the reasons set forth in detail on the record, the Court finds: (1) it was not practicable to present the defendant before the judicial officer who set conditions of release and whose order is alleged to have been violated, (2) that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, (3) that after consideration of the factors set forth in 18 U.S.C. Section 3142(g), there is no condition or combination of conditions of release that will reasonably assure that the defendant does not pose a danger to the safety of the community, particularly given the nature of the offense which the Court found probable cause to believe the defendant committed while on release and information developed that raises serious concerns as to the suitability of the third party custodian previously in place. Accordingly, pursuant to the defendant's stipulation and the Court's findings, the Court revokes the prior order of release on conditions, ECF No. 25 , and enters an order of detention pending trial, which shall be without prejudice. So Ordered. Signed by Judge S. Dave Vatti on 7/13/2022. (Nuzzi, Tiffany) (Entered: 07/13/2022) |
| 07/14/2022 | 48 | ORDER granting 46 Motion to Withdraw. Attorney Michael J. Gustafson withdrawn from case as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 7/14/2022. (DeRubeis, B.) (Entered: 07/14/2022) |
| 07/18/2022 | 49 | Memorandum in Opposition by USA as to Miguel Rivera re 39 MOTION to Suppress (Attachments: # 1 Exhibit, # 2 Exhibit)(Freismuth, Natasha) (Entered: 07/18/2022) |
| 07/21/2022 | 50 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Motion Hearing as to 39 MOTION to Suppress set for 7/28/2022 09:15 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 07/21/2022) |
| 07/22/2022 | 51 | Consent MOTION to Continue *Motion Hearing* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 07/22/2022) |
| 07/25/2022 | 52 | ORDER granting 51 Motion to Continue as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 7/25/2022. (Lewis, D) (Entered: 07/25/2022) |
| 08/03/2022 | 53 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing as to 39 MOTION to Suppress set for 10/20/2022 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 08/03/2022) |
| 08/30/2022 | 54 | MOTION for Bond by Miguel Rivera. (Attachments: # 1 Exhibit A−C)(Hayes, Tracy) (Entered: 08/30/2022) |
| 09/07/2022 | 55 | ORDER REFERRING CASE to Judge S. Dave Vatti as to Miguel Rivera 54 MOTION for Bond filed by Miguel Rivera to Magistrate Judge Judge S. Dave Vatti<br>SO ORDERED by Judge Janet C. Hall on 9/7/2022. Motions referred to S. Dave Vatti(Lewis, D) (Entered: 09/07/2022) |
| 09/08/2022 | 56 | ORDER as to Miguel Rivera re Evidentiary hearing on Motion to Suppress (Doc. No. 39) set for October 20, 2022: Any exhibit and witness lists must be filed SEPTEMBER 29, 2022. Counsel shall also provide Chambers Copies of such lists, including exhibits, by SEPTEMBER 30, 2022.<br>SO ORDERED by Judge Janet C. Hall on 9/8/2022. (DeRubeis, B.) (Entered: 09/08/2022) |
| 09/08/2022 | 57 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Bond Hearing set for **9/15/2022 01:00 PM** in Magistrate Judge Courtroom, 4th Floor, Room 435, 915 Lafayette Blvd., Bridgeport, CT before Judge S. Dave Vatti (Nuzzi, Tiffany) (Entered: 09/08/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 58 | PRETRIAL ORDER as to Miguel Rivera Jury Trial set for 1/17/2023 09:15 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall Jury Selection set for 1/9/2023 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall<br>Signed by Judge Janet C. Hall on 9/8/2022. (Lewis, D) (Entered: 09/09/2022) |
| 09/13/2022 | 59 | TRANSCRIPT of Proceedings: as to Miguel Rivera. Type of Hearing: Video Initial Appearance, Arraignment, Bond Hearing. Held on 11/9/2020 before Judge Thomas O. Farrish. Court Reporter: Julie Monette. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 10/4/2022. Redacted Transcript Deadline set for 10/14/2022. Release of Transcript Restriction set for 12/12/2022. (Monette, Julie) (Entered: 09/13/2022) |
| 09/13/2022 | 60 | Memorandum in Opposition by USA as to Miguel Rivera re 54 MOTION for Bond (Attachments: # 1 Exhibit WPD Report, # 2 Exhibit CSP Report, # 3 Exhibit CSP SW Affidavit, # 4 Exhibit Photos Second Floor Residence, # 5 Exhibit Photos Firearm and Vest, # 6 Exhibit Lab Report, # 7 Exhibit Photos Garage Search, # 8 Exhibit Photos M. Rivera and A. Rivera, # 9 Exhibit Report Re M. Rivera Identification)(Freismuth, Natasha) (Entered: 09/13/2022) |
| 09/15/2022 | 61 | Minute Entry for proceedings held before Judge S. Dave Vatti: Bond Motion Hearing as to Miguel Rivera held on 9/15/2022, denying 54 Motion for Bond as to Miguel Rivera (1). Defendant detained. Total Time: 52 minutes(Court Reporter Courtsmart.) (Nuzzi, Tiffany) (Entered: 09/15/2022) |
| 09/16/2022 | 62 | ORDER denying 154 Defendant's Motion for Bond. On September 15, 2022, the Court conducted a hearing on defendant's motion for bond, ECF No. 154 , pursuant to 18 U.S.C. Section 3148(b). For the reasons set forth in detail on the record, the Court **DENIES** the motion for bond. In summary, based on the content of a state search warrant affidavit that led to the issuance of a search warrant for defendant's residence and the results of that search warrant, including items seized from the defendant's residence and a detached garage at the premises, the Court finds that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release. In particular, there is probable cause to believe that defendant engaged in narcotics distribution over a significant period of time while on federal pre−trial release and that, in June 2022, he also was unlawfully in possession of a firearm, which was located in the trunk of a vehicle connected to him, all of which places him in violation of pretrial release conditions. Further, the Court has assessed the bond proposal made by the defendant in light of the factors set forth in 18 U.S.C. Section 3142(g) and has concluded that the bond proposal does not reasonably assure the safety of the community and also concludes that defendant, based on the extended pattern of conduct violative of release conditions, cannot be trusted to abide by release conditions. In particular, the proposal gives defendant significant freedom of movement during the work week and the Court would be left solely with the defendant's word that he will not violate release conditions. In light of the pattern of conduct identified by the Court in detail on the record, the Court is unwilling to accept any such assurance by the defendant at this stage. Location monitoring is an insufficient substitute as it cannot prevent criminal activity. Accordingly, the defendant's motion for bond is **DENIED**. So Ordered.<br>Signed by Judge S. Dave Vatti on 9/16/2022. (Nuzzi, Tiffany) (Entered: 09/19/2022) |
| 09/19/2022 | 63 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 10/20/2022*. Evidentiary Hearing set for 10/20/2022 has been changed to 9:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall as to 39 MOTION to Suppress. (DeRubeis, B.) (Entered: 09/19/2022) |
| 09/22/2022 | 64 | NOTICE *Gov Witness List MTS Hearing* by USA as to Miguel Rivera re 63 Calendar Entry,, Set/Reset Motion and R&R Deadlines/Hearings, 56 Order, (Freismuth, Natasha) (Entered: |

| | | |
|---|---|---|
| | | 09/22/2022) |
| 09/22/2022 | 65 | NOTICE *Gov Evidence List MTS Hearing* by USA as to Miguel Rivera re 63 Calendar Entry,, Set/Reset Motion and R&R Deadlines/Hearings, 56 Order, (Freismuth, Natasha) (Entered: 09/22/2022) |
| 09/29/2022 | 66 | NOTICE *Defendant's Exhibit List* by Miguel Rivera (Hayes, Tracy) (Entered: 09/29/2022) |
| 09/30/2022 | 67 | NOTICE *of Related Case* by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 09/30/2022) |
| 10/18/2022 | 68 | MOTION to Withdraw Document 39 MOTION to Suppress by Miguel Rivera. (Hayes, Tracy) (Entered: 10/18/2022) |
| 10/19/2022 | 69 | ORDER granting 68 Motion to Withdraw Document as to Miguel Rivera (1); ORDER withdrawing 39 Motion to Suppress as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 10/19/2022. (DeRubeis, B.) (Entered: 10/19/2022) |
| 10/19/2022 | | Terminate Deadlines and Hearings as to Miguel Rivera: 10/20/2022 Hearing Canceled, deadline terminated. (DeRubeis, B.) (Entered: 10/19/2022) |
| 10/19/2022 | 70 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Change of Plea Hearing set for 11/8/2022 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 10/19/2022) |
| 10/25/2022 | 71 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Bond Hearing. Held on 09/15/22 before Judge S. Dave Vatti. Court Reporter: eScribers, LLC. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 11/15/2022. Redacted Transcript Deadline set for 11/25/2022. Release of Transcript Restriction set for 1/23/2023. (Gottlieb, J) (Entered: 10/25/2022) |
| 11/08/2022 | 72 | ORAL MOTION to Reinstate Motion to Suppress by Miguel Rivera. (Lewis, D) (Entered: 11/14/2022) |
| 11/08/2022 | 73 | Minute Entry for proceedings held before Judge Janet C. Hall: Motion Hearing as to Miguel Rivera held on 11/8/2022; granting 72 Motion as to Miguel Rivera (1); re 72 MOTION filed by Miguel Rivera ; Status Conference as to Miguel Rivera held on 11/8/2022. Hearing changed from a change of plea to a status conference. Oral Motion to Renew Motion to Suppress − granted, motion is reinstated. Defendant to disclose expert by 12/20/2022; defendant to supplement motion to suppress by 1/17/2023; government to disclose expert by 2/3/2023; government to file any supplement by 2/17/2023; jury selection has been rescheduled to 4/3/2023; Speedy Trial Act Findings made on the record; the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 11/8/2022 to and including 4/3/2023 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7). 20 minutes(Court Reporter Terri Fidanza.) (Lewis, D) (Entered: 11/14/2022) |
| 11/08/2022 | 74 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 1/9/2023* Jury Selection has been changed to 4/3/2023 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 11/14/2022) |
| 11/30/2022 | | Terminate Deadlines and Hearings as to Miguel Rivera: Hearing deadline for pretrial conference set for 12/22/2022 terminated in light of jury selection moving to April 2023. (DeRubeis, B.) (Entered: 11/30/2022) |

| | | |
|---|---|---|
| 01/17/2023 | 75 | MOTION for Extension of Time to Extend Suppression Filings until March 3, 2023 by Miguel Rivera. (Hayes, Tracy) (Entered: 01/17/2023) |
| 01/20/2023 | 76 | ATTORNEY APPEARANCE Patricia Stolfi Collins appearing for USA (Collins, Patricia) (Entered: 01/20/2023) |
| 01/20/2023 | 77 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephonic Conference set for 1/25/2023 10:00 AM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference, via telephone. Please use the following dial−in for this call: 1−877−873−8017; Access Code: 6415663#. (DeRubeis, B.) (Entered: 01/20/2023) |
| 01/24/2023 | 78 | NOTICE OF AMENDED E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 1/25/2023*. Status Conference set for 1/25/2023 has been changed to 10:30 AM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Janet C. Hall. Counsel are requested to participate in this conference, via telephone. Please use the following dial−in for this call: 1−877−873−8017; Access Code: 6415663#. (Calendar amended to reflect change in time only.) (DeRubeis, B.) (Entered: 01/24/2023) |
| 01/25/2023 | 79 | Minute Entry for proceedings held before Judge Janet C. Hall: Motion Hearing held on 1/25/2023. 75 Motion for Extension of time to March 3, 2023 to file Suppression Filings − Granted. In light of extended deadlines, jury selection is rescheduled to June 5, 2023. Speedy Trial Act Findings made on the record; the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 1/25/2023 to and including 6/5/2023 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7). 14 minutes(Court Reporter Terri Fidanza.) (Lewis, D) (Entered: 01/25/2023) |
| 01/25/2023 | 80 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 4/3/2023* Jury Selection set for 6/5/2023 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 01/25/2023) |
| 02/01/2023 | 81 | ORDER TO SHOW CAUSE: Counsel for defendant, Miguel Rivera, is hereby **ORDERED TO SHOW CAUSE** why he should not be sanctioned for failure to disclose how long his expert needs to conduct a hand−writing analysis as ordered by the court on January 25, 2023. Such disclosure was due to be filed by close of business on Friday, January 27, 2023 and, to date, no such disclosure has been filed.<br><br>Counsel has until noon on Monday, February 6, 2023 to respond to this ORDER TO SHOW CAUSE or sanctions will enter against him.<br><br>SO ORDERED by Judge Janet C. Hall on 2/1/2023. (Show Cause Response due by 2/6/2023). (DeRubeis, B.) (Entered: 02/01/2023) |
| 02/01/2023 | 82 | STATUS REPORT by Miguel Rivera (Hayes, Tracy) (Entered: 02/01/2023) |
| 02/01/2023 | 83 | Consent MOTION for Order Re: Proposed Scheduling Order Regarding MTS by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 02/01/2023) |
| 02/10/2023 | 84 | ORDER granting 83 Consent MOTION for Order Re: Proposed Scheduling Order Regarding MTS by USA as to Miguel Rivera. SO ORDERED by Judge Janet C. Hall on 2/10/2023. (DeRubeis, B.) (Entered: 02/10/2023) |
| 02/10/2023 | 85 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing re: 39 Motion to Suppress set for 4/25/2023 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 02/10/2023) |

| | | |
|---|---|---|
| 03/05/2023 | 86 | NOTICE *of Intent to Offer Expert Testimony* by Miguel Rivera (Hayes, Tracy) (Entered: 03/05/2023) |
| 03/07/2023 | 87 | Supplemental MOTION to Suppress by Miguel Rivera. (Hayes, Tracy) (Entered: 03/07/2023) |
| 03/17/2023 | 88 | PRETRIAL ORDER as to Miguel Rivera: Pretrial Conference set for 5/18/2023 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall, Jury Selection set for 6/6/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall, Jury Trial set for 6/7/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall.<br>Signed by Judge Janet C. Hall on 3/17/2023. (DeRubeis, B.) (Entered: 03/17/2023) |
| 03/17/2023 | 89 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 5/18/2023 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall, Jury Selection set for 6/6/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall, Jury Trial set for 6/7/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 03/17/2023) |
| 04/05/2023 | 90 | Consent MOTION to Continue *MTS hearing and disclosure deadlines* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 04/05/2023) |
| 04/06/2023 | 91 | NOTICE *Re Expert Witness* by USA as to Miguel Rivera (Attachments: # 1 Exhibit CV)(Freismuth, Natasha) (Entered: 04/06/2023) |
| 04/12/2023 | 92 | ORDER granting 90 Consent MOTION to Continue MTS hearing and disclosure deadlines by USA as to Miguel Rivera. SO ORDERED by Judge Janet C. Hall on 4/12/2023. (DeRubeis, B.) (Entered: 04/12/2023) |
| 04/12/2023 | 93 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 4/25/2023*. Evidentiary Hearing re: 39 Motion to Suppress set for 8/1/2023 01:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (DeRubeis, B.) (Entered: 04/12/2023) |
| 05/01/2023 | 94 | ORDER as to Miguel Rivera: In light of several requests to extend deadlines for supplemental filings relating to defendants Motions to Suppress (Doc. Nos. 39 & 87 ), as well as related requests to extend the hearing date for such Motions, and absent objection from counsel, the hearing date for such Motions is now set for August 1, 2023. Due to the possibility that the court may require additional briefing post hearing, and the need for counsel to prepare for trial once the court issues its ruling on such Motions, the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial. Accordingly, the court finds that the time period of delay from 6/6/2023 to and including 9/25/2023 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7).<br>SO ORDERED by Judge Janet C. Hall on 5/1/2023. (Lewis, D) (Entered: 05/01/2023) |
| 05/01/2023 | 95 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 6/6/2023* Jury Selection has been changed to 9/25/2023 08:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (Lewis, D) (Entered: 05/01/2023) |
| 05/01/2023 | 96 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Motion Hearing re 39 MOTION to Suppress , 87 Supplemental MOTION to Suppress has been changed to 8/1/2023 01:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (Lewis, D) (Entered: 05/01/2023) |
| 05/05/2023 | 97 | PRETRIAL ORDER as to Miguel Rivera: Pretrial Conference set for 9/15/2023 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall; Jury Selection set for 9/25/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall; Jury Trial set for 10/17/2023 09:00 AM in Courtroom One, 141 Church St., |

| | | |
|---|---|---|
| | | New Haven, CT before Judge Janet C. Hall.<br>Signed by Judge Janet C. Hall on 5/3/2023. (DeRubeis, B.) (Entered: 05/05/2023) |
| 07/13/2023 | 98 | NOTICE TO COUNSEL as to Miguel Rivera: In advance of the evidentiary hearing scheduled for August 1, 2023 on defendant's Motion to Suppress (Doc. No. 39 ) and Supplemental Motion to Suppress (Doc. No. 87 ), counsel are hereby ordered to file their witness and exhibit lists by July 19, 2023, and provide chambers copies, including the exhibits, by July 20, 2023. SO ORDERED by Judge Janet C. Hall on 7/13/2023. (DeRubeis, B.) (Entered: 07/13/2023) |
| 07/19/2023 | 99 | Proposed Witness List by USA (Freismuth, Natasha) (Entered: 07/19/2023) |
| 07/19/2023 | 100 | Proposed Exhibit List by USA (Freismuth, Natasha) (Entered: 07/19/2023) |
| 07/20/2023 | 101 | Proposed Exhibit List by USA (Freismuth, Natasha) (Entered: 07/20/2023) |
| 07/20/2023 | 102 | ORDER as to Miguel Rivera: The deadline for disclosure of witnesses and exhibits was yesterday. The court assumes, and advises the parties, that it will not entertain any exhibits or witnesses offered by the defendant.<br>SO ORDERED by Judge Janet C. Hall on 7/20/2023. (Loedel, Michael) Modified text on 7/21/2023 to change the word "motions" to "exhibits" (Sichanh, Christina). (Entered: 07/20/2023) |
| 07/20/2023 | 103 | NOTICE *Defendant's Proposed Exhibit List* by Miguel Rivera (Hayes, Tracy) (Entered: 07/20/2023) |
| 07/20/2023 | 104 | NOTICE *Defendant's Witness List* by Miguel Rivera (Hayes, Tracy) (Entered: 07/20/2023) |
| 07/21/2023 | 105 | Docket Entry Correction as to Miguel Rivera re 102 Order, text modified to remove the word motions and replace it with exhibits. (Sichanh, Christina) (Entered: 07/21/2023) |
| 07/26/2023 | 106 | NOTICE *RE Testimonial Aid* by USA as to Miguel Rivera (Attachments: # 1 Exhibit Gov Ex 9 (Aid))(Freismuth, Natasha) (Entered: 07/26/2023) |
| 08/01/2023 | 107 | Minute Entry for proceedings held before Judge Janet C. Hall: Evidentiary Hearing as to Miguel Rivera held on 8/1/2023. Taking under advisement 39 Motion to Suppress as to Miguel Rivera (1); taking under advisement 87 Motion to Suppress as to Miguel Rivera (1); Speedy Trial Act Findings made on the record; the court finds that a continuance is in the best interest of the defendant and outweighs the public interest in a speedy trial, the court finds that the time period of delay from 9/26/2023 to and including 10/16/2023 is hereby excluded pursuant to Title 18, U.S.C. 3161 (h)(7). Jury Selection is rescheduled to 10/16/2023. Total Time: 4 hours and 7 minutes (Court Reporter Terri Fidanza.) (Langello, Nicholas) Modified file date and text on 9/7/2023 (Langello, Nicholas). (Entered: 08/02/2023) |
| 08/01/2023 | 108 | Marked Exhibit and Witness List as to Miguel Rivera (Langello, Nicholas) Modified file date on 9/7/2023 (Langello, Nicholas). (Entered: 08/02/2023) |
| 08/03/2023 | 109 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *Jury Selection RESET FROM 9/25/2023 09:00 AM*. Jury Selection set for 10/16/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Jury Trial set for 10/17/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall (Langello, Nicholas) (Entered: 08/03/2023) |
| 08/04/2023 | 110 | FOURTH PRETRIAL ORDER as to Miguel Rivera: Pretrial Conference set for 9/27/2023 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Jury Selection set for 10/16/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Jury Trial set for 10/17/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Any objections to this Order shall be made in writing within five (5) days of the issuance of this Order.<br>Signed by Judge Janet C. Hall on 8/4/2023. (DeRubeis, B.) (Entered: 08/04/2023) |
| 08/04/2023 | 111 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 9/27/2023 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. The defendant is required to attend this conference. Jury Selection set for 10/16/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. |

| | | |
|---|---|---|
| | | Jury Trial set for 10/16/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If the defendant is in custody, defense counsel is reminded that civilian clothing is needed for the defendant's appearance at jury selection and trial. (DeRubeis, B.) (Entered: 08/04/2023) |
| 08/04/2023 | 112 | NOTICE OF AMENDED E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 10/16/2023*. Jury Trial set for 10/17/2023 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (Calendar amended to reflect correct date for start of jury trial.) (DeRubeis, B.) (Entered: 08/04/2023) |
| 08/04/2023 | 113 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Motion to suppress. Held on August 1, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 8/25/2023. Redacted Transcript Deadline set for 9/4/2023. Release of Transcript Restriction set for 11/2/2023. (Fidanza, T.) (Entered: 08/04/2023) |
| 08/11/2023 | 114 | MOTION to Withdraw Counsel of Record and Appoint New Counsel by Miguel Rivera. (Attachments: # 1 Envelope)(Freberg, B) (Entered: 08/11/2023) |
| 08/14/2023 | 115 | ORDER REFERRING CASE to Judge S. Dave Vatti as to Miguel Rivera re 114 MOTION to Appoint Counsel filed by Miguel Rivera.<br>SO ORDERED by Judge Janet C. Hall on 8/14/2023. Motions referred to S. Dave Vatti(Sichanh, Christina) (Entered: 08/14/2023) |
| 08/15/2023 | 116 | SUPERSEDING INDICTMENT returned before Judge Maria E. Garcia with the signature of the foreperson redacted. Grand jury number N−22−1 as to Miguel Rivera (1) count(s) 1s. (Langello, Nicholas) (Entered: 08/15/2023) |
| 08/15/2023 | 117 | Unredacted document with FOREPERSON'S SIGNATURE regarding Indictment 116 as to defendant(s)Miguel Rivera. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Langello, Nicholas) (Entered: 08/15/2023) |
| 08/16/2023 | 118 | NOTICE *Post Suppression Hearing Brief* by Miguel Rivera (Hayes, Tracy) (Entered: 08/16/2023) |
| 08/23/2023 | 119 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing set for 8/29/2023 at 01:30 PM re 114 MOTION to Appoint Counsel filed by Miguel Rivera. The hearing is to be held in Magistrate Judge Courtroom, 4th Floor, Room 435, 915 Lafayette Blvd., Bridgeport, CT, before Judge S. Dave Vatti.(Jacques, Djess) (Entered: 08/23/2023) |
| 08/28/2023 | 120 | Memorandum in Opposition by USA as to Miguel Rivera re 39 MOTION to Suppress , 87 Supplemental MOTION to Suppress (Freismuth, Natasha) (Entered: 08/28/2023) |
| 08/29/2023 | 121 | ORDER REFERRING CASE to Judge S. Dave Vatti as to Miguel Rivera for arraignment. SO ORDERED by Judge Janet C. Hall on 8/29/2023. (Sichanh, Christina) (Entered: 08/29/2023) |
| 08/29/2023 | 122 | Minute Entry for Arraignment and Motion Hearing proceeding as to Miguel Rivera held on 8/29/2023 re 114 MOTION to Appoint Counsel filed by Miguel Rivera before Judge S. Dave Vatti. Order denying 114 Motion to Appoint Counsel as to Miguel Rivera entered on 8/29/2023; Plea entered by Miguel Rivera Not Guilty on counts One. Total Time: 1 hours and 3 minutes.(Court Reporter Courtsmart.) (Jacques, Djess) (Jacques, Djess). (Additional attachment(s) added on 9/11/2023: # 1 Corrected minutes) (Jacques, Djess). Modified on 9/11/2023 to correct minutes. (Jacques, Djess). (Entered: 08/30/2023) |

| | | |
|---|---|---|
| 08/30/2023 | 123 | Order. After extensive discussion with defendant and Attorney Hayes, outside of the government's presence, regarding issues and concerns raised by defendant in his Motion to Withdraw Counsel of Record and Appoint New Counsel, ECF No. 114 , defendant was satisfied that the issues were addressed and he elected to continue with Attorney Hayes as his counsel of record. Accordingly, the Motion to Appoint New Counsel, ECF No. 114 , is DENIED without prejudice. So Ordered.<br>Signed by Judge S. Dave Vatti on 8/30/23. (Jacques, Djess). (Entered: 08/30/2023) |
| 09/01/2023 | 124 | REPLY TO RESPONSE to Motion by Miguel Rivera re 87 Supplemental MOTION to Suppress (Hayes, Tracy) (Entered: 09/01/2023) |
| 09/05/2023 | 125 | MOTION in Limine *re Opening Statements* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 09/05/2023) |
| 09/05/2023 | 126 | Consent MOTION to Continue *Pretrial Exhibit Deadlines until Sept. 22, 2023* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 09/05/2023) |
| 09/05/2023 | 127 | MOTION in Limine *Re Impeachment and Notice Redacted* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 09/05/2023) |
| 09/05/2023 | 128 | SEALED MOTION Sealed Motion − by USA as to Miguel Rivera. (Freismuth, Natasha) Modified on 9/11/2023 to correct event category. (Jacques, Djess). (Entered: 09/05/2023) |
| 09/05/2023 | 129 | Sealed Document: sealed document by USA as to Miguel Rivera re 128 SEALED MOTION Sealed Motion − − (Freismuth, Natasha) (Entered: 09/05/2023) |
| 09/07/2023 | 130 | NOTICE *Re 404(b) Evidence* by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 09/07/2023) |
| 09/07/2023 | 131 | Docket Entry Correction as to Miguel Rivera re 122 Order on Motion to Appoint Counsel. Minutes uploaded on the docket.(Jacques, Djess) (Entered: 09/07/2023) |
| 09/07/2023 | 132 | ORDER granting 126 Motion to Continue Pretrial Exhibit Deadlines until Sept. 22, 2023 by USA as to Miguel Rivera (1). SO ORDERED Judge Janet C. Hall on 9/7/2023. (Sichanh, Christina) (Entered: 09/07/2023) |
| 09/18/2023 | 133 | Proposed Jury Instructions by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 09/18/2023) |
| 09/18/2023 | 134 | Proposed Witness List by USA (Freismuth, Natasha) (Entered: 09/18/2023) |
| 09/18/2023 | 135 | Proposed Voir Dire by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 09/18/2023) |
| 09/18/2023 | 136 | NOTICE *Re Gov Proposed Statement of Case* by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 09/18/2023) |
| 09/20/2023 | 137 | RULING: For the reasons stated above, the defendants Motion to Suppress (Doc. No. 39 ) is denied. SO ORDERED by Judge Janet C. Hall on 9/20/2023. (Sichanh, Christina) (Entered: 09/20/2023) |
| 09/22/2023 | 138 | Proposed Exhibit List by USA (Freismuth, Natasha) (Entered: 09/22/2023) |
| 09/22/2023 | 139 | MOTION to Dismiss *the Superseding Indictment* by Miguel Rivera. (Attachments: # 1 Exhibit Exhibit A)(Hayes, Tracy) (Entered: 09/22/2023) |
| 09/22/2023 | 140 | TRIAL MEMO *Statement of the Case* by Miguel Rivera (Hayes, Tracy) (Entered: 09/22/2023) |
| 09/22/2023 | 141 | Proposed Voir Dire by Miguel Rivera (Hayes, Tracy) (Entered: 09/22/2023) |
| 09/24/2023 | 142 | Memorandum in Opposition by Miguel Rivera re 125 MOTION in Limine *re Opening Statements* (Hayes, Tracy) (Entered: 09/24/2023) |
| 09/24/2023 | 143 | Proposed Jury Instructions by Miguel Rivera (Hayes, Tracy) (Entered: 09/24/2023) |
| 09/24/2023 | 144 | Proposed Witness List (Hayes, Tracy) (Entered: 09/24/2023) |
| 09/24/2023 | 145 | Proposed Exhibit List (Hayes, Tracy) (Entered: 09/24/2023) |
| 09/24/2023 | 146 | MOTION Redact Superseding Indictment by Miguel Rivera. (Hayes, Tracy) (Entered: 09/24/2023) |

| | | |
|---|---|---|
| 09/25/2023 | 147 | Memorandum in Opposition by USA as to Miguel Rivera re 139 MOTION to Dismiss *the Superseding Indictment* (Attachments: # 1 Exhibit)(Freismuth, Natasha) (Entered: 09/25/2023) |
| 09/25/2023 | 148 | Memorandum in Opposition by USA as to Miguel Rivera re 146 MOTION Redact Superseding Indictment (Freismuth, Natasha) (Entered: 09/25/2023) |
| 09/25/2023 | 149 | MOTION to Seal Defense filings containing GJ material and unredacted personal identifying information by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 09/25/2023) |
| 09/27/2023 | 150 | ORDER terminating 87 Motion to Suppress as to Miguel Rivera (1). Motion is terminated as moot in light of the court's Ruling (Doc. No. 137). SO ORDERED by Judge Janet C. Hall on 9/27/2023. (DeRubeis, B.) (Entered: 09/27/2023) |
| 09/27/2023 | 151 | RESPONSE/REPLY by USA as to Miguel Rivera re 127 Motion in Limine (Freismuth, Natasha) (Entered: 09/27/2023) |
| 09/27/2023 | 152 | ATTORNEY APPEARANCE: Josh B Ewing appearing for Miguel Rivera (Ewing, Josh) (Entered: 09/27/2023) |
| 09/27/2023 | 153 | Minute Entry for proceedings held before Judge Janet C. Hall: taking under advisement 125 Motion in Limine as to Miguel Rivera (1); taking under advisement 127 Motion in Limine as to Miguel Rivera (1); taking under advisement 128 Sealed Motion as to Miguel Rivera (1); taking under advisement 139 Motion to Dismiss as to Miguel Rivera (1); taking under advisement 146 Motion as to Miguel Rivera (1); granting 149 Motion to Seal as to Miguel Rivera (1); Pretrial Conference as to Miguel Rivera held on 9/27/2023. Total Time: 2 hours and 33 minutes(Court Reporter Terri Fidanza) (Barry, L) (Entered: 09/29/2023) |
| 10/02/2023 | 154 | ORDER: Motion to Dismiss the Superseding Indictment (Doc. 139 ) is denied. The court has issued this Order to avoid the government from taking further steps with respect to a second superseding indictment. A formal ruling will issue shortly.<br>SO ORDERED by Judge Janet C. Hall on 10/2/2023. (DeRubeis, B.) (Entered: 10/02/2023) |
| 10/02/2023 | 155 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Continued Pretrial Conference set for 10/11/2023 01:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. The defendant is required to attend this conference. (DeRubeis, B.) (Entered: 10/02/2023) |
| 10/02/2023 | 156 | Proposed Exhibit List by USA (Freismuth, Natasha) (Entered: 10/02/2023) |
| 10/03/2023 | 157 | ORDER as to Miguel Rivera: The court is considering the government's Motion in Limine to Admit Evidence Under Rule 609 or as Contradiction of Specific Testimony (Doc. No. 127 ) and the government's Supplement to the Motion (Doc. No. 151 ). If the defendant wishes to file a written Opposition to the government's Motion, it must do so by October 5, at 12 p.m.<br>SO ORDERED by Judge Janet C. Hall on 10/3/2023. (DeRubeis, B.) (Entered: 10/03/2023) |
| 10/03/2023 | 158 | ORDER as to Miguel Rivera: The defendant is ordered to produce his proposed exhibits to the court and the government by October 5, at 12 p.m., unless he has already done so. The court notes that the exhibits should have been produced to the court and the government before the pretrial conference on September 27.<br><br>As stated on the record during the pretrial conference on September 27, the defendant must provide the government with the underlying video from which the Video Image, defendant's Exhibit 10, originated. Defense counsel has agreed to allow the government's counsel to watch the video in its original state on the cellphone that recorded it, and to produce a copy of the video to the government's counsel upon request. Defense counsel is ordered to comply with the above by October 6, at 12 p.m.<br><br>SO ORDERED by Judge Janet C. Hall on 10/3/2023. (DeRubeis, B.) (Entered: 10/03/2023) |
| 10/03/2023 | 159 | RULING: For the reasons discussed above, the Motion to Dismiss the SupersedingIndictment (Doc. No. 139 ) is denied. The court will decide whether it will use aninterrogatory by October 11, 2023.<br>SO ORDERED by Judge Janet C. Hall on 10/3/2023. (Sichanh, Christina) (Entered: 10/03/2023) |

| | | |
|---|---|---|
| 10/03/2023 | 160 | RESPONSE/REPLY by USA as to Miguel Rivera re 142 Memorandum in Opposition to Motion *Re Opening Statements* (Freismuth, Natasha) (Entered: 10/03/2023) |
| 10/03/2023 | 161 | First MOTION Impeachment of Defense Witness by USA as to Miguel Rivera. (Collins, Patricia) (Entered: 10/03/2023) |
| 10/04/2023 | 162 | Proposed Jury Instructions by USA as to Miguel Rivera (Attachments: # 1 Supplement Tracked Changes)(Freismuth, Natasha) (Entered: 10/04/2023) |
| 10/05/2023 | 163 | Proposed Exhibit List (Hayes, Tracy) (Entered: 10/05/2023) |
| 10/06/2023 | 164 | SEALED MOTION − by Miguel Rivera. (Ewing, Josh) (Entered: 10/06/2023) |
| 10/06/2023 | 165 | SEALED MOTION − by Miguel Rivera. (Attachments: # 1 SEALED)(Ewing, Josh) (Entered: 10/06/2023) |
| 10/06/2023 | 166 | RESPONSE/REPLY by Miguel Rivera *Opposing Government Motion on Impeachment of Defense Witness* (Hayes, Tracy) (Entered: 10/06/2023) |
| 10/06/2023 | 167 | Motion in Limine to Exclude Evidence of Prior Convictions Under Rule 609 by Miguel Rivera (Hayes, Tracy) Modified on 10/11/2023 to change event type (Barry, L). (Entered: 10/06/2023) |
| 10/09/2023 | 168 | Motion in Limine to Exclude References to Bullet Proof Vest by Miguel Rivera (Hayes, Tracy) Modified on 10/11/2023 to change event type (Barry, L). (Entered: 10/09/2023) |
| 10/11/2023 | 169 | Proposed Witness List by USA (Freismuth, Natasha) (Entered: 10/11/2023) |
| 10/11/2023 | 171 | Minute Entry for proceedings held before Judge Janet C. Hall: granting 125 Motion in Limine as to Miguel Rivera (1); taking under advisement 127 Motion in Limine as to Miguel Rivera (1); granting 128 Sealed Motion as to Miguel Rivera (1); finding as moot 146 Motion as to Miguel Rivera (1); denying 161 Motion as to Miguel Rivera (1); granting 164 Sealed Motion as to Miguel Rivera (1); taking under advisement 167 Motion in Limine as to Miguel Rivera (1); granting in part and denying in part 168 Motion in Limine as to Miguel Rivera (1); Pretrial Conference as to Miguel Rivera held on 10/11/2023 Total Time: 2 hours and 2 minutes(Court Reporter Terri Fidanza) (Barry, L) (Entered: 10/12/2023) |
| 10/12/2023 | 170 | ORDER granting 165 Sealed Motion as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 10/12/2023. (Sichanh, Christina) (Entered: 10/12/2023) |
| 10/12/2023 | 172 | Proposed Witness List (Hayes, Tracy) (Entered: 10/12/2023) |
| 10/13/2023 | 173 | ORDER: After a review of the party's Motions, and following a September 27, 2023, pretrial conference and an October 11, 2023, pretrial conference, both of which were on the record, the government's Motion in Limine to Admit Evidence Under Rule 609 (Doc. No. 127 ), should the defendant testify, is granted in part and denied in part. The defendant's Motion in Limine to Exclude Evidence Under Rule 609 (Doc. No. 167 ) is granted in part and denied in part.<br><br>The government may not offer evidence of the defendant's prior conviction for Carrying a Pistol Without a Permit. According to the government's Supplemental Response providing the dates of conviction and the respective dates of release from confinement of the defendant (Doc. No. 151 ), which the defendant does not dispute, the defendant was released from confinement for this charge over ten years ago, on or about February 19, 2013. The court finds that the defendant's conviction does not meet the heightened balancing test under Federal Rule of Evidence 609(b). Illegally possessing a firearm is not highly probative of truthfulness, see United States v. Agostini, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003), and the similarity between the pistol crime and the alleged crime at issue here creates a significant risk of prejudice to the defendant.<br><br>If the defendant testifies, the government may offer evidence of the defendant's convictions for Burglary in the First Degree and Robbery in the Third Degree. According to the undisputed information provided by the government (Doc. No. 151 ), the defendant was released from custody for both charges within the last ten yearson or about March 22, 2019, for burglary, and on or about May 21, 2014, for robbery. Courts have held that crimes such as burglary and robbery are probative of truthfulness under Federal Rule of Evidence 609(a)(1). See United States v. Estrada, 430 F.3d 606, 617−18 (2d Cir. 2005); United States v. Thomas, 214 F. Supp. 3d 187, 196 (E.D.N.Y. 2016). However, as discussed and agreed to on the record at the October 11, 2023, pretrial conference, with respect to both convictions, the government may |

| | | |
|---|---|---|
| | | only offer evidence of: (1) the name of the crime and statute under which the defendant was convicted, (2) the date of the conviction, and (3) the sentence. Given these limits, the court finds, pursuant to Federal Rule of Evidence 403, that the probative value for truthfulness of this evidence outweighs the danger for unfair prejudice to the defendant.<br><br>Therefore, the government's Motion in Limine (Doc. No. 127 ) is granted with respect to the Burglary and Robbery convictions and denied with respect to the Carrying a Pistol Without a Permit conviction. The defendant's Motion in Limine (Doc. No. 167 ) is denied with respect to the Burglary and Robbery convictions and granted with respect to the Carrying a Pistol Without a Permit conviction.<br><br>SO ORDERED by Judge Janet C. Hall on 10/13/2023. (Sichanh, Christina) (Entered: 10/13/2023) |
| 10/13/2023 | 174 | MOTION for Reconsideration *of Court's Ruling Re Doc. 168* by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 10/13/2023) |
| 10/13/2023 | 175 | Proposed Exhibit List (Hayes, Tracy) (Entered: 10/13/2023) |
| 10/13/2023 | 176 | Consent MOTION to Continue *Final Revocation Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 10/13/2023) |
| 10/16/2023 | 177 | ORDER terminating as moot 176 Motion to Continue as to Miguel Rivera (1). This Motion was filed in error on the wrong case. SO ORDERED by Judge Janet C. Hall on 10/16/2023. (DeRubeis, B.) (Entered: 10/16/2023) |
| 10/16/2023 | 178 | Minute Entry for proceedings held before Judge Janet C. Hall: Jury Selection as to Miguel Rivera held on 10/16/2023. Voir Dire begun on 10/16/2023 Miguel Rivera (1) on Count 1s. Motion Hearing as to Miguel Rivera held on 10/16/2023 re 174 MOTION for Reconsideration *of Court's Ruling Re Doc. 168* filed by USA, Order denying 174 Motion for Reconsideration re 174 MOTION for Reconsideration. ( Jury Trial set for 10/17/2023 at 10:15 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall). Total Time: 7 hours and 55 minutes.(Court Reporter Terri Fidanza.) (Murphy, Tatihana) (Entered: 10/16/2023) |
| 10/17/2023 | 179 | Proposed Exhibit List (Hayes, Tracy) (Entered: 10/17/2023) |
| 10/17/2023 | 180 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Trial will continue on 10/18/2023 at 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. (Murphy, Tatihana) (Entered: 10/17/2023) |
| 10/17/2023 | 181 | Minute Entry for proceedings held before Judge Janet C. Hall:Jury Trial as to Miguel Rivera held on 10/17/2023. Jury Trial Continued Until 10/18/2023. Total Time: 7 hours and 15 minutes.(Court Reporter Terri Fidanza.)(Murphy, Tatihana) (Entered: 10/18/2023) |
| 10/18/2023 | 182 | Minute Entry for proceedings held before Judge Janet C. Hall:Jury Trial as to Miguel Rivera held on 10/18/2023. Jury Trial Continued Until 10/19/2023. ( Jury Trial set for 10/19/2023 at 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall). Total Time: 7 hours and 26 minutes.(Court Reporter Terri Fidanza.)(Murphy, Tatihana) (Entered: 10/18/2023) |
| 10/19/2023 | 183 | Minute Entry for proceedings held before Judge Janet C. Hall:Jury Trial as to Miguel Rivera held on 10/19/2023. Total Time: 6 hours and 30 minutes. (Court Reporter Terri Fidanza.)(Murphy, Tatihana) (Entered: 10/19/2023) |
| 10/19/2023 | 184 | JURY VERDICT with foreperson's signature redacted as to Miguel Rivera (1) Guilty on Count 1s. (Murphy, Tatihana) (Entered: 10/19/2023) |
| 10/19/2023 | 185 | Unredacted document with FOREPERSON'S SIGNATURE regarding Jury Verdict 184 as to defendant(s)Miguel Rivera. Access to the pdf document is restricted pursuant to Federal Rule of Criminal Procedure 49.1(e). (Murphy, Tatihana) (Entered: 10/19/2023) |
| 10/20/2023 | 186 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Excerpt of Day 1 of Trial −−Testimony only. Held on October 17, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a |

| | | |
|---|---|---|
| | | Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 11/10/2023. Redacted Transcript Deadline set for 11/20/2023. Release of Transcript Restriction set for 1/18/2024. (Fidanza, T.) (Entered: 10/20/2023) |
| 10/20/2023 | 187 | ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Miguel Rivera. First Disclosure−PSI due 12/1/2023. Objections Due 12/15/2023. 2nd−Disclosure PSI due 12/26/2023. Sentencing Memorandum due 1/2/2024. Response due 1/9/2024. Sentencing set for 1/16/2024 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall.<br>Signed by Judge Janet C. Hall on 10/20/2023. (Murphy, Tatihana) (Entered: 10/20/2023) |
| 10/20/2023 | 188 | Marked Witness List as to Miguel Rivera. (Murphy, Tatihana) (Entered: 10/20/2023) |
| 10/20/2023 | 189 | Marked Exhibit List as to Miguel Rivera. (Murphy, Tatihana) (Entered: 10/23/2023) |
| 10/25/2023 | 190 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Sentencing set for 1/16/2024 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Defendant's sentencing memorandum shall be filed no later than fourteen (14) days prior to the sentencing date, and any response by the government shall be filed no later than seven (7) days prior to the sentencing date. (DeRubeis, B.) (Entered: 10/25/2023) |
| 11/17/2023 | 191 | Acknowledgment of Receipt of Government Exhibits as to Miguel Rivera (Sichanh, Christina) (Entered: 11/17/2023) |
| 11/28/2023 | 192 | Acknowledgment of Receipt of Defendant's Exhibits as to Miguel Rivera (Sichanh, Christina) (Entered: 11/28/2023) |
| 11/30/2023 | 193 | Consent MOTION to Continue *Sentence Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 11/30/2023) |
| 12/01/2023 | 194 | ORDER granting 193 Motion to Continue Sentencing as to Miguel Rivera (1). Motion is granted. Within 7 days from the date of this Order, counsel for defendant is ordered to submit a status report as to the name of the mental health person retained, and his/her expected date of submitting his/her report to counsel.<br>SO ORDERED by Judge Janet C. Hall on 12/1/2023. (DeRubeis, B.) (Entered: 12/01/2023) |
| 12/01/2023 | 195 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 1/16/2024*. Sentencing set for 4/16/2024 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. The Probation Office is directed to prepare a Presentence Investigation Report consistent with the new sentencing date. Defendant's sentencing memorandum shall be filed no later than fourteen (14) days prior to the sentencing date, and any response by the government shall be filed no later than seven (7) days prior to the sentencing date. (DeRubeis, B.) (Entered: 12/01/2023) |
| 12/12/2023 | 196 | STATUS REPORT *re Expert* by Miguel Rivera (Hayes, Tracy) (Entered: 12/12/2023) |
| 02/05/2024 | 197 | MOTION for Bond *for Temporary Release to Attend Funeral Services* by Miguel Rivera. (Hayes, Tracy) (Entered: 02/05/2024) |
| 02/08/2024 | 198 | ORDER The defendants 197 Motion for Temporary Release as to Miguel Rivera (1) is granted in part. The same conditions imposed by Judge Garcia in United States v. Rivera, 22−cr−201, Doc. No. 40, are imposed by this court. In addition, the court further orders that, if at any time the defendant is not in the presence of a member of the Federal Public Defenders Office, the Federal Public Defender must immediately notify the Probation Office and the undersigneds Chambers. SO ORDERED by Judge Janet C. Hall on 2/8/2024. (Barry, L) (Entered: 02/08/2024) |

| | | |
|---|---|---|
| 02/08/2024 | 199 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Excerpt of Day 2 of trial. Testimony of Farrell Shriver. Held on October 18, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter before and after the deadline for Release of Transcript Restriction. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/29/2024. Redacted Transcript Deadline set for 3/10/2024. Release of Transcript Restriction set for 5/8/2024. (Fidanza, T.) (Entered: 02/08/2024) |
| 03/04/2024 | 200 | Consent MOTION to Continue *Sentence Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 03/04/2024) |
| 03/06/2024 | 201 | ORDER granting in part for 45 days 200 Motion to Continue Sentencing as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 3/6/2024. (DeRubeis, B.) (Entered: 03/06/2024) |
| 03/06/2024 | 202 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 4/16/2024*. Sentencing set for 5/23/2024 09:30 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Defendant's sentencing memorandum shall be filed no later than fourteen (14) days prior to the sentencing date, and any response by the government shall be filed no later than seven (7) days prior to the sentencing date. (DeRubeis, B.) (Entered: 03/06/2024) |
| 05/09/2024 | 203 | MOTION for Forfeiture of Property by USA as to Miguel Rivera. (Attachments: # 1 Text of Proposed Order)(Freismuth, Natasha) (Entered: 05/09/2024) |
| 05/14/2024 | 204 | ORDER granting 203 Motion for Preliminary Order of Forfeiture of Property as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 5/13/2024. (DeRubeis, B.) (Entered: 05/14/2024) |
| 05/14/2024 | 205 | PRELIMINARY ORDER DIRECTING FORFEITURE OF PROPERTY as to Miguel Rivera. Signed by Judge Janet C. Hall on 5/13/2024. (DeRubeis, B.) (Entered: 05/14/2024) |
| 05/15/2024 | 206 | Consent MOTION to Continue *Sentence Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 05/15/2024) |
| 05/16/2024 | 207 | ORDER granting 206 Motion to Continue Sentencing as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 5/16/2024. (DeRubeis, B.) (Entered: 05/16/2024) |
| 05/16/2024 | 208 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 5/23/2024*. Sentencing set for 9/25/2024 at 10:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Defendant's sentencing memorandum shall be filed no later than fourteen (14) days prior to the sentencing date, and any response by the government shall be filed no later than seven (7) days prior to the sentencing date. (DeRubeis, B.) (Entered: 05/16/2024) |
| 08/13/2024 | 209 | Consent MOTION to Continue *Sentence Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 08/13/2024) |
| 08/14/2024 | 210 | ORDER granting 209 Motion to Continue as to Miguel Rivera (1). The court expects this is the last extension. A calendar will issue in a few weeks for a date in November. SO ORDERED by Judge Janet C. Hall on 8/14/2024. (Barry, L.) (Entered: 08/14/2024) |
| 09/04/2024 | 211 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 9/25/2024*. Sentencing set for 11/5/2024 at 10:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. Defendant's sentencing memorandum shall be filed no later than fourteen (14) days prior to the sentencing date, and any response by the government shall be filed no later than seven (7) days prior to the sentencing date. (DeRubeis, B.) (Entered: |

| | | |
|---|---|---|
| | | 09/04/2024) |
| 09/18/2024 | 212 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED − government and defense counsel)* as to Miguel Rivera. (available to USA, Miguel Rivera) (Attachments: # 1 Financial Statement)(Nagy, M.) (Entered: 09/18/2024) |
| 10/11/2024 | 213 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED − government and defense counsel)* as to Miguel Rivera. (available to USA, Miguel Rivera) (Attachments: # 1 Addendum, # 2 Financial Statement)(Nagy, M.) (Entered: 10/11/2024) |
| 10/11/2024 | 214 | Sealed Sentencing Recommendation: as to Miguel Rivera (Nagy, M.) (Entered: 10/11/2024) |
| 10/29/2024 | 215 | SENTENCING MEMORANDUM by USA as to Miguel Rivera (Freismuth, Natasha) (Entered: 10/29/2024) |
| 10/30/2024 | 216 | Consent MOTION to Continue *Sentence Hearing* by Miguel Rivera. (Hayes, Tracy) (Entered: 10/30/2024) |
| 10/31/2024 | 217 | ORDER granting 216 Motion to Continue Sentencing as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 10/31/2024. (DeRubeis, B.) (Entered: 10/31/2024) |
| 10/31/2024 | 218 | NOTICE OF E−FILED CALENDAR as to Miguel Rivera: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 11/5/2024*. Sentencing set for 11/22/2024 at 10:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Janet C. Hall. If defendant intends to file a sentencing memorandum, it is due by 11/15/2024. (DeRubeis, B.) (Entered: 10/31/2024) |
| 11/01/2024 | 219 | SENTENCING MEMORANDUM by Miguel Rivera (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Hayes, Tracy) (Entered: 11/01/2024) |
| 11/01/2024 | 220 | MOTION to Seal Memorandum in Aid of Sentencing and Exhibit 6, MOTION to File Redacted Memorandum in Aid of Sentencing re 219 Sentencing Memorandum by Miguel Rivera. (Hayes, Tracy) (Entered: 11/01/2024) |
| 11/01/2024 | 221 | Sealed Document: Memorandum in Aid of Sentencing and Exhibit 6 by Miguel Rivera re 219 Sentencing Memorandum, 220 MOTION to Seal Memorandum in Aid of Sentencing and Exhibit 6 MOTION to File Redacted Memorandum in Aid of Sentencing re 219 Sentencing Memorandum − (Attachments: # 1 Exhibit 6)(Hayes, Tracy) (Entered: 11/01/2024) |
| 11/13/2024 | 222 | ORDER granting 220 Motion to Seal as to Miguel Rivera (1); granting 220 Motion to File Redacted Memorandum as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 11/13/2024. (Barry, L.) (Entered: 11/13/2024) |
| 11/17/2024 | 223 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Day 1 of Jury Trial. Held on October 17, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 12/8/2024. Redacted Transcript Deadline set for 12/18/2024. Release of Transcript Restriction set for 2/15/2025. (Fidanza, T.) (Entered: 11/17/2024) |
| 11/17/2024 | 224 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Day 2 of Jury Trial. Held on October 18, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal |

| | | |
|---|---|---|
| | | information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 12/8/2024. Redacted Transcript Deadline set for 12/18/2024. Release of Transcript Restriction set for 2/15/2025. (Fidanza, T.) (Entered: 11/17/2024) |
| 11/17/2024 | 225 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Day 3 of Jury Trial (Verdict). Held on October 19, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 12/8/2024. Redacted Transcript Deadline set for 12/18/2024. Release of Transcript Restriction set for 2/15/2025. (Fidanza, T.) (Entered: 11/17/2024) |
| 11/20/2024 | 226 | NOTICE *of Supplemental Exhibits* by Miguel Rivera re 219 Sentencing Memorandum (Hayes, Tracy) (Entered: 11/20/2024) |
| 11/21/2024 | 227 | PRESENTENCE INVESTIGATION REPORT (Supplement − Second Addendum to the PSR) *(SEALED − government and defense counsel)* as to Miguel Rivera. (available to Miguel Rivera, USA) (Nagy, M.) (Entered: 11/21/2024) |
| 11/22/2024 | 228 | Minute Entry for proceedings held before Judge Janet C. Hall: Sentencing as to Miguel Rivera held on 11/22/2024. The defendant is sentenced to a term of imprisonment of 60 months. Upon release the defendant shall be placed on supervised release for a total term of 3 years. Special assessment of $100.00 shall be paid immediately. Total Time: 1 hour and 34 minutes (Court Reporter Terri Fidanza.) (Barry, L.) (Entered: 11/25/2024) |
| 11/25/2024 | 229 | MOTION to Dismiss by USA as to Miguel Rivera. (Freismuth, Natasha) (Entered: 11/25/2024) |
| 11/26/2024 | 230 | ORDER granting 229 Motion to Dismiss as to Miguel Rivera (1). SO ORDERED by Judge Janet C. Hall on 11/26/2024. (Barry, L.) (Entered: 11/26/2024) |
| 11/26/2024 | 231 | JUDGMENT as to Miguel Rivera (1), Count(s) 1, Dismissed by Government Motion.; Count(s) 1s, The defendant is sentenced to a term of imprisonment of 60 months. Upon release the defendant shall be placed on supervised release for a total term of 3 years. Special assessment of $100.00 shall be paid immediately.<br>Signed by Judge Janet C. Hall on 11/26/2024. (Barry, L.) (Entered: 11/26/2024) |
| 11/26/2024 | 232 | DISMISSAL OF COUNTS as to Miguel Rivera. (Barry, L.) (Entered: 11/26/2024) |
| 11/26/2024 | | JUDICIAL PROCEEDINGS SURVEY − FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi−bin/Dispatch.pl?crsurvey<br>(Barry, L.) (Entered: 11/26/2024) |
| 11/26/2024 | 233 | NOTICE OF APPEAL by Miguel Rivera re 231 Judgment, (Hayes, Tracy) (Entered: 11/26/2024) |
| 11/27/2024 | 234 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 233 Notice of Appeal − Final Judgment. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none. (Barry, L.) (Entered: 11/27/2024) |

| | | |
|---|---|---|
| 12/02/2024 | 235 | Statement of Reasons *(SEALED − government and defense counsel)* as to Miguel Rivera. (available to Miguel Rivera, USA) (Nagy, M.) (Entered: 12/02/2024) |
| 12/17/2024 | 236 | ORDER Returning Submission as Deficient as to Miguel Rivera Signed by Judge Janet C. Hall on 12/17/2024. (Barry, L.) (Entered: 12/17/2024) |
| 12/29/2024 | 237 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Sentencing Hearing. Held on November 22, 2024 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/21/2025. Redacted Transcript Deadline set for 1/29/2025. Release of Transcript Restriction set for 3/31/2025. (Fidanza, T.) (Entered: 12/29/2024) |
| 01/26/2025 | 238 | SEALED TRANSCRIPT of Proceedings as to Miguel Rivera held on September 27, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. Type of Hearing: Pretrial Hearing. (Fidanza, T.) (Entered: 01/26/2025) |
| 01/26/2025 | 239 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Pretrial Hearing. Held on September 27, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/17/2025. Redacted Transcript Deadline set for 2/26/2025. Release of Transcript Restriction set for 4/28/2025. (Fidanza, T.) (Entered: 01/26/2025) |
| 04/16/2025 | 240 | TRANSCRIPT of Proceedings: as to Miguel Rivera Type of Hearing: Status conference held post jury selection. Held on October 16, 2023 before Judge Janet C. Hall. Court Reporter: Terri Fidanza. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/7/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/15/2025. (Fidanza, T.) (Entered: 04/16/2025) |

SEP 22 2020 PM4:26
FILED-USDC-CT-HARTFORD

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GRAND JURY H-19-1

UNITED STATES OF AMERICA

v.

MIGUEL RIVERA, a.k.a. "Macho"

CRIMINAL NO. 3:20CR___ ( )

VIOLATION:

18 U.S.C. §§ 922(g)(1) & 924(a)(2)
(Unlawful Possession of a Firearm by a Felon)

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Unlawful Possession of a Firearm by a Felon)

1. On or about July 5, 2020, in the District of Connecticut, the defendant MIGUEL RIVERA, a.k.a. "Macho," having been, and knowing that he had been, convicted in the Superior Court of the State of Connecticut of a crime punishable by a term of imprisonment exceeding one year, namely: (a) Carrying a Firearm without a Permit, in violation of Connecticut General Statutes § 29-35(a), on or about March 12, 2012, (b) Robbery in the Third Degree, in violation of Connecticut General Statues § 53a-136, on or about April 18, 2013, and (c) Burglary in the First Degree, in violation of Connecticut General Statutes § 53a-101(a)(2), on or about August 17, 2015, knowingly and intentionally possessed a firearm in and affecting commerce, that is, a Romarm/Cugir, AK Type Model, 7.62 x 39mm caliber, semi-automatic rifle, bearing serial number 1964-CD0611 and containing a fully loaded large capacity 30-round magazine, that had been shipped and transported in interstate and foreign commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

FORFEITURE ALLEGATION
(Firearm Offense)

2. Upon conviction of the firearm offense alleged in this Indictment, the defendant MIGUEL RIVERA, a.k.a. "Macho," shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), the firearm and ammunition involved in the commission of this offense, including but not limited to: a Romarm/Cugir, AK Type Model, 7.62 x 39mm caliber, semi-automatic rifle, bearing serial number 1964-CD0611, and 30 rounds of 7.62 x 39mm caliber ammunition associated with that firearm, all of which were seized from the defendant on or about July 5, 2020.

All in accordance with Title 18, United States Code, Section 924, and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

/s/

FOREPERSON

UNITED STATES OF AMERICA

LEONARD C. BOYLE
FIRST ASSISTANT UNITED STATES ATTORNEY

MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY

AUG 15 2023 PM2:08
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-22-1

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:20CR168 (JCH) |
| v. | VIOLATIONS: |
| MIGUEL RIVERA, a.k.a. "Macho" | 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Unlawful Possession of a Firearm and Ammunition by a Felon) |

SUPERSEDING INDICTMENT

The Grand Jury charges:

COUNT ONE
(Unlawful Possession of a Firearm and Ammunition by a Felon)

1. On or about July 5, 2020, in the District of Connecticut, the defendant MIGUEL RIVERA having been, and knowing that he had been, previously convicted of a crime punishable by imprisonment for a term exceeding one year in the Superior Court of the State of Connecticut, specifically:

a. Burglary in the First Degree, in violation of Conn. Gen. Stat. § 53a-101(a)(2), on or about August 17, 2015;

b. Robbery in the Third Degree, in violation of Conn. Gen. Stat. § 53a-136, on or about April 18, 2013; and

c. Carrying a Pistol without a Permit, in violation of Conn. Gen. Stat. § 29-35(a), on or about March 12, 2012,

did knowingly possess a firearm and ammunition in and affecting interstate and foreign commerce, that is: (a) one Romarm/Cugir WASR 10, AK Type Model, 7.62x39mm caliber, semi-automatic rifle bearing serial number 1964-CD0611; (b) approximately 30 rounds of Tula 7.62x39mm

ammunition; and (c) one round of Prvi Partizan (PPU) 5.56x45mm ammunition, all of which had been shipped and transported in interstate and foreign commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

FORFEITURE ALLEGATION
(Firearm Offense)

2. Upon conviction of the offense alleged in Count One of this Superseding Indictment, the defendant MIGUEL RIVERA shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in the commission of the offense, including but not limited to the following: (a) one Romarm/Cugir, WASR 10 AK Type Model rifle, 7.62x39mm caliber, semi-automatic rifle bearing serial number 1964-CD0611; (b) approximately 30 rounds of Tula 7.62x39mm ammunition; and (c) one round of Prvi Partizan (PPU) 5.56x45mm ammunition, all of which were seized on or about July 5, 2020.

All in accordance with Title 18, United States Code, Section 924(d); Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461(c); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL

______________________________
FOREPERSON

UNITED STATES OF AMERICA

Vanessa Roberts Avery
VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

Natasha M. Freismuth
NATASHA M. FREISMUTH
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA)
vs. ) September 27, 2023
MIGUEL RIVERA ) 3:20cr168(JCH)
Defendant. ) 2:04 p.m.

141 Church Street
New Haven, Connecticut

PRETRIAL CONFERENCE

B E F O R E:

THE HONORABLE JANET C. HALL, U. S. D. J.

FOR THE GOVERNMENT:

Natasha Freismuth
U.S. Attorney's Office
157 Church St., 25th Floor
New Haven, CT 06510

Patricia Stolfi Collins
United States Attorney Office
157 Church Street
New Haven, CT 06510

FOR THE DEFENDANT:

Tracy Hayes
Federal Public Defender's Office
265 Church St., Suite 702
New Haven, CT 06510-7005

14:04:43

15:59:25 all I've got to do. We'll do it. We'll get this in. We got way off on jury selection. Where were we? I couldn't recall.

15:59:38 I get a motion to dismiss. I will confess, I haven't carefully read it and my law clerk hasn't researched it. So I will deal with that in a brief written ruling. I guess I say brief. Obviously my considerations isn't brief, but my reasons will be succinct. If anybody wants me to articulate, I will invite them in that brief ruling and I will do it on record when I have time. I don't know what my decision is going to be. I've had the issue not for a while. I can't remember. I think I know which way it goes. I don't know for sure so I have to go back and read the cases. Sorry. I can't resolve that one for you right now. Attorney Freismuth, you look broken hearted.

16:00:32 MS. FREISMUTH: I'm wondering if you have an idea when, Your Honor. If the defendant wants to charge him in two counts, I could go to grand jury. It won't delay trial. Under the Speedy Trial Act, there's no prejudice if it is the same conduct. But obviously I can't get an indictment the same day as trial.

16:00:52 THE COURT: There's no jury sitting tomorrow or the next day?

16:00:55 MS. FREISMUTH: No. I can go next week which is

16:01:00 why I'm with wondering if the court will have an idea.

16:01:07 THE COURT: We have a humongous ruling that I
16:01:10 hoped to get out.

16:01:11 MS. FREISMUTH: As I indicated in my opposition,
16:01:14 even if the Court were to find he should have been
16:01:16 charged in two separate counts, doesn't need to be a
16:01:20 division.

16:01:22 THE COURT: That's a question I had, Attorney
16:01:23 Hayes. Put aside that she can get another indictment.
16:01:28 Why isn't this issue -- I understand your argument. I'm
16:01:33 not being critical of you making it. Isn't it solved,
16:01:37 can't I ask the jury to answer a special interrogatory
16:01:40 like we do on drug quantity? Do you find that the
16:01:46 defendant, Mr. Rivera, however I phrase it. I'm not
16:01:50 saying it properly. It will be done properly. Do you
16:01:53 find he possessed the firearm charge or I'll describe it.
16:01:58 That's one. Yes or no. Do you find two. Do you find he
16:02:03 possessed the ammunition charge, yes, no. You must
16:02:07 answer each of the two questions. It is part of the
16:02:12 verdict. I could make it questions under the count. If
16:02:16 you found him guilty, have you found unanimously all 12
16:02:23 he possessed the firearm, yes or no. All 12 unanimously
16:02:27 he possessed the ammunition and I will have charged him.
16:02:28 You can't find him guilty if six of you think he had the
16:02:32 gun and six think he has the ammunition.

16:02:35 MS. FREISMUTH: Under the Government's reading of the case, they actually can disagree in terms of ammo or firearm. It is a means to an element, not the element itself.

16:02:45 THE COURT: Then I don't know when you are going to get the answer. I never heard of that. I'm not saying you are wrong. Maybe I'm hung up on the drug issue.

16:02:57 MS. FREISMUTH: It is different than drugs that carry mandatory weight. It is similar in terms of how in a (b)(1)(C) charge. They don't need to agree on cocaine or heroin. They have to agree it is a controlled substance. They are required to agree he possessed some type of weapon.

16:03:15 THE COURT: Half of them could say oh, I think he had a gun and the other half could say he has ammunition?

16:03:19 MS. FREISMUTH: Yes, Your Honor. The second Circuit hasn't ruled on it, but every other circuit that has addressed it is very clear.

16:03:25 THE COURT: Give me a break, Attorney Freismuth.

16:03:29 MR. HAYES: Right.

16:03:30 THE COURT: Seriously.

16:03:30 MR. HAYES: Although the Court did pose the question to me, again all the Government's examples, case

law are from the Ninth and Seventh Circuit.

MS. FREISMUTH: Just clarification also the Sixth and the Fourth.

THE COURT: Why shouldn't she go to the grand jury next week?

MR. HAYES: She can.

THE COURT: So he's going to face two counts. Except I suppose your answer -- I'm sorry. I have to finish this thought. It is mind-boggling to me.

If she separates it into two counts under what you just said the jury could find as currently pled, he would be not guilty on both counts.

MS. FREISMUTH: Yes, Your Honor.

It is two different issues, though.

THE COURT: It may be two different issues but the consequences for the defendant are enormous. He's looking at forty years or he's looking at zero years.

MS. FREISMUTH: To be fair, the Government doesn't believe he should be charged in two separate counts. I believe it's a single count and the case law is clear they are possessed in the same series of events. What he's asking for would expose his client to twice the penalty.

THE COURT: I understand that. I don't understand how you get away with less than unanimity.

MS. FREISMUTH: The Government looked into the issue fully in terms of making the charging decision.

THE COURT: That doesn't tell me anything. No offense. I'm not supposed to rely on what you say. I've spent 26 years having hammered into me both by a affirms and reversals, there has to be unanimity.

I do know the law it can be two different kinds of drugs. You don't have to know. You are saying it is the same as that.

MS. FREISMUTH: It is, Your Honor. It is a means to an element.

THE COURT: Do you dispute that that's true about the type of drugs and the proof?

MS. FREISMUTH: In terms of a (b)(1)(C) quantity when there's no man min, they do not need to agree.

THE COURT: Just to be guilty of the crime of possession with intent, it can be any drug within the schedule and it may be on one day he had one kind, another day another. Some of the jurors think that one day they didn't have good evidence. The others think oh, no, They had him solid. I don't give a unanimity charge on that that I recall.

MR. HAYES: I believe they have to be unanimous in their decision.

THE COURT: There's a controlled substance. Not

Case: 24-3120, 05/22/2025, DktEntry: 25.1, Page 37 of 277



16:06:00 the type of drug.
16:06:00 MR. HAYES: That I'm fine with.
16:06:02 THE COURT: That's what I'm asking.
16:06:04 MR. HAYES: I do believe that. In our case, my
16:06:07 concern was when this superseding indictment was first
16:06:12 came down and Mr. Rivera and I discussed it, it was
16:06:18 confusing because we see the firearm, we see 30 rounds of
16:06:22 ammunition and then also one round of ammunition all in
16:06:26 that same charge, so Mr. Rivera says well, what if they
16:06:31 don't believe I possessed, you know, any one of those or
16:06:35 two of them, how do we know what the jury is, you know,
16:06:40 if they convict him, what are they convicting him of.
16:06:47 THE COURT: The Government is correct. You tell
16:06:49 me if I'm wrong. The charge has to do with a firearm
16:06:55 which was found in a public area but which there will be
16:07:00 testimony, I'm allowing it, that Mr. Rivera admitted that
16:07:06 he had that firearm.
16:07:08 MR. HAYES: Yes.
16:07:09 THE COURT: The ammunition at issue was a piece,
16:07:13 a cartridge or something, a piece of ammunition in his
16:07:17 pocket when he was searched incident to an arrest, right,
16:07:22 the single?
16:07:22 MR. HAYES: Yes.
16:07:23 THE COURT: The 30 rounds were inside the gun?
16:07:27 MR. HAYES: Yes.

16:07:28 16:07:30 16:07:34 16:07:40 16:07:45 16:07:49 16:07:54 16:07:57 16:08:03 16:08:04 16:08:09 16:08:11 16:08:16 16:08:20 16:08:25

THE COURT: The Government is correct it is all the same act of possession. In other words, if the jury believes that he dropped that firearm. The piece in the pocket creates another complexity, but the possession of those three things either took place all at once or they didn't take place all at once. I think the jury can say I don't know that one piece of ammunition that sounds hokey. I didn't trust the officer on that. He didn't handle it right. Who knows what they said. What they think. If they believe the statement. They believe the officer said he said he had the gun, then the 30 pieces of ammunition there's no question. They are possessed together. They are in the gun. I guess I will have to look at the Government's cases. Any Second Circuit district cases?

16:08:26 16:08:28 16:08:31 16:08:35

MS. FREISMUTH: No, Your Honor. The closest I could find was a case about a particular date in terms, the date is in the element is merely a means and the Second Circuit followed that theory.

16:08:39 16:08:44 16:08:46 16:08:46

The best analogy is the drug law where it is the unlawful possession of the item itself. It doesn't matter what the particular item is as long as the item it is prohibited by a statute.

16:08:53 16:08:53

THE COURT: Right. But here practically speaking, the 30 rounds of the firearm are like a

16:09:00 hand-in-glove.

16:09:00 MS. FREISMUTH: Correct. The single bullet is
16:09:02 different.

16:09:03 THE COURT: That's the complexifying.

16:09:06 So they could disbelieve the detective and the
16:09:10 whole confession, but he is guilty of possessing a single
16:09:14 piece.

16:09:15 MS. FREISMUTH: Correct. The opposite is
16:09:16 reading more into the statute than is required under the
16:09:19 law.

16:09:20 THE COURT: Don't I want to know what they
16:09:22 found? You are telling me they don't have to be
16:09:23 unanimous. That's what bothers me.

16:09:23 MS. FREISMUTH: I understand, Your Honor. I
16:09:29 have read the case law from the other circuits.

16:09:31 THE COURT: The answer to your question is God
16:09:36 only knows when I can get you an answer. I'm serious.
16:09:41 The law clerk would hopefully get a handle on it by
16:09:43 getting the cases pulled, read them, whatever, and maybe
16:09:48 by Friday. I can't work this weekend. I have plans. I
16:09:58 can tackle it Monday. I could try to get a decision out
16:10:03 Monday or Tuesday morning. I don't know when your grand
16:10:06 jury is.

16:10:08 MS. FREISMUTH: I understand. I did try to file
16:10:09 my response as fast as possible.

16:10:13 THE COURT: I know you did. I'm struggling with the lack of unanimity. I really am. I have to look at the (b)(1)(C). That rings a bell that you are right. What you are telling me is right.

16:10:26 MS. FREISMUTH: I had a conviction on it in front of Judge Meyer last year. It was a trial where we charged only with a (b)(1)(C) controlled substance to be frank we didn't know if it was crack or cocaine. We knew it was one of the two.

16:10:47 MR. HAYES: I still have concerns with that lack of unanimity as it applies to this case. As it applied to the case Attorney Freismuth had before Judge Meyer that's fine. That's not this case. That wasn't a gun case. This is. The Court asked earlier if the Court could address this with interrogatories.

16:11:12 THE COURT: She's telling me that wouldn't be proper. The answer could be when I ask the jury did you find something, I tell them the word find means all 12 beyond a reasonable doubt. She's saying the law would allow six to find the gun and six to find the ammunition in the pocket. They won't answer that yes. That won't help me.

16:11:36 MR. HAYES: I don't see that.

16:11:37 THE COURT: I don't either. That's what I have to look at. And the fact the circuit hasn't address it,

16:11:46 it is challenging.

16:11:48 Another reversal on the horizon.

16:11:58 MS. FREISMUTH: Just for clarification, if I'm
16:12:22 hearing some of the conversation correctly, assuming that
16:12:26 the Court were to find that the jury is to be unanimous
16:12:31 in terms of which item was possessed, would it satisfy
16:12:37 the Defendant's concerns if they did the interrogatory?
16:12:45 Do I still need a new superseding indictment?

16:12:48 THE COURT: If I conclude. I don't know what
16:12:51 I'm going to conclude. I think your hypothetical if I
16:12:58 conclude, yes, you can charge it in one count, no, you
16:13:02 don't have to replead, but I need to tell them they need
16:13:07 a basis for unanimity. Either the gun the single or the
16:13:11 third.

16:13:12 MS. FREISMUTH: What I'm looking for from the
16:13:15 defendant is that is whether or not the interrogatories
16:13:19 would satisfy his concerns that he doesn't want me to
16:13:22 seek another indictment to split it.

16:13:26 THE COURT: That's only if I find it has to be
16:13:30 unanimous. If I find it doesn't have to be unanimous, I
16:13:37 still have the question can you put the two in one count
16:13:37 and I think you're right, but I don't know yet. So I'm
16:13:40 sorry.

16:13:40 MS. FREISMUTH: I understand, Your Honor. Part
16:13:46 of the problem is if I don't split it, I can't put it

16:13:49 back together.
16:13:49 THE COURT: I know that. I guess if I agree
16:13:53 with him that you have to have two counts, then when I
16:14:00 grant the motion to dismiss, you will recharge him at the
16:14:03 grand jury. We'll have a speedy trial and it will be
16:14:04 speedy, trust me.
16:14:04 MS. FREISMUTH: From the Government's
16:14:08 perspective, there's no reason to continue the trial.
16:14:11 THE COURT: That's what I'm saying. You will
16:14:13 need to recharge him and which you will do in two counts,
16:14:17 three counts.
16:14:18 MS. FREISMUTH: I definitely think the case law
16:14:22 is abundantly clear on the ammo inside the firearm.
16:14:25 THE COURT: I would think so. Let's say two
16:14:26 counts.
16:14:27 MS. FREISMUTH: I think his argument suggests
16:14:28 the bullet doesn't fit inside the firearm.
16:14:33 THE COURT: If I agree it should be two counts
16:14:36 which I'm not saying I will, I'm saying if I do, then I
16:14:39 grant his motion. Then there's no indictment. You got
16:14:45 to be ready to recharge.
16:14:47 MS. FREISMUTH: He's detained in both cases.
16:14:52 THE COURT: So you have time. What's the
16:14:53 minimum to get to trial after indictment?
16:14:56 MS. FREISMUTH: Your Honor, the Speedy Trial Act

16:14:58 requires the defendant have 30 days' notice. However, the Court can find it doesn't apply if he's not prejudiced by the fast trial date and there is no prejudice with the same evidence and the same charges.

16:15:14 THE COURT: I didn't know that. We'll have to check that. Assuming that comes up.

16:15:18 MS. FREISMUTH: It is in my motion.

16:15:22 THE COURT: Then I would intend at the latest. I have a jury selection in November. I will do it then.

16:15:29 MS. FREISMUTH: The Government believes we can seek the superceding indictment and still go on the 16th.

16:15:31 THE COURT: That's if you get the decision by the time the grand jury sits next week. What date does it sit?

16:15:42 MS. FREISMUTH: I can't disclose.

16:15:46 THE COURT: If that's the case, Attorney Hayes, there's no change, just making two counts.

16:15:55 MR. HAYES: Right.

16:15:56 THE COURT: So I would expect to go forward with jury selection.

16:16:02 MR. HAYES: If everything is done timely, sure.

16:16:04 THE COURT: If I get a decision out Tuesday morning, if she has a grand jury Wednesday or Thursday. If I dismissed the indictment, you know she's going to get another one and she'll get one I'm pretty sure on

16:16:17 Wednesday or Thursday, whatever day they are meeting, I'm still going to go on Monday.

16:16:23 MR. HAYES: That's fine, Your Honor.

16:16:25 THE COURT: Just making sure. If you had an objection, I would want to hear it now. That's the fastest I will get this thing out. I thought I had a lot of criminal cases. I thought I have seen a lot of issues. Seems like today I have said more times than I said in the last 20 years, I don't know that issue. I have to look closer. I think it is you, Attorney Freismuth. Maybe it is you, Attorney Hayes.

16:16:53 Are there other motions? 609?

16:16:57 MS. FREISMUTH: If the defendant doesn't testify it is likely not relevant.

16:17:02 THE COURT: That's about his prior convictions. They are old. I don't know. You didn't give me the dates.

16:17:07 MS. FREISMUTH: I believe they are in there. We believe they all fit.

16:17:17 THE COURT: They are '12 and '13, but I don't know when. The trial is October. So if it's earlier than October of 2013, they have to meet the truthfulness.

16:17:38 MS. FREISMUTH: I can provide that.

16:17:38 THE COURT: I would like the date of conviction on the three crimes. If you think a different date

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. 3:20-CR-00168 (JCH) |
| v. | : | |
| MIGUEL RIVERA, Defendant. | : | OCTOBER 2, 2023 |

**RULING ON DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT (DOC. NO. 139)**

## I. INTRODUCTION

Defendant Miguel Rivera ("Rivera") has been charged with unlawful possession of a firearm and ammunition by a felon, in violation of sections 922(g)(1) and 924(a)(2) of title 18 of the United States Code. See Superseding Indictment (Doc. No. 116). Rivera has moved to dismiss the Superseding Indictment on the grounds that it is impermissibly duplicitous. See Motion to Dismiss the Superseding Indictment ("Def.'s Mot.") (Doc. No. 139). The government opposes the Motion. See Government's Opposition to Motion to Dismiss the Superseding Indictment ("Gov.'s Opp.") (Doc. No. 147). On October 2, 2023, the court issued an Order denying the Motion (Doc. No. 154). The court now issues this formal Ruling to articulate the bases for its denial.

## II. DUPLICITY

In his Motion, the defendant argues that the Superseding Indictment is duplicitous because it charges him with possession of a firearm and ammunition under a single count, even though (1) the firearm and ammunition were found under different

circumstances,[1] and (2) the "evidence for each charge is different".[2] See Def.'s Mot. at 2. The government contends that the Superseding Indictment "properly charges the defendant as the alleged unlawful possession occurred at the same time—his arrest on July 5, 2020". See Gov.'s Opp. at 1, 2-6.

The court agrees with the government. The Second Circuit has held that, "a convicted felon who simultaneously possesses various firearms and rounds of ammunition can generally only be charged with a single violation of [section] 922(g)." United States v. Olmeda, 461 F.3d 271, 279-80 (2d Cir. 2006); see also United States v. Pelusio, 725 F.2d 161, 168 (2d Cir. 1983) ("[A]bsent any evidence that the defendants received the [firearm] and the . . . ammunition on separate occasions, they could not lawfully be found guilty of receipt of the gun and the ammunition as separate crimes forming the subject of multiplicitous counts."). Multiple charges for different firearms and ammunition are, generally, only warranted "if the evidence shows that the felon acquired possession of the firearms or ammunition on different occasions, or that he stored them at different sites." Olmeda, 461 F.3d at 280. Here, the government alleges that Rivera possessed one firearm, a "Romarm/Cugir WASR 10, AK Type Model, 7.62x39mm caliber, semi-automatic rifle", as well as "approximately 30 rounds of Tula

---

[1] As the defendant states in his Motion, the government alleges that, when the defendant was arrested on July 5, 2020, a single round of "Prvi Patiizan (PPU) 5.56x45mm ammunition" was recovered from his pocket; the government further alleges that a "Romarm/Cugir WASR 10, AK Type Model, 7.62x39mm caliber, semi-automatic rifle" and "approximately 30 rounds of Tula 7.62x39mm ammunition" were recovered from the ground in the vicinity of where Rivera was arrested. See Def.'s Mot.; accord Gov.'s Opp. at 5; Superseding Indictment.

[2] The defendant contends that the government relies on a different evidentiary basis for his alleged possession of the round of PPU ammunition than it does for the alleged possession of the rifle and the Tula ammunition. See Def.'s Mot. Specifically, the defendant argues that "the only actual evidence [Rivera] possessed the [rifle] (and the loaded magazine [containing Tula ammunition]) was a statement law enforcement attributes to Mr. Rivera", whereas the "basis for the ammunition charge is the police report (and, presumably, the testimony) of the arresting officer". See id.

7.62x39mm ammunition" and "one round of Prvi Patiizan (PPU) 5.56x45mm ammunition", simultaneously and over the course of a single night. See Superseding Indictment. The government is not alleging that Rivera acquired the firearm and ammunition on different occasions or stored them at separate sites. Given the government's allegations, the court finds that charging Rivera under a single count, rather than under multiple counts, is appropriate.

## III. JURY UNANIMITY

Although the defendant does not address the issue of jury unanimity in his Motion, the government's Opposition addresses the issue, and the issue was also discussed by the court and counsel for both sides at the pretrial conference on September 27, 2023. As such, the court will address unanimity in its Ruling.

The government contends that the jury need not be unanimous as to the specific firearm and ammunition the defendant possessed because the type of firearm or ammunition possessed is a means, rather than an element, of section 922(g). The Second Circuit has yet to address the specific question of whether a jury must be unanimous as to the specific type of weapon to convict a defendant under section 922(g). However, other circuits have found that unanimity as to the specific firearm or ammunition is unnecessary. The First Circuit first addressed the issue in United States v. Verrecchia. There, the court applied the Supreme Court's reasoning in Richardson v. United States, which held that a federal criminal jury need only unanimously agree on each "element" of the crime to convict but may nonetheless disagree on the "underlying brute facts [that] make up a particular element." United States v. Verrecchia, 196 F.3d 294, 298-99 (1999) (citing Richardson v. United States, 526 U.S. 813, 817 (1999)). The

First Circuit analyzed section 922(g) and concluded that the "plain language of the statute suggests that the element of the crime is simply the possession of 'any firearm'"—a conclusion that was bolstered by the statute's "punishment provisions", which, the appeals court found, did not "indicate[ ] an intent on the part of Congress to link culpability to the nature and quantity of the weapons possessed . . . ." Id. at 299-300.

Since then, multiple other circuit courts—the Fifth, Sixth, and Seventh Circuits—have adopted Verrecchia's holding, and it does not appear that any circuit courts have reached contrary holdings. See, e.g., United States v. DeJohn, 368 F.3d 533, 542 (6th Cir. 2006) ("We are convinced by Verrecchia's careful analysis of the statute, and we hold accordingly that the particular firearm possessed is not an element of the crime under § 922(g) . . . ."); United States v. Talbert, 501 F.3d 449, 451-52 (5th Cir. 2007) (adopting the "careful analysis" of Verrecchia); United States v. Pollock, 757 F.3d 582, 587-88 (7th Cir. 2014) (applying Verrecchia and holding that "possession of a specific firearm [i]s not an element of the offense"); see also United States v. Workman, 755 Fed. App'x 533, 538-39 (6th Cir. 2018) (finding that jury unanimity was not required where the evidence at trial was such that a juror could find that the defendant's "constructive possession—the act—extended to any firearm or ammunition listed in the indictment").

In addition, as the government noted in the pretrial conference, the Second Circuit has addressed jury unanimity in other contexts. For example, the Second Circuit has held that, in the context of drug distribution and possession under sections 841(a)(1) and 841(b)(1)(C) in title 21 of the United States Code, a jury need not agree

on the specific controlled substances involved in a violation, "as long as the jury unanimously agrees that the offense involved some schedule I or II controlled substance". See United States v. Requena, 980 F.3d 30, 48-51 (2d Cir. 2020); accord United States v. Thomas, 274 F.3d 655, 660 n.3 (2d Cir. 2001) (holding that the type and quantity of a drug need only be submitted to the jury "as an element . . . in cases where the Government will seek a sentence above a statutory maximum in the event of a conviction"). Indeed, in reaching these holdings, the Second Circuit has relied on the same reasoning as the Verrecchia court and its progeny, citing Richardson's language that a jury need only agree on the elements of a statute—rather than the underlying means or "brute facts"—and emphasizing that unanimity is unnecessary where the "specific nature of th[e] substance has no bearing on the statutory penalty range." Requena, 980 F.3d at 48-50; see also Verrecchia, 196 F.3d at 300 ("Nothing in [section 922(g)'s] statutory provisions indicates an intent on the part of Congress to link culpability to the nature or quantity of the weapons possessed . . . ."). The Second Circuit has also relied on a more recent Supreme Court case, Mathis v. United States, where the Court further delineated the difference between "elements" and "means" or "brute facts":

> [I]n [Mathis] the Supreme Court discussed a hypothetical statute that requires use of a "deadly weapon" as an element of a crime and further provides that the use of a "knife, gun, bat, or similar weapon" would all qualify. The Court explained that because only the use of a deadly weapon is an element—and the illustrative list "merely specifies diverse means of satisfying [that] element—a jury could convict even if some jurors concluded that the defendant used a knife while others concluded he used a gun, so long as all agreed that the defendant used a "deadly weapon." That said, if statutory alternatives carry different [maximum or minimum] punishments, then . . . they must be elements.

See Requena, 980 F.3d at 49 (citing Mathis v. United States, 579 U.S. 500, 505 (2016)).

The court finds that these legal principles, as established by the Supreme Court and the Second Circuit, are applicable to section 922(g). Section 922(g) prohibits a felon's possession of "any firearm or ammunition". See 21 U.S.C. § 922(g) (emphasis added). It is also a simple statute that does not "carry different punishments" depending on the firearm or ammunition possessed. See Mathis, 579 U.S. at 505. Given the controlling case law, the court concludes that, in rendering a verdict on a single "felon in possession" count, a jury need not be unanimous as to the precise firearm or ammunition that the defendant possessed.

As the court stated on the record during the September 27, 2023, pretrial conference, the court is considering the use of an interrogatory as a potential means of addressing the defendant's concerns. The Second Circuit has held that interrogatories are generally disfavored in criminal cases, though they are occasionally permitted—and even recommended—in certain contexts. See United States v. Pierce, 940 F.3d 817, 821 (2d Cir. 2019) (noting that interrogatories, while generally discouraged, are recommended for determining whether a jury has found "continuing series of violations" for purposes of establishing a continuing criminal enterprise conviction under 21 U.S.C. § 848(c)).

The court has yet to decide whether it will use an interrogatory in the case at bar, and it intends to make a final decision by October 11, 2023.

## IV. CONCLUSION

For the reasons discussed above, the Motion to Dismiss the Superseding Indictment (Doc. No. 139) is denied. The court will decide whether it will use an interrogatory by October 11, 2023.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of October 2023.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

______________________________
UNITED STATES OF AMERICA)
Government )
vs. )
MIGUEL RIVERA )
Defendant. )
______________________________)

October 16, 2023
3:20cr168(JCH)
4:10 p.m.

141 Church Street
New Haven, Connecticut

STATUS CONFERENCE HELD AFTER JURY SELECTION

B E F O R E:

THE HONORABLE JANET C. HALL, U. S. D. J.

FOR THE GOVERNMENT:

Natasha Freismuth
Patricia Stolfi-Collins
U.S. Attorney's Office
157 Church St., 25th Floor
New Haven, CT 06510

FOR THE DEFENDANT:

Tracy Hayes
Federal Public Defender's Office
265 Church St., Suite 702
New Haven, CT 06510-7005

Josh B. Ewing
Federal Defender of Connecticut
10 Columbus Blvd.
Hartford, CT

THE COURT: 12:30 doesn't work. 12:30 gives them two hours and a quarter in the box.

MS. FREISMUTH: 12:15.

THE COURT: It has to be 12 or 1:15 for lunch. If it is 1:15, we'll take a break at 11:30 and lunch would be could be 1:15 so that's an hour fifteen break, an hour and a half lunch break. The regular period in the afternoon. Let's do that. Just so you know, Tatiana, we'll take lunch at 1:15 as usual. Hopefully, we start at 10:15. We'll take a break at 11:30. Come back at 11:45. So that's an hour and fifteen at the first period and an hour and a half at the second. That's not bad. Anything else?

MS. FREISMUTH: Just for clarification, were you expecting us to email the proposed changes to the Court's jury instruction to the law clerk or bring them?

THE COURT: Bring them with you. We'll talk our way through. Some of the boilerplates we'll go through by groups. The guts of the charge we'll go through each one. Take all your comments and discuss it as best we can. I will resolve it, if I can. If not we'll do a little bit more research and get back to you on the rulings as the case goes forward. Sounds like could be going to the jury on Thursday I would think. That's what it sounds like. I will get you answers by hopefully

Wednesday night as to what the charge will actually be. Now I haven't given you the Verdict Form. I assume we won't have any argument. Do you find that the Government has cared its burden beyond a reasonable doubt. The defendant is guilty or, you know, do you find the defendant guilty, whatever, the standard form on one count. That's pretty straightforward. I don't think we'll have a lot of discussion about it. It is really the question of whether we do interrogatories and I'm very much undecided. I'm interested to hear people's point of view. I know the Government suggest interrogatories. I really should take home those cases tonight, so I have fresh in my mind sort of some interesting things said in some of the cases about the subject of interrogatories. I'm interested in the defendant's view as well. Not a long charge. A lot it is stuff that I developed over many years. I want every comment. You get points for finding typos, you get points for checking that the law clerk forgot to check there's only one defendant in this case, not two. I need this to be perfect. Hopefully, you have reviewed it and go over it and even with a nitpicking editor's eye you tell me all of those. That's great. I'll see you tomorrow hopefully at 10:00.

(Adjourned: 4:38 p.m.)

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA
vs.
MIGUEL RIVERA
Defendant.

October 17, 2023
3:20cr168(JCH)
9:48 a.m.

141 Church Street
New Haven, Connecticut

DAY 1 OF JURY TRIAL

B E F O R E:

THE HONORABLE JANET C. HALL, U. S. D. J.

FOR THE GOVERNMENT:

Natasha Freismuth
U.S. Attorney's Office
157 Church St., 25th Floor
New Haven, CT 06510

Patricia Stolfi Collins
United States Attorney Office
157 Church Street
New Haven, CT 06510

FOR THE DEFENDANT:

Tracy Hayes
Federal Public Defender's Office
265 Church St., Suite 702
New Haven, CT 06510-7005

Josh B Ewing
Federal Defender of Connecticut
10 Columbus Blvd.
Hartford, CT

11:24:58 THE COURT: You may be seated and good morning. In order for the mic to pick up your voice, you have to be right on top of it. What's coming out of your mouth has to be going in the direction of where that little foam thing is on the top. Try it right now.
11:25:17 THE WITNESS: Testing.
11:25:21 THE COURT: Very good.
11:25:21 DIRECT EXAMINATION
11:25:21 BY MS. FREISMUTH:
11:25:22 Q. Good morning, Officer Porzio. Where are you currently employed?
11:25:39 A. The City of Waterbury, Waterbury Police Department.
11:25:42 Q. When did you join the Waterbury Police Department?
11:25:43 A. I was hired in December of 2017.
11:25:50 Q. What is your current rank or title?
11:25:52 A. Patrolman.
11:25:53 Q. Have you always had that rank or title?
11:25:55 A. I started as Patrolman D. I'm now a Patrolman A.
11:26:00 Q. Can you describe the training you received as a patrol officer for the Waterbury Police Department?
11:26:06 A. Yes, I initially was sent to the POST Academy in Meriden for a period of approximately six months. There

11:28:56 A. I do.
11:28:56 Q. Back in July of 2020, were you issued a body-worn camera by the Waterbury Police Department?
11:29:03 A. No. At that time period, we were not issued body-worn cameras.
11:29:08 Q. I'm barely able to hear you with the mic. You said at that time you had not been issued a body-worn camera yet?
11:29:17 A. That's correct.
11:29:18 Q. On this day in July of 2020, were you called to the area of Williams Street and the intersection of Laurel Street in Waterbury?
11:29:24 A. I was.
11:29:25 Q. What was your understanding of why you should respond to that area?
11:29:28 A. We received a call for shots fired in the area.
11:29:32 Q. How detailed was the information you received?
11:29:35 A. It stated that there were multiple shots fired but that nothing was seen.
11:29:43 Q. When you received the information, where does it come from?
11:29:47 A. It's relayed audibly via police radio and also shows up on our computer screen inside each cruiser, so we can visually see the notes from the caller in dispatch.

11:32:41 pushing the other button and see if it works.

11:32:51 May I have one moment, Your Honor?

11:32:54 THE COURT: Yes.

11:32:56 MS. FREISMUTH: I'll seek some assistance and return to this part of my testimony, so we can move forward.

11:33:03 THE COURT: I appreciate that.

11:33:05 BY MS. FREISMUTH:

11:33:05 Q. Now, I will come back to this section of your testimony, Officer Porzio, but I want to return to your response to Williams Street in Waterbury.

11:33:15 Are you familiar with that area?

11:33:17 A. Yes.

11:33:17 Q. How are you familiar with it?

11:33:19 A. I have responded to a number of 911 calls in that area. A high frequency of calls involving very often narcotics usage, narcotics distribution complaints, overdoses as well as violent crimes, robbery complaints and shots fired.

11:33:39 Q. On this particular day, July 5, 2020, how did you physically respond to the scene?

11:33:45 A. I drove there in a marked police cruiser.

11:33:49 Q. Does the marked cruiser have lights and sirens?

11:33:54 A. It does.

11:33:55 Q. Can you describe what you were wearing?

A. I was wearing a full Waterbury Police Department uniform with my name on it, badge on it, patches.

Q. Were you wearing a ballistic vest?

A. I was.

Q. This vest is issued to you by the Waterbury Police Department?

A. Yes, it is.

Q. Who was in the car with you?

A. I was by myself.

Q. Is it routine for you to drive alone in the patrol car?

A. Depending on the area I'm assigned to. That night it was routine.

Q. Did anyone else also respond to the scene?

A. Yes. Other officers responded simultaneously.

Q. When you initially arrived, was anyone else also on scene?

A. No, I was the first on scene.

Q. What was the exact location to where you responded?

A. I was dispatched to Laurel Street at Williams Street.

Q. I know we described your prior experiences with the area. Is it a residential area?

A. It is.

11:34:50 Q. Approximately how long did it take you to respond?

11:34:53 A. A matter of minutes.

11:34:54 Q. Can you please describe what you saw, if anything, upon your initial arrival on Williams Street?

11:35:01 A. I turned onto Williams Street from East Main. I was heading north on Williams Street toward Laurel. To my left, I saw a single individual walking on the sidewalk behind the line of parked cars.

11:35:17 Q. Were you able to later get a better view of what this individual looked like?

11:35:23 A. Yes. He was shorter than myself. He was stocky. He was wearing a red shirt.

11:35:30 Q. Did you later determine he was wearing anything else?

11:35:34 A. Yes. I later saw he was wearing body armor or a ballistic vest similar so what I wear at work every day.

11:35:41 Q. The individual you saw walking on Williams Street, were you later able to identify him by name?

11:35:47 A. Yes.

11:35:47 Q. Who did you identify him as?

11:35:50 A. Miguel Rivera.

11:35:51 Q. Do you see Miguel Rivera in the courtroom today?

11:35:53 A. Yes.

11:35:53 Q. Can you please describe where he's seated?

11:35:57 A. He's seated on the right side. He just pulled his mask down.

11:36:00 MS. FREISMUTH: Let the record reflect the witness has just identified the defendant who pulled down his mask.

11:36:08 THE COURT: Can you describe what position he's in?

11:36:10 THE WITNESS: Yes. He's not the first seat, the next one in.

11:36:13 THE COURT: The record shall reflect that the witness has identified the defendant Mr. Rivera.

11:36:19 Thank you very much, Mr. Rivera.

11:36:21 BY MS. FREISMUTH:

11:36:21 Q. Did you observe anyone on Williams Street at this time?

11:36:24 A. No, I did not.

11:36:28 Q. What time of night is this?

11:36:30 A. It was approximately 2 in the morning.

11:36:34 Q. Can you describe the lighting in the area?

11:36:40 A. Yes, lit by streetlights.

11:36:42 Q. So where is he located and where are you located?

11:36:47 A. So I am in the roadway in my cruiser facing Laurel Street so facing north and then Mr. Rivera was on the sidewalk to my left facing East Main so facing south,

facing toward me walking.

Q. If I understand this correctly, you two are facing opposite directions?

A. Correct.

Q. Approximately how close to him were you on the sidewalk inside your cruiser?

A. It would be more than a car's length away. Approximately ten feet or so.

Q. If I can have one moment. I think I will return to see if Government's Exhibit 43 will play for me. We'll continue.

What did you do after you saw Mr. Rivera on the sidewalk?

A. I initially rolled down my window and attempted to address him to conduct my investigation to see if he had heard anything in the area, if there were shots fired.

Q. Were you successful in that attempt?

A. No. As soon as Mr. Rivera noticed me, he disappeared from my sight.

Q. What did you think when he disappeared?

A. I thought he was fleeing from me.

Q. What did you do after you noted he was gone?

A. I exited my cruiser to further investigate. I heard a loud sound which is synonymous with a hard

metallic object striking something else and then as I approached the sidewalk, I saw Mr. Rivera climbing over a chain link fence that separates the yards of 29 and 35 Williams Street.

Q. Now, this metal sound, the sound of metal hitting something hard, in terms of when you observed Mr. Rivera and the first fence, how are those lining up in terms of time?

A. I heard the noise immediately before I observed Mr. Rivera climbing the fence.

Q. So after he went over the first fence, what did you do?

A. I gave him verbal commands to stop. He ignored my commands so I chased him on foot.

Q. Did you go over the same fence?

A. No, I went to the right and climbed over an adjacent fence.

Q. Where did this lead you?

A. This lead me into the area between 29 and 35 Williams Street.

Q. What happens next?

A. Next Mr. Rivera climbed over another fence into the backyard area of 29 Williams Street. I followed him over that fence and I continued to chase him through the backyard of 29 Williams Street.

Q. Then what happened?

A. I ordered Mr. Rivera to stop again. He eventually came to a taller fence in the very back of 29 Williams Street. Here he slowed and I was able to catch up and tackle him and place him in handcuffs.

Q. So you physically tackled him?

A. I did.

Q. During this flight that you described, did you have a firearm?

A. I did.

Q. Where was it?

A. It was in my holster.

Q. Did you ever pull it out?

A. No.

Q. I saw you shake your head. I know you said you had tackled him. What happened after that?

A. I placed Mr. Rivera in handcuffs. And then I placed him under arrest for interfering, then I immediately searched his person.

Q. Now, when you put -- when you initially took Mr. Rivera into custody, did he say anything to you?

A. Yes. He said that someone was shooting in the area but that it was not him and he repeated multiple times that he was wearing a stabproof vest.

Q. Then you said that he was searched. Let me ask

you a different question first. When did backup arrive?

A. Backup arrived after I had already placed Mr. Rivera under arrest.

Q. Who was the first officer you recall coming to assist you?

A. The first officer I recall was Officer Fredericks.

Q. What happened after Officer Fredericks arrived?

A. I handed off Mr. Rivera to Officer Fredericks to escort him to the police cruiser for transport.

Q. And were you involved at all in the transport?

A. No, I was not.

Q. You mentioned before a search of Mr. Rivera's person. Did a search of his person occur in your presence?

A. Yes.

Q. What did you observe, if anything, that was recovered?

A. I located --

MR. HAYES: Your Honor, objection. That wasn't the testimony.

THE COURT: The question --

MR. HAYES: The testimony earlier was I immediately searched his person, meaning this officer.

THE COURT: What do you want me to do? She's

asked and it's been answered. You can cross or I can tell the jury to disregard and she'll pose it in another fashion.

MR. HAYES: Asked and answered, Your Honor.

THE COURT: I think she's allowed to turn to the subject matter to then ask further about any search. Asked and answered that I wouldn't sustain.

MS. FREISMUTH: I'm not sure if it would help for me to provide more clarification.

THE COURT: I will tell the jury to ignore the last question and answer. We're in the middle of a question. Let's back up and you try another question. If there's an objection, if I can get it before the answer. Officer, if you see the gentleman at the end starting to get out of his chair, you have to hold your answer so he has a chance to make any objection.

BY MS. FREISMUTH:

Q. Officer Porzio, did you observe a search of Mr. Rivera's person?

A. The search I conducted.

Q. Did you conduct the search?

A. Yes.

Q. What did you find?

A. I located a bullet in Mr. Rivera's pocket.

Q. So this item was on Mr. Rivera's person?

11:43:37 A. Yes.
11:43:39 Q. What did you do with the bullet after you found
11:43:42 it?
11:43:42 A. I left it in place.
11:43:45 Q. Then what happened in terms of Mr. Rivera's
11:43:50 custody?
11:43:50 A. I then transferred him to Officer Fredericks who
11:43:54 then conducted a search of his own and transported him to
11:43:59 police headquarters for booking.
11:44:01 Q. You had said before that the pursuit of Mr.
11:44:04 Rivera ended in the rear yard of 29 Williams Street,
11:44:08 correct?
11:44:08 A. Yes.
11:44:09 Q. Do you remember how the defendant was brought
11:44:12 from outside of that yard to be transported back to
11:44:18 police headquarters?
11:44:18 A. No, I was not involved.
11:44:23 Q. You said before you heard a metal sound. It
11:44:24 sounded like metal hitting the ground. When you went
11:44:29 back after Mr. Rivera was secured, did you look for
11:44:34 anything in his flight path?
11:44:35 A. Yes. I retraced the steps that he had taken
11:44:39 during the pursuit and I located a firearm next to a
11:44:45 dumpster that was in the backyard area of 35 Williams
11:44:51 Street.

Q. Was anything covering the firearm when you found it?

A. No, it was on the ground with nothing covering it.

Q. Now, I'm going through some exhibits admitted in the beginning of your testimony, some were just photographs. I think it might help to ask some preliminary questions beforehand. Did you have an opportunity to review photographs prior to your testimony today?

A. I did.

Q. Is it fair to say that some of the photographs are from the night in question?

A. Yes.

Q. And is fair to say there's also a second series of photographs that were taken later in the day in the daytime in 2023?

A. Yes.

Q. The photos that were taken during the daytime at the scene, were you present when they were taken?

A. I was on scene, yes.

Q. What about the ones taken during the daytime in 2023?

A. I was present.

Q. I'm going to pull up Government's Exhibit 37.

11:46:00 For clarification, this is one of the daytime photos we're talking about, correct?
11:46:03 A. Yes.
11:46:04 Q. This is not taken the night of?
11:46:07 A. Correct.
11:46:07 Q. Can you describe what we're looking at here?
11:46:10 A. This is the left side of Williams Street if you are facing Laurel Street.
11:46:16 Q. Does it capture the positions that we were talking about earlier in terms of where you were when you saw Mr. Rivera on the sidewalk?
11:46:23 A. This is the direction I was facing as I drove up Williams Street. He would have been in the middle of the road here.
11:46:30 Q. So the perspective from the photograph is looking up Williams Street. Is what you were looking at?
11:46:36 A. Correct.
11:46:36 Q. Where was Mr. Rivera?
11:46:37 A. He was on the sidewalk as pictured in this photo.
11:46:41 Q. Can you give us an idea more in particular looking at Government's Exhibit 37 where he was?
11:46:46 A. He would have been close to the spray-painted white line on the road. The gray patch.
11:46:58 Q. I'll just use a circle on Government's Exhibit

11:47:00 37 to highlight a white marking in the road. Are you
11:47:04 saying he was on the sidewalk near that location?
11:47:06 A. Yes, to the left of that.
11:47:08 THE COURT: That won't be preserved so I will
11:47:11 let the record reflect that counsel had circled and the
11:47:13 witness identified in front of the car, maybe five, ten
11:47:18 feet, a straight white line with sort of half arrows at
11:47:22 each end and another line going out the top
11:47:27 perpendicular.
11:47:27 MS. FREISMUTH: Thank you, Your Honor.
11:47:29 BY MS. FREISMUTH:
11:47:29 Q. Approximately where was your cruiser located?
11:47:31 A. My cruiser was located in the middle of the
11:47:34 road. A bit closer to the vantage point of this photo.
11:47:40 Q. So past perhaps the lower of the two yellow
11:47:43 lines in the road?
11:47:43 A. Yes, approximately.
11:47:47 Q. Now, I'm going to pull up two exhibits at the
11:47:50 same time. First, I will pull up Government's Exhibit
11:47:53 34. Then I will pull up Government's Exhibit 8.
11:48:05 Now, Officer Porzio, we spoke before about some
11:48:09 of the differences in terms. Now, is it fair to say
11:48:13 Government's Exhibit 8 is a nighttime photo taken the
11:48:15 night of?
11:48:15 A. Yes.

11:48:16 Q. Is it fair to say Government Exhibit 34 is a daytime photo taken this year?

11:48:19 A. Correct.

11:48:20 Q. And in addition to the difference in the date and time, is there any difference with the status of 29 Williams Street, particularly to the back of the house?

11:48:33 A. Yes. It looks like there's been an addition to the house.

11:48:38 Q. Now, looking at Government's Exhibit 34 and 8, can you tell us again where approximately Mr. Rivera was when you saw him?

11:48:48 A. When I initially saw him, he would have been approximately behind the green truck.

11:48:56 Q. Now, I'm going to show you Government's Exhibit 19. I put up Government's Exhibit 19. Do you see your cruiser here the night of?

11:49:15 A. Yes. My cruiser is the one angled in the center of the road facing the camera.

11:49:24 Q. I will blow up part of Government's Exhibit 19. Is it the cruiser that's in the middle of the street kind of angled?

11:49:33 A. Yes.

11:49:34 THE COURT: The record will reflect it is the first vehicle in the middle of the road to the right of a car with high beams on it. If there's any objection to

any of my recordmaking, please speak up if I misunderstood something.

BY MS. FREISMUTH:

Q. I will pull up Government's Exhibit 8 again. You said before that Mr. Rivera ran before you had an opportunity to speak with him. Can you see any portion of your pursuit depicted in Government's Exhibit 8?

A. Yes, I can.

Q. What do you see?

A. So the left side where the horizontal fence connects with the house on the left is where I initially saw Mr. Rivera fleeing. He was climbing over that section of the fence.

Q. I enlarged a portion of Government's Exhibit 8 and then in the very back is there a dumpster there?

A. There is.

Q. That's the dumpster you mentioned earlier in your testimony?

A. Yes.

Q. Now you said before that you didn't go over the same fence. Can you describe for the jury where you went?

A. Yes, I went to the right down that corridor there along the vertical fence.

Q. Is that the area where there's another officer

11:50:47 standing toward the rear of the photo?
11:50:49 A. Yes.
11:50:49 THE COURT: I apologize. I'm going to need
11:50:49 clarification. You said where the fence connects to the
11:50:52 house. You are talking about the house on the right and
11:50:55 the fence in the front yard?
11:50:58 THE WITNESS: The fence I was referring to is
11:51:01 the house on the left where it connects. There's a small
11:51:05 gated fence that connects to the fence that's facing the
11:51:09 different direction, Your Honor.
11:51:10 THE COURT: Thank you.
11:51:11 BY MS. FREISMUTH:
11:51:11 Q. Now, I will pull up Government's Exhibit 23.
11:51:21 I'm going to show at the same time as Government's
11:51:23 Exhibit 8.
11:51:30 Here again so the record is clear, we once again
11:51:34 have a nighttime photo and a daytime photo, correct?
11:51:37 A. Correct.
11:51:38 Q. Looking at the daytime photo, Government Exhibit
11:51:41 23, can you better see the fence that you are talking
11:51:43 about how you went over?
11:51:44 A. Yes.
11:51:45 Q. Where is it?
11:51:46 A. It is to the right and closer to the blue garage
11:51:54 doors.

11:51:57 Q. I have enlarged a portion of it toward the back. Is this the portion that you were talking about that you went over?

11:52:03 A. Correct.

11:52:05 Q. I'm now going to pull up Government's Exhibit 11 and 38. What's depicted in Government's Exhibit 38?

11:52:30 A. That's a daytime photo of the fence that Mr. Rivera initially jumped over during the pursuit and behind it is where the dumpster was on the night of the incident.

11:52:45 Q. If you look at the two exhibits together, Government's Exhibit 38 and Government's Exhibit 11, are you describing for us approximately where the dumpster would be located in the more current photo?

11:52:57 A. Yes.

11:53:00 Q. The houses that are surrounding this yard, do you recall anyone coming out to speak with you during the pursuit or thereafter?

11:53:09 A. No, I don't.

11:53:15 Q. Going to pull up Government's Exhibit 10. This is again another photo of the backyard of the night in question, correct?

11:53:33 A. Yes.

11:53:41 Q. I pulled up a highlight of this Government's Exhibit 10. Can you see all three fences that were

11:53:48 discussed in your testimony?
11:53:50 A. Yes.
11:53:51 Q. Where is the first fence?
11:53:53 A. The first fence that Mr. Rivera jumped over is
11:53:57 the one that has the no parking sign on it.
11:54:03 Q. I will draw an arrow. Are you referring to this
11:54:06 fence here?
11:54:07 A. Yes.
11:54:08 Q. Just the let the record reflect I have drawn an
11:54:11 arrow starting at the no parking sign on the fence
11:54:18 closest to the perspective of the camera.
11:54:31 The second arrow I drew is this the fence that
11:54:35 you described that you went over?
11:54:37 A. Yes.
11:54:38 Q. Let the record reflect I have drawn a second
11:54:43 arrow to the fence off to the right side of the camera.
11:54:50 Where is the second fence?
11:54:52 A. The second fence that Mr. Rivera then I both
11:54:57 jumped over is the next furthest one to the left,
11:55:02 directly to the left of the dumpster.
11:55:06 Q. Are you speaking at the rear where I just drew
11:55:09 the arrow?
11:55:11 A. Yes.
11:55:11 Q. Let the record reflect I have drawn an arrow to
11:55:15 the fence that's directly off the rear of 29 Williams

11:55:19 Street as depicted in the photo.
11:55:21 Where is the third fence that you said Mr. Rivera did not make it over?
11:55:26 A. All the way to the back and all the way to the left.
11:55:30 Q. So this area, I will draw an arrow to the fence in the very far view of the photo; is that correct?
11:55:39 A. Yes.
11:55:42 Q. Now, I will pull up Government's Exhibit 20 and Government's Exhibit 10.
11:55:57 Now, what is in Government's Exhibit 20?
11:56:00 A. That is the backyard area where the fence is where I placed Mr. Rivera under arrest.
11:56:09 Q. For clarification, Government's Exhibit 20 is how the yard looks today and fence as of today?
11:56:17 A. Correct.
11:56:17 Q. But that's the same area he was tackled and detained?
11:56:22 A. Yes.
11:56:26 Q. I would like to pull up Government's Exhibit 28. Do you recognize what's depicted in the paragraph?
11:56:38 A. Yes.
11:56:38 Q. Is this the ballistic vest that you described Mr. Rivera to be wearing the night in question?
11:56:44 A. Yes, it is.

11:56:49 Q. You said earlier in your testimony that a vest was part of your uniform that you wear. Have you had an opportunity to examine the vest in person?

11:57:01 A. Yes.

11:57:01 Q. How did it compare to the vest that you wear every day?

11:57:05 A. It is very similar.

11:57:06 MS. FREISMUTH: I would like to show a physical piece of evidence to the witness, Your Honor, Government's Exhibit 5 for identification.

11:57:17 THE COURT: You may proceed.

11:57:31 MS. FREISMUTH: If you would please open it for me, Agent Ladyga.

11:58:01 Your Honor, if I may approach the witness.

11:58:03 THE COURT: You may.

11:58:08 MS. FREISMUTH: (Handing.).

11:58:14 BY MS. FREISMUTH:

11:58:14 Q. Officer Porzio, I handed you Government's Exhibit 5 for identification. Would you mind taking it out of the evidence envelope that Agent Ladyga just opened?

11:58:28 A. (Complying).

11:58:29 Q. Looking at it, do you recognize this object?

11:58:31 A. I do.

11:58:32 Q. How do you recognize it?

11:58:33 A. It is the vest in question.
11:58:35 Q. You are familiar with it? You have seen it before?
11:58:37 A. Yes. It was the one Mr. Rivera was wearing on the night of the incident.
11:58:41 MS. FREISMUTH: If I can approach, Your Honor, I will take back Government's Exhibit 5 for identification.
11:58:53 THE COURT: I believe it is in evidence. There was no objection.
11:58:57 MR. HAYES: Correct.
11:58:58 MS. FREISMUTH: I will move into evidence.
11:59:00 THE COURT: It is in evidence. I already declared so Attorney Hayes is sitting quietly. I assume there's no issue.
11:59:09 MR. HAYES: Correct, Your Honor.
11:59:10 MS. FREISMUTH: Thank you.
11:59:12 BY MS. FREISMUTH:
11:59:12 Q. What did you do after the pursuit that we just discussed?
11:59:17 A. After pursuit, after I retraced my steps and located the firearm, I continued searching for further evidence.
11:59:27 Q. Did you discovery any?
11:59:30 A. Yes. I, along with other officers, located a number of spent shell casings further up Williams Street

11:59:38 closer to Laurel Street.
11:59:39 Q. I will publish for the witness Government's
11:59:41 Exhibit 17 as well as Government's Exhibit 19. What are
12:00:02 we looking at first in Government's Exhibit 17, Officer
12:00:06 Porzio?
12:00:06 A. Those are two photos from the night of the
12:00:09 incident that show where the shell casings were found.
12:00:13 Q. So if I pull up a section of Government's
12:00:16 Exhibit 17, if I pull up a section, what are these little
12:00:26 yellow makers with numbers on them?
12:00:28 A. Those are evidence tags used to mark individual
12:00:32 pieces of evidence.
12:00:36 Q. If I highlight one of them in more detail, can
12:00:40 you tell us what the pieces of evidence are?
12:00:43 A. Individual spent shell casings.
12:00:48 Q. Now, these two photos is it fair to say that
12:00:52 Government's Exhibit 17 and 19, are looking at the same
12:00:56 area but from different perspectives?
12:00:58 A. Yes.
12:00:59 Q. They are both from the night of, correct?
12:01:01 A. Correct.
12:01:02 Q. All of these yellow markers are each of those
12:01:05 shell casings?
12:01:06 A. Yes.
12:01:07 Q. I know we talked before where your cruiser was

12:01:12 located in the Government's Exhibit 19. Can you remind
12:01:14 us again which direction Mr. Rivera was walking on the
12:01:17 sidewalk when you encountered him?
12:01:20 A. He was walking toward where my cruiser is from
12:01:23 where this picture is taken.
12:01:24 Q. Away from the spent shell casings?
12:01:27 A. Correct.
12:01:29 Q. I will show you Government's Exhibit 36. Can
12:01:40 you describe what's in the picture?
12:01:42 A. Yes. This is a daytime photo of the
12:01:46 intersection of Laurel Street and Williams Street.
12:01:49 Q. So this is taken in 2023 but captures that
12:01:55 intersection of Laurel Street?
12:01:57 A. Yes.
12:01:58 Q. I will publish for the witness Government's
12:02:00 Exhibit 6. Do you recognize the first page here, the
12:02:10 certificate?
12:02:10 A. Yes.
12:02:12 Q. And does this pertain to documents that were
12:02:15 acquired from the Waterbury Police Department in
12:02:17 connection to this case?
12:02:18 A. Yes.
12:02:19 Q. I'm going to turn to the second page.
12:02:30 I don't need you to read the street number. Can
12:02:33 you tell me the street that's identified as Mr. Rivera's

residence?

A. It was Laurel Street.

Q. Waterbury, Connecticut?

A. Yes.

Q. I would like to approach and show the officer some physical evidence that I believe will be entered into without objection. Government's Exhibit 7A through 7S. If I may approach, Your Honor.

THE COURT: You may.

MS. FREISMUTH: (Handing.)

BY MS. FREISMUTH:

Q. Officer Porzio, I have handed you Government's Exhibits 7A through 7S that I will move for admission.

THE COURT: They are in evidence.

MS. FREISMUTH: Sorry. Thank you.

THE COURT: They are admitted. I think I said that already.

BY MS. FREISMUTH:

Q. Would you mind reaching into the envelope and pulling some of those smaller exhibits out for us.

THE COURT: I'm sorry. You had not moved them so Exhibit 7A through 7S are full exhibits.

MS. FREISMUTH: Thank you, Your Honor.

BY MS. FREISMUTH:

Q. Mr. Porzio, do you recognize those items?

12:04:14 A. Yes.
12:04:14 Q. Can you describe for us generally what they are?
12:04:17 A. These are spent shell casings that were
12:04:21 recovered from the scene that night.
12:04:23 Q. I will approach and collect Government's Exhibit
12:04:26 7A through S.
12:04:39 Now, Officer Porzio, did you do anything else
12:04:43 before you left the scene that night?
12:04:44 A. I attempted to locate any witnesses to the
12:04:48 incident. I was able to find one individual who heard
12:04:52 the shots fired, but I couldn't find anyone who had seen
12:04:57 the incident occur.
12:04:58 Q. Did you speak with the defendant at all beyond
12:05:01 the initial contact?
12:05:02 A. No.
12:05:05 Q. I'm going to pull back up Government's Exhibit
12:05:08 11. Can you identify what is in this highlighted portion
12:05:16 of Government's Exhibit 11?
12:05:17 A. That's the firearm that was recovered on scene.
12:05:22 Q. What is the number one on the yellow tag?
12:05:25 A. It is another evidence tag used to mark that
12:05:28 individual piece of evidence.
12:05:30 Q. I'm going to pull up Government's Exhibit 14 and
12:05:34 publish it to the jury. Will you please describe what's
12:05:39 depicted in Government's Exhibit 14?

A. That is a closer angle of the same firearm that was discovered on scene.

Q. What is the surface, the type of ground that it was on?

A. Pavement or concrete.

Q. How does this photo compare to when you first saw the firearm?

A. It is the same.

Q. I'm going to pull back up Government's Exhibit 10. And in Government's Exhibit 10, do you also see the same evidence marker that we just discussed as being in Government's Exhibit 11?

A. Yes.

Q. Can you generally describe where it is located?

A. Yes. It is to the right of the dumpster and to the left of the individual standing on a right side of the photo.

Q. And is the arrow that I have drawn between the two items you just described, does that reflect where the evidence marker is for the firearm?

A. Yes.

Q. During the pursuit, did you ever see the firearm in Mr. Rivera's hands?

A. No.

Q. In terms of the metal sound you said you heard,

12:06:58 remind us where you were when you heard it?
12:07:01 A. I was in the process of exiting my cruiser.
12:07:05 Q. So had Mr. Rivera jumped over the first fence yet?
12:07:10 A. No.
12:07:11 Q. Now you are asked to testify more than three years later about the events that occurred and in particular, this metal sound. Are you sure that you heard that sound?
12:07:22 A. I'm 100 percent positive that I heard the sound.
12:07:25 Q. Why are you so positive?
12:07:27 A. Because it stuck out to me in my mind at the time.
12:07:32 Q. Something that's a significant fact to you?
12:07:34 A. Because in my training and experience, I know that individuals often attempt to discard firearms when they are illegally possessing them and fleeing from police.
12:07:45 Q. In your time with Waterbury Police Department, have you had other incidents where you engaged in such pursuits?
12:07:53 A. Yes.
12:07:53 Q. Have you recovered firearms in the line of path?
12:07:56 A. Yes, I have.
12:07:56 Q. Did you ever hear similar sounds when they had

12:07:59 also struck a hard surface?

12:08:03 A. Yes, if it was on a hard surface.

12:08:05 Q. How did the sound you heard in other cases

12:08:08 compare to the sound you heard on this night in question?

12:08:11 A. It was similar.

12:08:12 Q. The material the dumpster that's right next to

12:08:14 the firearm, what material is it made out of?

12:08:18 A. Metal.

12:08:20 MS. FREISMUTH: I'm now going to approach and

12:08:22 show the witness Government's Exhibits 1 and 4.

12:08:48 Your Honor, I would like to approach with

12:08:51 Government's Exhibit 1 and 4.

12:08:53 THE COURT: Any objection to this, Attorney

12:08:54 Hayes?

12:08:55 MR. HAYES: No, Your Honor.

12:08:56 MS. FREISMUTH: We would move to admit

12:08:59 Government's Exhibit 1 and Exhibit 4.

12:09:01 THE COURT: They are admitted as full exhibits

12:09:04 absent objection and they may be shown to the witness and

12:09:09 to the jury.

12:09:12 BY MS. FREISMUTH:

12:09:12 Q. Officer Porzio, do you recognize the exhibits I

12:09:16 just handed you?

12:09:16 A. Yes.

12:09:16 Q. What are they?

BY MR. HAYES:

Q. Officer Porzio, we just heard Government's Exhibit 43, right? You just heard that?

A. I don't recall the number. I heard the recording.

Q. That was the 911 call?

A. Yes.

Q. That was from July 5, 2020, right?

A. Yes.

Q. And you heard what seemed to be a female caller?

A. Yes.

Q. She said they're shooting, right? She used an expletive. I can play it again.

A. I believe you, yes.

Q. She also again said they let off, right?

A. Yes, sir.

Q. So "they" implies more than one person, right?

A. It can or can be a nondescript use of a gender pronoun.

Q. When you hear it, it sounds like "they" meaning more than one person. Is that fair to say?

A. I don't think that's necessarily true.

Q. When you first seize Mr. Rivera, you don't find any gloves on him, right? He's not wearing any gloves?

A. Not to my recollection, no.

13:11:10 Q. You didn't write it in your report so no, he wasn't wearing any gloves, right?
13:11:16 A. Not to my recollection.
13:11:17 Q. You would have written it in your report because that's important, is that correct?
13:11:22 A. I may have.
13:11:23 Q. You don't write everything in your report that you believe is important?
13:11:27 A. If I thought it was important, I likely would have written it. I don't recall him wearing gloves.
13:11:34 Q. Summertime July 5, right?
13:11:36 A. Yes.
13:11:37 Q. If he was wearing gloves, you would have written that in your report, correct?
13:11:42 A. I may have.
13:11:42 Q. You didn't find any gloves in his pocket, right?
13:11:47 A. Not to my recollection.
13:11:48 Q. According to you, you found one round of ammunition in his pocket?
13:11:51 A. Yes, sir.
13:11:51 Q. You left it there. That's what you testified to?
13:11:54 A. Yes, sir.
13:11:55 Q. So you have a Bachelor's from -- well, an Emergency Management and Homeland Security from Post

13:17:39 A. No, it does not.
13:17:40 Q. So in fact, Williams Street is perpendicular to East Main and Laurel Street?
13:17:47 A. Yes.
13:17:47 Q. Just one long street, one block?
13:17:50 A. Yes.
13:17:52 Q. You testified earlier that you get calls to go to Williams Street often?
13:17:56 A. To the area of Williams Street, yes, sir.
13:18:07 Q. You said that -- well, -- strike that.
13:18:17 As you are driving north on Williams Street heading up the hill, you see Mr. Rivera, right?
13:18:24 A. Yes.
13:18:25 Q. You said he's walking on the sidewalk?
13:18:28 A. Yes.
13:18:28 Q. You don't see him with any firearm, right?
13:18:32 A. No. There were cars blocking.
13:18:35 Q. So you don't see him with any firearm; is that right?
13:18:38 A. No.
13:18:40 Q. You claim that he's standing in front of 34 Williams Street?
13:18:49 A. 35.
13:18:51 Q. 35 Williams Street. I'm sorry. 35 Williams Street?

13:22:12 Q. Is there any place for anyone to take out any plates or put in any plates?
13:22:18 A. You can take, yes, you can take the body armor out.
13:22:26 Q. Did you see if this has body armor inside?
13:22:31 A. I did not examine the interior of the vest.
13:22:47 Q. So according to your testimony, you first see Mr. Rivera with the red shirt. You don't see any vest, right?
13:22:56 A. No, sir. I did not notice the vest.
13:23:05 Q. You testified earlier that no one else was outside?
13:23:09 A. I did not see anyone else.
13:23:16 Q. When we heard Government's Exhibit 43 which was the audiotape, that person doesn't say Mr. Rivera is doing any shooting, right?
13:23:29 A. Correct. She did not.
13:23:35 Q. Do you recall what time you received that dispatch call?
13:23:40 A. It was immediately before 2:00 a.m.
13:23:45 Q. So you arrive around 1:57; is that right?
13:23:48 A. Approximately at that time, yes.
13:23:51 Q. 1:57 is in your report so you arrive at 1:57?
13:23:57 A. If that's what I wrote. I don't remember the clock at the time.

13:24:00 Q. And when you say immediately before, what does that mean?

13:24:05 A. That means a short period of time. As long as it took me to receive the call and respond to the scene.

13:24:13 Q. That's what I'm asking. How long from the call to respond to the scene?

13:24:16 A. A matter of minutes.

13:24:18 Q. Four minutes, five minutes?

13:24:21 A. Less than five minutes. I don't know the exact time.

13:24:23 Q. So the call is they're shooting, right?

13:24:26 A. Yes.

13:24:27 Q. And you know that Mr. Rivera's fingerprints were not found on that AK-47, right?

13:24:37 A. I'm not aware of the forensic results.

13:24:43 Q. That means DNA as well, right?

13:24:47 A. I'm not aware.

13:24:48 Q. You don't know?

13:24:49 A. Correct.

13:24:51 Q. And so as far as, you know, you don't know if any gun powder was found on Mr. Rivera?

13:25:03 A. I don't know.

13:25:17 Q. So you said that -- your testimony was that as Mr. Rivera jumped over one fence, right, jumped over a fence?

13:25:37 A. He did jump over a number of fences.
13:25:39 Q. I'm asking you about the first fence. That was
13:25:44 for 29 Williams Street. Was that the first fence?
13:25:48 A. It was connected to 29 William.
13:25:52 Q. Let's back up. When you pull up, you lower down
13:25:56 your window. You get out of your car. You said you
13:26:00 heard a clinking sound, is that right?
13:26:02 A. Yes.
13:26:03 Q. As soon as you get out of your car, you hear
13:26:06 that sound, is that right?
13:26:06 A. As I'm exiting my cruiser.
13:26:08 Q. You hear the clinking sound?
13:26:11 A. Yes, sir.
13:26:11 Q. You testified that you're one hundred percent
13:26:21 positive that you heard that sound, that clinking sound?
13:26:24 A. Yes, sir.
13:26:25 Q. Sounded like metal?
13:26:27 A. Sounded like a metal object striking something.
13:26:31 Q. Sounded like a firearm?
13:26:33 A. Sounds similar to the sound that a firearm would
13:26:36 make.
13:26:36 Q. You said that it stuck out in your mind?
13:26:40 A. It did.
13:26:42 Q. You recall meeting with Government counsel and
13:26:47 the agent previously?

13:26:48 A. Yes.
13:26:51 Q. You met with them in July 2022. Do you recall that?
13:26:57 A. I don't recall the exact date.
13:26:59 Q. 2022?
13:27:02 A. I did.
13:27:03 Q. At that time, you told the agent -- well, you met with the agent. You gave them information. Them meaning the Government and Agent Ladyga, is that right?
13:27:15 A. What was the question?
13:27:16 Q. You gave them information?
13:27:18 A. I spoke with them, yes.
13:27:20 Q. About the incident from July 2020, July 5?
13:27:24 A. Yes.
13:27:25 Q. That's what you were there for, right?
13:27:27 A. I was there to discuss the case and to prep for trial.
13:27:34 Q. You did discuss the case, right?
13:27:37 A. Yes.
13:27:41 Q. In discussing the case, you are the person with the information, so you gave information to the Government and Agent Ladyga, right?
13:27:50 A. Yes.
13:27:51 Q. Because it was your encounter with Mr. Rivera, right?

A. It was.

Q. And so at the time when you met with Agent Ladyga --

MS. FREISMUTH: I'm going to object to the name of the officer. I think he means Agent Ladyga.

MR. HAYES: Yes, Just my New York accent. I apologize.

BY MR. HAYES:

Q. So you said at the time that you heard a metal clinking, right? You testified to that, is that right?

A. What's the question?

Q. When you met with Agent Ladyga and Government counsel, you described the events from July, 2020?

A. Yes, sir.

Q. July 5, 2020?

A. Yes.

Q. You described hearing metal clinking, right?

A. Yes.

Q. And you said it sounded like a metal object hitting another metal object?

A. Another hard object. Sounded like a metal object hitting another hard object.

Q. Actually you told them hitting another metal object?

13:29:18 A. I don't remember the exact.
13:29:20 THE COURT: Did you ask that as a question and not a statement?
13:29:24 MR. HAYES: Yes, Your Honor.
13:29:27 THE COURT: Because you are not testifying.
13:29:29 MR. HAYES: That's correct, Your Honor.
13:29:30 BY MR. HAYES:
13:29:30 Q. You also said that it was an atypical sound, right?
13:29:37 A. Yes. It stood out to me.
13:29:40 Q. I'm sorry.
13:29:41 A. You said atypical?
13:29:42 Q. Yes.
13:29:43 A. Yes. It stood out to me.
13:29:48 Q. Atypical meaning something that you don't hear often?
13:29:51 A. Correct.
13:29:52 Q. That was what?
13:29:53 A. Given the circumstances.
13:29:55 Q. I'm sorry. There's no question. I'm asking you the question. That is what you told Agent Ladyga in 2022, right, those words that atypical?
13:30:08 A. I don't recall using the exact conversation, sir.
13:30:11 Q. I'm sorry.

13:34:43 I had with them, but I believe it would be self-evident
13:34:47 that would be a likely follow-up for detectives.
13:34:51 Q. As far as you know, no one talked to anyone or
13:34:54 you don't have any information of anyone in the Waterbury
13:34:59 Police Department talking to residents at 35 or 29
13:35:04 Williams Street?
13:35:04 A. I'm not aware of any.
13:35:10 Q. Were you -- so you said that Officer Fredericks
13:35:13 you met with him in the back of 35 -- I'm sorry. 29
13:35:21 Williams Street, right?
13:35:22 A. Yes, sir.
13:35:23 Q. He transported Mr. Rivera to the Waterbury
13:35:27 Police Department?
13:35:28 A. I was not involved in the transport. I handed
13:35:31 him off to Officer Fredericks, then he was transported to
13:35:36 the police department. I'm not sure who transported him.
13:35:38 Q. Did anyone else help you investigate the area,
13:35:42 any other officers?
13:35:42 A. There were other officers on scene who canvassed
13:35:47 for witnesses and look for evidence.
13:35:49 Q. Did they talk to people?
13:35:53 A. I believe some talked to people in the area.
13:35:57 Q. Did you bring those reports with you?
13:36:00 A. Did I?
13:36:01 Q. Bring any of those reports of anyone being

13:41:00 A. I see him here as I'm driving up to him.

13:41:06 Q. Let's just to be clear. You are driving north on Williams Street towards Laurel Street up the hill?

13:41:14 A. Yes.

13:41:15 Q. You testified earlier that you see Mr. Rivera coming down Williams Street down the hill on the sidewalk?

13:41:26 A. As I pulled up to this spot, I saw him walking down.

13:41:31 Q. So that's where you first saw him?

13:41:33 A. Yes.

13:41:34 Q. You don't see a vest?

13:41:37 A. I did not observe a vest at the time.

13:41:39 Q. Just to be clear, when you seize Mr. Rivera ultimately, the vest is not underneath that red shirt, right?

13:41:49 A. Correct.

13:41:49 Q. And it is over the shirt?

13:41:52 A. Yes.

13:42:03 Q. You didn't take this photo?

13:42:06 A. No, I did not.

13:42:13 Q. Tommy, can we look at the fences? So you can still see where we have enlarged the fences?

13:42:27 A. Yes.

13:42:28 Q. So the fence on the left of your screen, so it

has a dark top, is that a fence -- is that what you are referring to as the fence where the no parking sign is?

A. Yes. I see it.

Q. That's the fence?

A. Which fence?

Q. The first fence.

A. Yes.

Q. So you hear clinking immediately as you are getting out of your vehicle?

A. Yes.

Q. You eventually find the firearm. Can we zoom on where the dumpster is please, Tom? Thank you.

You find the firearm to the right of that dumpster where it says USA; is that right?

A. Yes.

Q. But you don't see Mr. Rivera with the firearm as he's jumping over the fence, right?

A. That's correct.

Q. In fact, you never saw Mr. Rivera with that firearm?

A. Correct.

Q. Or any firearm?

A. Correct.

Q. And you said that Mr. Rivera gave you a statement that he talked to you?

13:45:03 A. He spoke to me.
13:45:06 Q. He said someone was shooting; is that right?
13:45:09 A. Yes.
13:45:09 Q. But it wasn't him?
13:45:11 A. That's what he said.
13:45:13 Q. He didn't tell you that he had had a firearm?
13:45:15 A. No.
13:45:16 Q. He did not tell you that he had that AK-47?
13:45:21 A. No.
13:45:22 Q. You didn't ask him?
13:45:24 A. No, I did not.
13:45:24 Q. Did you read him his Miranda rights at the time?
13:45:28 A. I did not.
13:45:29 Q. Do you know when you transferred Mr. Rivera to Officer Fredericks, did he read Mr. Rivera his Miranda rights?
13:45:42 A. I'm not aware.
13:45:44 Q. Certainly he didn't do it in front of you, if he did?
13:45:52 A. Correct.
13:45:53 Q. So according to you, Mr. Rivera jumps over two fences as depicted somewhat as what we see in Exhibit 8, right?
13:46:08 A. Yes.
13:46:08 Q. You only jumped over one fence, is that right?

13:46:11 A. That's incorrect. I jumped over two.
13:46:15 Q. You jumped over two as well?
13:46:17 A. Yes.
13:46:18 Q. Eventually you meet one another in the back of is it 29-35? Do they share that space or the space for 29 Williams Street?
13:46:29 A. Where he was placed under arrest is the backyard of 29 Williams Street.
13:46:34 Q. So when he gets to what would be the third fence, that's a taller fence, is that right?
13:46:41 A. Yes.
13:46:42 Q. So tall he didn't try to jump over?
13:46:45 A. He slowed down. I was catching up to him.
13:46:49 Q. He never got to that fence?
13:46:51 A. Correct.
13:46:52 Q. He didn't try to kick you or anything from that fence, right, because he didn't get to the fence, right?
13:46:59 A. Correct.
13:46:59 Q. You tackled him?
13:47:01 A. Yes, sir.
13:47:03 Q. You have learned that in your training as well?
13:47:07 A. Yes, sir, takedowns we learned.
13:47:10 Q. I'm sorry.
13:47:11 A. A takedown to apprehend someone, yes, sir.
13:47:17 Q. He complied. He didn't fight you?

13:50:01 Q. It is toward the back?
13:50:03 A. Yes.
13:50:05 Q. We see to the right of the dumpster, you can sort of make out what would be the evidence marking?
13:50:14 A. Yes.
13:50:15 Q. Did you put down the evidence marking?
13:50:18 A. No.
13:50:20 Q. When you see the firearm, did you move it?
13:50:23 A. No.
13:50:23 Q. Did you take any photos of the firearm?
13:50:26 A. No.
13:50:27 Q. I know officers sometimes have small notebooks. Did you take any notes from that day?
13:50:34 A. I don't recall.
13:50:36 Q. When you wrote your report, do you remember reading notes and writing from what you wrote down?
13:50:45 A. I don't specifically recall.
13:50:47 Q. Do you do that at times?
13:50:49 A. Yes.
13:50:50 Q. Do you at times or all the time? Do you have a notebook?
13:50:54 A. Yes.
13:50:55 Q. Small?
13:50:56 A. Yes.
13:50:57 Q. And you rely on that sometimes to take notes for

13:53:59 Q. And you said that previously or in the past, you said that you responded you said to a number of calls in that area, right?
13:54:09 A. Yes.
13:54:11 Q. Narcotic sales?
13:54:14 A. Complaints of narcotics distribution, yes.
13:54:17 Q. Overdoses?
13:54:18 A. Yes.
13:54:18 Q. Shots fired?
13:54:20 A. Yes.
13:54:21 Q. Robberies?
13:54:21 A. Yes.
13:54:24 Q. Fair to say that's a high crime street or area?
13:54:28 A. Yes.
13:54:34 Q. You never encountered Mr. Rivera prior to that date, right?
13:54:41 A. Not to my recollection.
13:54:42 Q. We just saw earlier his address was listed as 24 Laurel Street?
13:54:47 A. Yes.
13:54:47 Q. Where is that in connection to Williams Street?
13:54:53 A. It is nearby.
13:54:56 Q. I'm sorry.
13:54:56 A. It is nearby, sir.
13:54:58 Q. Less than a mile?

13:55:00 A. Yes.
13:55:04 Q. Around the corner?
13:55:08 A. Some would consider around the corner, yes.
13:55:12 Q. It is close to the area of I guess 35 Williams Street? Let's say that.
13:55:19 A. Yes.
13:55:25 Q. Just to be certain, you completed a Use of Force Report that evening?
13:55:34 A. Yes.
13:55:35 Q. Because you used force in arresting Mr. Rivera?
13:55:38 A. Correct.
13:55:39 Q. By tackling him?
13:55:41 A. Yes.
13:55:42 Q. By dragging him to the ground by the top of his body?
13:55:45 A. Yes.
13:55:49 MR. HAYES: The Court's indulgence.
13:56:13 THE COURT: Yes.
13:56:13 MR. HAYES: Thank you, Your Honor.
13:56:16 THE COURT: Thank you very much. A very brief redirect.
13:56:22 MS. FREISMUTH: Yes, Your Honor. If I can have one minute, Your Honor. If I can have a moment to confer with defense counsel.
13:56:46 THE COURT: Yes.

14:06:43 THE WITNESS: Sergey Babakov, B-a-b-a-k-o-v.

14:06:43 THE CLERK: Thank you. Please state the city and state of employment.

14:06:57 THE WITNESS: State of Connecticut. City of Waterbury.

14:07:00 THE COURT: You may about seated, sir, and good afternoon to you.

14:07:03 DIRECT EXAMINATION

14:07:08 BY MS. FREISMUTH:

14:07:08 Q. Good afternoon.

14:07:09 A. Good afternoon.

14:07:09 Q. Can you please tell us where you are employed?

14:07:12 A. I'm employed by the City of Waterbury.

14:07:16 Q. What's your position?

14:07:19 A. I'm a forensic crime scene examiner.

14:07:19 Q. How long have you been employed in that manner?

14:07:23 A. Almost 16 years.

14:07:25 Q. Did you say 16?

14:07:27 A. 16.

14:07:28 Q. And during your time with Waterbury, have you had any other positions?

14:07:32 A. No.

14:07:34 Q. Can you please describe for us your educational background?

14:07:37 A. I have a Bachelor's Degree in marine science,

A. I did not.

THE COURT: Did you say 31?

MS. FREISMUTH: Yes, Your Honor.

BY MS. FREISMUTH:

Q. 31 Williams Street and 35 Williams Street essentially the same house?

A. Yes, it is one building.

Q. What's your understanding of why you needed to arrive there?

A. In my understanding after several reports of shots fired in the area, Waterbury Police Department patrol units located multiple fired cartridge casings and a firearm.

Q. While on scene, did you collect evidence?

A. I did.

Q. Was a firearm one piece of evidence that you collected?

A. I'm sorry. Can you repeat the question?

Q. Was the firearm one piece of evidence that you collected?

A. Yes.

Q. What do you do when you take possession of that evidence?

A. It gets transported back to the crime lab of the Waterbury Police Department. Then it usually gets

processed with touch DNA and also gets test fired.

Q. Is it made safe?

A. I made it safe at the scene.

Q. When I say "made safe", what does that mean?

A. That means remove magazine and make sure there's no ammunition inside the barrel so the firearm is not functional. Can't function the firearm.

Q. I'm now going to pull up for you what's been admitted into evidence as Government's Exhibit 22. I'm sorry. Government 14. Do you recognize what's depicted in Government Exhibit 14?

A. Yes. That's the firearm that I recovered at 31 Williams Street.

Q. What's the surface that the firearm was on when you found it?

A. It was a hard surface like a concrete, like a roadway.

Q. In this number one tag that's here, what's that?

A. That's the item number. Every piece of evidence that gets collected at a crime scene is assigned its own unique identification number. In this particular case, I assigned to the firearm number one.

Q. Pull up Government's Exhibit 11. What are we looking at here?

A. This is a photograph, a medium range photograph

14:12:28 of the firearm in its location.
14:12:30 Q. Do we have again the evidence tag to the
14:12:32 firearm?
14:12:32 A. Yes, that's item number one.
14:12:35 Q. What's the firearm located next to?
14:12:37 A. It is located next to the dumpster.
14:12:40 Q. What is that dumpster made out? What's the
14:12:43 material?
14:12:44 A. Metal.
14:12:44 Q. I will publish Government's Exhibit 22. What
14:12:49 are we looking at in the picture?
14:12:51 A. We're looking at basically identification of the
14:12:55 firearm make model. Maybe a country where it was made.
14:13:02 Q. And Government's Exhibit 25. What is this?
14:13:08 A. This is a photograph of a magazine indicated
14:13:11 what caliber the magazine is.
14:13:13 Q. The caliber is 7.62?
14:13:19 A. 7.62 by 39.
14:13:21 Q. I will publish Government's Exhibit 21. What
14:13:25 are we looking at here?
14:13:26 A. This is a photograph that I took at Waterbury
14:13:29 Police Department crime lab. It is the photograph of a
14:13:33 firearm and the magazine had 30 rounds of ammunition so
14:13:38 firearm and ammunition.
14:13:40 Q. In Government's Exhibit 16, what's depicted in

the photo?

A. This is the ammunition that I recovered from the firearm's magazine.

MS. FREISMUTH: Your Honor, I would like to approach and show the witness physical exhibits 1, 4 and 2.

BY MS. FREISMUTH:

Q. Do you recognize the items that I placed in front of you?

A. Yes.

Q. Can you please describe generally what they are?

A. This is a rifle, AK-47-type rifle, item number one that I collected and this bag contains ammunition that I removed from the magazine.

Q. Now in terms of Government's Exhibit 1, did you swab the firearm for DNA?

A. Yes. It was processed for touch DNA.

Q. Where did you swab the firearm?

A. The handle and the magazine and then trigger and a slide.

Q. Why only those two parts of the entire firearm?

A. Because those parts are the most commonly touched when the firearm is used.

Q. Now once evidence has been handled, for instance, I'm touching it without gloves. Can you go

14:15:26 back and reswab it?
14:15:27 A. No.
14:15:28 Q. Why not?
14:15:29 A. It's been contaminated already. Any time you
14:15:32 touch, you introduce your skin cells so it is no longer.
14:15:36 You can no longer isolate the profile. It is a lot of
14:15:42 mixed profile.
14:15:44 Q. When you were swabbing it only for the two
14:15:46 locations you just mentioned, you said you were following
14:15:47 a general protocol?
14:15:49 A. Yes. At the time that's what the protocol was
14:15:51 at our lab.
14:15:52 Q. Did you swab any of the ammunition?
14:15:55 A. I did not.
14:15:55 Q. Why not?
14:15:57 A. It wasn't protocol at the time.
14:16:00 Q. Did you check the firearm for fingerprints?
14:16:04 A. No. Again it's no longer in protocol for at
14:16:09 least our crime lab.
14:16:10 Q. Why not?
14:16:12 A. The success rate. We did it for a while. The
14:16:17 success rate was zero to be honest with you. It is
14:16:22 almost impossible to obtain any fingerprints from trigger
14:16:23 or textured handle like this. With touch DNA, our
14:16:27 success rate is about 70, 75 percent.

Q. You are using this term "touch DNA". What does that mean?

A. Pretty much any time you touch the object, you leave your skin cells on the object and can be analyzed because the instrument is very sensitive. You need a large amount. So what happens is you take cotton swabs, you moisten them in distilled water and swab the areas of interest that you want to swab. Then those swabs being placed in an envelope and either we can run them on our rapid DNA machine, then send them to full confirmation to the State lab or if we don't have enough, maybe right away send it to the State lab where it will get analyzed by the DNA section.

Q. At this time I will collect those exhibits back. In addition to the firearm, the magazine, and the ammunition that's inside the magazine, did you collect and process any other evidence recovered from the scene?

A. I collected 20 fired cartridge casings.

Q. How did you collect them?

A. First of all, I complete the documentation of them and then collect, each individual item gets placed in each individual container. In that case, we used envelopes.

Q. And where were these shell casings located?

A. They were located on the roadway and on the

14:38:32 Q. Are you saying that the City of Waterbury doesn't test anyone for gunshot residue?
14:38:37 A. No.
14:38:38 Q. You are telling under oath to this jury that if somebody shoots a firearm, gunshot residue would not show up on your hand?
14:38:47 A. I'm not saying that. What I'm saying is that --
14:38:50 Q. That's what you implied.
14:38:52 THE COURT: He's entitled to finish his answer. Unless you want me to instruct him, if you think he was giving testimony.
14:38:59 MR. EWING: Understood.
14:39:00 A. What I'm saying is actually it is not our decision. It is a decision that was made collectively especially by the State of Connecticut Forensic Science Laboratory. If you know anything about GSR, you will know if you go to the hospital, just in a hospital, walk around the hospital and your hands will test positive for GSR. It is just what it tests for.
14:39:24 Q. This is a yes or no question. You did not test Mr. Rivera's hands for the GSR?
14:39:30 A. I did not.
14:39:31 Q. You said if somebody is walking around the hospital and had it on them. If they held an AK-47 and fired it, they would have gun residue on their hands,

14:39:35 correct?

14:39:35 A. Yes.

14:39:39 Q. Testing for gunshot residue is a fairly easy

14:39:57 process, correct?

14:39:57 A. You can swab his hand, yes.

14:39:59 Q. Just like at TSA in the airport?

14:40:02 A. I'm not sure what TSA at the airport does.

14:40:07 Q. Kind of what you did with the DNA. You take a

14:40:08 cotton swab and you put it on their hands.

14:40:11 A. I'm not familiar with that. That never happened

14:40:14 to me. I don't know.

14:40:16 Q. Now, all of your testimony, you didn't see Mr.

14:40:20 Rivera ever holding a firearm on the night in question,

14:40:23 correct?

14:40:23 A. I have never seen Mr. Rivera until today.

14:40:26 Q. And nothing in your analysis can tell us that

14:40:31 Mr. Rivera held that gun, correct?

14:40:33 A. Yes.

14:40:37 MR. EWING: No questions, Your Honor.

14:40:39 THE COURT: Any redirect?

14:40:40 MS. FREISMUTH: Just a couple of points, Your

14:40:43 Honor.

14:40:46 REDIRECT EXAMINATION

14:40:46 BY MS. FREISMUTH:

14:40:47 Q. Pull up Government's Exhibit 21. You had

14:45:30 Q. And when you are on patrol, do you respond to calls that are made for help or assistance?
14:45:36 A. Yes, ma'am.
14:45:37 Q. Or to a 911 call?
14:45:39 A. Yes.
14:45:40 Q. Is that what you mean by calls of service?
14:45:42 A. Yes.
14:45:43 Q. And prior to becoming a Stamford police officer, where did you work?
14:45:47 A. City of Waterbury.
14:45:48 Q. Were you a Waterbury police officer?
14:45:51 A. I was.
14:45:51 Q. How long were you a Waterbury police officer?
14:45:53 A. For five years.
14:45:56 Q. Before becoming a police officer in Waterbury, what did you do?
14:45:59 A. I sold pest control.
14:46:02 Q. How long did you sell pest control?
14:46:04 A. For about five years as well.
14:46:06 Q. Who did you work for?
14:46:07 A. A company called Amtech out of Brookfield.
14:46:11 Q. Was that here in Connecticut?
14:46:12 A. Yes, ma'am.
14:46:13 Q. What's your educational background?
14:46:15 A. I have three years of college experience.

14:47:17 Q. I apologize. When you were a Waterbury police officer, were you also a patrol officer?
14:47:22 A. I was.
14:47:23 Q. And did you usually patrol in uniform?
14:47:26 A. I did.
14:47:27 Q. What did your uniform consist of?
14:47:30 A. My class C uniform, my ballistic vest.
14:47:34 Q. And it is marked like people will know that you are a police?
14:47:38 A. Yes. It's marked on the front.
14:47:43 Q. In 2023, as a Stamford police officer, do you routinely wear body-worn cameras?
14:47:51 A. Yes.
14:47:51 Q. In 2020, when you were a Waterbury police officer, were you issued a body-worn camera?
14:47:57 A. No, we didn't have them at that point.
14:47:59 Q. When did the Waterbury Police Department issue body-worn cameras?
14:48:03 A. I believe we got them July, 2021.
14:48:06 Q. Why is that date significant that you know when they were issued?
14:48:10 A. That's when the Police Accountability Act was put into place.
14:48:14 Q. When you say Police Accountability Act, do you mean the State of Connecticut law?

14:48:19 A. Yes.
14:48:20 Q. I'm going to turn your attention back to July 2020. You were a member of a Waterbury Police Department then?
14:48:29 A. I was.
14:48:29 Q. How long at that point had you been a Waterbury police officer?
14:48:34 A. On the road, I was for two years.
14:48:37 Q. Your duties in July of 2020 were as a patrol officer?
14:48:41 A. Yes, ma'am.
14:48:42 Q. More specifically, I'm going to turn your attention to July 5, 2020. Were you working that day?
14:48:48 A. I was.
14:48:49 Q. What hours were you working?
14:48:51 A. From 10:00 p.m. to 6:00 a.m.
14:48:54 Q. Was that 10:00 p.m. on July 4, 2020 into July 5 of 2020?
14:49:00 A. Yes.
14:49:02 Q. What was you assignment on that date?
14:49:04 A. I was the patrol wagon which means that I pick up. I pick up suspects from the crimes where they committed them.
14:49:13 Q. You were assigned that at the beginning of your shift?

14:49:16 A. Yes.
14:49:16 Q. Is that how it is routinely decided what role you will play?
14:49:23 A. Yeah.
14:49:23 Q. What type of vehicle were you in that night?
14:49:26 A. It is a standard van.
14:49:29 Q. When were you driving -- were you alone in that van?
14:49:32 A. I was.
14:49:34 Q. At approximately 2:00 a.m., did you respond to Williams Street in Waterbury, Connecticut?
14:49:40 A. I did.
14:49:41 Q. Why did you respond to that location?
14:49:43 A. I responded because Officer Porzio called out a foot pursuit.
14:49:48 Q. How did you get that information he called out a foot pursuit?
14:49:53 A. I heard it over the police radio.
14:49:55 Q. Where were you when you received that information?
14:49:57 A. I was by the mall that's adjacent to East Main Street which is next to Williams Street.
14:50:03 Q. When you say the mall, do you mean like a shopping mall?
14:50:06 A. Yes.

14:50:07 Q. What's the name of the mall in Waterbury?
14:50:10 A. Brass Mill Mall.
14:50:11 Q. So you responded to Williams Street from the
14:50:13 Brass Mill Mall?
14:50:14 A. Yes, ma'am.
14:50:15 Q. And what route did you take?
14:50:17 A. I took Union Street to East Main to Williams
14:50:21 Street.
14:50:22 Q. So when so you drove on Williams Street from
14:50:26 East Main Street?
14:50:26 A. Yes.
14:50:27 Q. And do you know what the street is that you
14:50:30 would reach if you drove up Williams Street?
14:50:33 A. I believe it is Laurel.
14:50:39 Q. When you got to Williams Street, what did you
14:50:42 do?
14:50:43 A. I saw Officer Porzio's marked police cruiser in
14:50:48 the area. I called out to him because I didn't know
14:50:53 exactly where he was.
14:50:53 Q. Did you initially see him?
14:50:56 A. I did not.
14:50:57 Q. What did you do after you saw the police
14:51:00 cruiser?
14:51:01 A. I started canvassing around the area of 31.
14:51:05 That's when Officer Porzio started walking back from

14:51:09 behind the residence towards me in the driveway.
14:51:13 Q. Did you park your vehicle?
14:51:13 A. I did.
14:51:14 Q. You got out of your vehicle?
14:51:16 A. I did.
14:51:16 Q. At that point is that when you were calling out
14:51:20 for Officer Porzio?
14:51:20 A. Yes.
14:51:21 Q. Did you see him immediately?
14:51:22 A. No.
14:51:24 Q. About how much time past before you saw him
14:51:27 approximately?
14:51:27 A. I would say about a minute.
14:51:29 Q. And you said he was coming from what direction?
14:51:33 A. He was coming from the back residence. I think
14:51:37 it is 31 Williams Street.
14:51:42 Q. Was he alone?
14:51:43 A. No.
14:51:43 Q. Who was with him?
14:51:46 A. Mr. Rivera.
14:51:46 Q. And did you know his name when you first saw
14:51:49 him?
14:51:49 A. No.
14:51:50 Q. Did you later learn it was Miguel Rivera?
14:51:52 A. Yes, I did.

14:51:54 Q. Did you interact with a Miguel Rivera that night?
14:51:57 A. I patted him down after we brought him to the back of our police cruiser.
14:52:02 Q. Do you see the person that you padded down in the courtroom today?
14:52:06 A. Yes.
14:52:07 Q. Can you point to that person and indicate an article of clothing that person is wearing?
14:52:14 A. (Indicating).
14:52:15 Q. You pointed in the direction. Can you indicate an article of clothing?
14:52:21 A. Blue suit.
14:52:22 THE COURT: I think the record will reflect that Mr. Rivera rose after a few moments. You identified the person standing?
14:52:32 THE WITNESS: Yes.
14:52:33 THE COURT: Thank you.
14:52:40 BY MS. STOLFI-COLLINS:
14:52:40 Q. Turning your attention back to July 5, 2020, where did you pat down the defendant?
14:52:49 A. As soon as we got back to the marked police cruiser, I patted him down for weapons and contraband.
14:52:56 Q. Did you find anything?
14:52:57 A. I found Mr. Rivera to have a live round in his

14:53:01 pocket.
14:53:02 Q. And in his pants pocket?
14:53:05 A. Yes.
14:53:09 Q. When you patted him down, was he handcuffed?
14:53:13 A. He was.
14:53:14 Q. Was he wearing anything of note?
14:53:17 A. Yes, he was wearing a ballistic vest as well.
14:53:22 Q. A ballistic vest that's something that's familiar to you?
14:53:25 A. Yes, it is something that I wear every day.
14:53:27 Q. Why do you wear it?
14:53:29 A. For protection.
14:53:37 Q. After you took the bullet from the defendant's pocket, what did you do with it?
14:53:41 A. I took that and the vest and took it back to headquarters which is where I submitted it as evidence.
14:53:48 Q. What type of bullet did you take from his pants?
14:53:53 A. It was a live round. I thought at first it was a 223 round.
14:53:59 Q. And you said that you put the bullet into evidence?
14:54:03 A. I did.
14:54:03 Q. And the ballistic vest that the defendant was wearing was that also placed into evidence?
14:54:10 A. It was.

Q. May I have one second, Your Honor? I'm going to show you. I have pulled up Exhibit 15 which I believe we agreed is going to be an exhibit.

Do you recognize Exhibit 15, Officer Fredericks?

THE COURT: Is that being published so, Tatiana, would you block the public view.

MS. STOLFI-COLLINS: Apologies.

THE COURT: 15 for ID is being shown to the witness.

MR. HAYES: No objection.

MS. STOLFI-COLLINS: I thought I had asked, Attorney Hayes, before I published it.

THE COURT: Exhibit 15 is a full exhibit absent objection. You may publish it, Tatiana.

BY MS. STOLFI-COLLINS:

Q. Officer Fredericks, do you recognize Exhibit 15 on this screen in front of you?

A. Yes, ma'am.

Q. What do you recognize it to be?

A. A live round.

Q. And is it the live round that was recovered from the defendant's pocket?

A. Yes, ma'am.

Q. How do you know that?

A. It has my name stamped on the evidence bag.

14:56:23 Q. That's what you do when you place evidence into the Waterbury evidence room?
14:56:27 A. Yes, ma'am.
14:56:28 MS. STOLFI-COLLINS: I'm going to now show you Exhibit 3.
14:56:49 MR. HAYES: No objection.
14:56:53 THE COURT: Exhibit 3 is a full exhibit.
14:56:58 MS. STOLFI-COLLINS: I didn't hear you.
14:56:59 THE COURT: I said Exhibit 3 is a full exhibit absent objection.
14:57:03 MS. STOLFI-COLLINS: Thank you.
14:57:04 THE COURT: All right. Thank you.
14:57:08 MS. STOLFI-COLLINS: May I approach the witness?
14:57:09 THE COURT: You may.
14:57:10 BY MS. STOLFI-COLLINS:
14:57:10 Q. I'm showing you Exhibit 3 that's in evidence.
14:57:14 A. Yes, ma'am.
14:57:14 Q. Can you tell the jury what that is?
14:57:17 A. Can I tell what it is you said?
14:57:20 Q. Yes.
14:57:21 A. It is the live round I found on Mr. Rivera.
14:57:25 Q. How do you know that?
14:57:27 A. It has my name stamped and says Waterbury police evidence on there.
14:57:38 MS. STOLFI-COLLINS: May I approach to take the

15:11:40 Q. Officer Porzio didn't tell you there was a live round in Mr. Rivera's pocket, right?
15:11:46 A. No, he did not.
15:11:47 Q. The round that you found on Mr. Rivera was actually live?
15:11:51 A. It was.
15:11:52 Q. Meaning that when you say "live," can you tell the jury what does that mean?
15:11:56 A. Unspent, hadn't been used.
15:11:59 Q. If it hasn't been used, fair to say that it can be used?
15:12:05 A. It can, yeah.
15:12:07 Q. You testified earlier that you thought initially was a 223 caliber. Am I saying that right?
15:12:15 A. Yes.
15:12:16 Q. That's what you thought at the time?
15:12:18 A. Yes. That's what my sergeant told me.
15:12:22 Q. You said somebody told you it was a 223 round?
15:12:26 A. Yes.
15:12:27 Q. And when you were shown -- Court's indulgence?
15:12:54 THE COURT: Yes.
15:13:38 BY MR. HAYES:
15:13:38 Q. This is in as full. I am showing Government's Exhibit 15. Can you see that, Officer?
15:13:45 A. Yes, sir.

15:13:46 Q. And you testified earlier that you're familiar with this what's depicted in the photograph the round in the photo because of what?

15:13:59 A. My name is stamped on the evidence packaging.

15:14:01 Q. What does that mean? What's the significance of your name on the evidence bag?

15:14:07 A. When I collect the evidence and I submit it, I have to print my name on the package to put it on the front to show that I'm the one that submitted it.

15:14:16 Q. That's part of your training. You received training to know how to do that, to know the importance?

15:14:23 A. Yes, sir.

15:14:23 Q. Are you familiar with the term "chain of custody"?

15:14:28 A. Yes, sir.

15:14:29 Q. Is this part of the chain of custody process what you just explained?

15:14:34 A. Yes.

15:14:36 Q. Could you tell the jurors the significance of chain of custody? What does that mean?

15:14:45 A. So you take the evidence from the crime scene. You take it back to headquarters. Then you submit it as evidence.

15:14:57 Q. It is logged in?

15:14:59 A. Yes, sir. It is entered into, after its been

put in the evidence, it's put in a locker for safekeeping.

Q. And if you were to let's say that piece of evidence, number 15, that that was needed for court and Agent Ladyga took that evidence, would he have to show he was part of the chain of custody, meaning he touched or handled evidence?

A. Yes. He would have to fill that out.

Q. So it is also fair to say that if let's say your sergeant, who you talked about earlier, if he found the round first and then gives it to you, the chain of custody would be from the sergeant to you to the locker?

A. Yes.

Q. And that's because it is important, chain of custody is important?

A. Yes, it is.

Q. It is not just this round, right? It could be the AK that's in this case, involved in the case, right?

A. Yes, sir.

Q. Or even the ballistics vest, right?

A. Yes.

Q. When you were handed Government's Exhibit 28, which is the vest, the ballistics vest, you read that it is a ballistics vest, right?

A. Yes, sir.

15:20:50 THE COURT: He wasn't in the courtroom.
15:20:53 MR. HAYES: No, Your Honor, but he knows Officer
15:20:56 Babakov.
15:20:56 MS. STOLFI-COLLINS: What's the basis for
15:20:58 knowing his training, Your Honor?
15:21:02 MR. HAYES: I will withdraw that question. I
15:21:04 can continue.
15:21:05 THE COURT: Thank you very much. I think that's
15:21:08 helpful.
15:21:09 BY MR. HAYES:
15:21:09 Q. You are not an expert in ballistics, right?
15:21:13 A. No, sir.
15:21:13 Q. You are not an expert in forensics, are you?
15:21:16 A. No, sir.
15:21:17 Q. So when you testified earlier about the insert
15:21:23 in the vest, you didn't know what that insert is for,
15:21:28 right?
15:21:28 A. I do know it is for protection because the
15:21:31 outside layer doesn't stop anything. It is just to hold
15:21:35 the ballistic vest itself.
15:21:36 Q. You don't know what type of protection. You
15:21:39 never wore that vest?
15:21:40 A. That particular vest?
15:21:41 Q. You never got shot when you had that vest on?
15:21:44 A. I have never been shot period.

15:21:47 Q. Thankfully. You never tested that vest to see if it could keep bullets from penetrating?
15:22:00 A. No. It does say on there that it can't stop a rifle round.
15:22:05 Q. It says on the --
15:22:05 A. Saying it on the vest.
15:22:07 Q. It says it's a ballistics vest, right?
15:22:08 A. Yes.
15:22:10 Q. You have never tested it, right?
15:22:12 A. No.
15:22:13 Q. You don't know how old it is?
15:22:15 A. I don't.
15:22:16 Q. You don't know how worn it is?
15:22:18 A. No.
15:22:18 Q. When you handled the vest, did you see on what would be the back of the vest there was dirt or paint or something?
15:22:28 A. Looked like dirt.
15:22:29 Q. So it was an older vest?
15:22:32 A. I don't know how you can quantify that is old or not. It had dirt on it.
15:22:39 Q. That's fair. That's not your vest, though?
15:22:43 A. That's not my vest.
15:22:58 Q. Now, when you see Mr. Rivera, did he still have the vest on?

15:23:05 A. He did.
15:23:06 Q. When you take him into the van, did you keep the vest on him?
15:23:12 A. No, it was taken off him.
15:23:13 Q. Did you take it off of him?
15:23:16 A. Not that I recall, no.
15:23:18 Q. So when you say that, were you -- did you transport Mr. Rivera to the police department yourself?
15:23:28 A. I did not.
15:23:29 Q. You had someone else with you?
15:23:32 A. I did not transport him.
15:23:33 Q. You did not transport him?
15:23:36 A. No.
15:23:54 Q. So you -- let me understand this. Did you take the vest back to Waterbury Police?
15:24:05 A. I did.
15:24:05 Q. But not Mr. Rivera?
15:24:08 A. No.
15:24:08 Q. And you took the live round back to Waterbury police?
15:24:13 A. I did.
15:24:14 Q. Obviously Mr. Rivera --
15:24:16 A. Yeah.
15:24:17 Q. You don't know who transported Mr. Rivera?
15:24:20 A. I don't.

Having been called as a witness, was first duly sworn and testified on his/her oath as follows:

THE WITNESS: Yes.

THE CLERK: State your name and spell your last name for the record.

THE WITNESS: Mandy Young, M-a-n-d-y Y-o-u-n-g, Meriden, Connecticut.

THE COURT: You may seated, ma'am. Thank you.

MS. STOLFI-COLLINS: May I inquire, Your Honor.

THE COURT: Yes please.

DIRECT EXAMINATION

BY MS. STOLFI-COLLINS:

Q. Good afternoon.

A. Good afternoon.

Q. I'm going to ask you to repeat your full name for the jury?

A. My name is Mandy Young.

Q. Are you recently married?

A. I am.

Q. What was your maiden name before you became Mandy Young?

A. Mandy Pascu.

Q. When did you get married, what the year?

A. October of 2022.

Q. And Ms. Young, where you currently employed?

15:31:24 A. At the State of Connecticut at the Forensic Lab.
15:31:27 Q. And how long have you worked for the State of Connecticut Forensic Lab?
15:31:32 A. Just shy of five years.
15:31:34 Q. What's your title at the lab?
15:31:35 A. I am a Forensic Science Examiner One and the Alternate CODIS Administrator.
15:31:38 Q. Can you tell me where you went to undergraduate?
15:31:46 A. I went to the University of Akron in Ohio.
15:31:50 Q. What did you study?
15:31:52 A. I studied biology.
15:31:55 Q. After you graduated from University of Akron, where did you go?
15:32:00 A. To the University of New Haven.
15:32:02 Q. What did you study at the University of New Haven?
15:32:05 A. Forensic science.
15:32:10 Q. What degrees do you currently have?
15:32:13 A. I have a Bachelor of Science in Biology and I also have a Master of Science in Forensic Science.
15:32:24 Q. What are your responsibilities as a Forensic Examiner One at the State of Connecticut lab?
15:32:31 A. At a Forensic Science Examiner One, my duties are to process biological samples and process DNA samples. I also write reports on my conclusions and I

15:38:38 to review.

15:38:41 Q. This is the process that's followed in every

15:38:44 case where DNA is asked to be tested?

15:38:47 A. Yes.

15:38:50 Q. You briefly mentioned earlier what DNA was. Is

15:38:54 a person's DNA the same throughout his or her body?

15:38:58 A. Yes, it is.

15:38:58 Q. What part of the body contain DNA?

15:39:02 A. Anything that has a cell. So you might have --

15:39:05 so you will have DNA within your skin cells, within

15:39:09 saliva, any type of bodily fluid such as semen or blood.

15:39:15 Q. Are there any exceptions to -- you mentioned

15:39:18 that DNA is unique. Are there exceptions to that?

15:39:21 A. Identical twins.

15:39:24 Q. So DNA can be used to differentiate between

15:39:28 individuals?

15:39:28 A. Yes, it can.

15:39:32 Q. How do you go about doing that?

15:39:35 A. The process to obtain a DNA profile is a

15:39:41 standard procedure set by the lab. It is a multistep

15:39:44 procedure. So the first thing we do to obtain a DNA

15:39:47 profile before we do a comparison is extract it so that

15:39:51 first step takes the DNA from inside the cell. It

15:39:54 purifies it, isolates it on its own. The next step is a

15:40:00 quantification step. It tells us how much DNA is present

16:30:54 MS. FREISMUTH: No objection.

16:31:00 THE COURT: Attorney Hayes, I have sometimes charged this crime as four elements subsequent to the Supreme Court decision, but cases they seem to do both, but I think the more recent ones seem to do it as three.

16:31:17 MS. FREISMUTH: I will say it is in line with the parties' stipulation.

16:31:21 THE COURT: That's why. They are not going to deliberate and check off what's been proved.

16:31:27 MR. HAYES: Yes.

16:31:28 THE COURT: So you are all right with that, too, Attorney Hayes?

16:31:32 MR. HAYES: Yes.

16:31:32 THE COURT: Great. 29, possession of a firearm. I will point out in case you had missed it, I struggled mightily. The indictment uses the form of writing which I hate and/or. I never heard anybody speak in conversation she had a cat/dog and/or dog. You know, and so I think it is very unclear. The case law is clear that any one of those will prove. If possession of one of the items listed is proven that satisfies the element. We went through this on the motion to dismiss. I don't know that the jury will understand that if I keep using and slash, and/or, however that uses is in the indictment and so I have used ammunition or firearm except in one or

16:32:32 two rare cases. Quoting the indictment and maybe
16:32:36 somewhere else I saw and when I talk about moving in
16:32:41 interstate commerce. They both have to if they are going
16:32:45 to be found. As far as what the jury has to find, I say
16:32:49 or. If there's an objection to that, I want to be sure
16:32:53 that's probably the thing we spent the time on in this
16:32:56 charge. I don't know that I ever had a drug or firearm
16:33:01 kind of multiple objects. I might have in a drug case or
16:33:05 conspiracy to distribute drugs of different kinds. I
16:33:11 didn't know what to do about and/or. As we come upon it,
16:33:18 please let me know if anybody objects.

16:33:21 Charge 29 definition of some of the terms in the
16:33:26 possession element and then, of course, my description
16:33:29 that they must unanimously agree that the defendant
16:33:35 possessed at least one of the following: I don't think
16:33:38 that's as clear as it could be. It could be read by a
16:33:42 jury to mean they all have to agree on either 1, 2 or 3.
16:33:51 It should be "or" not "and", Michael. I mean I just
16:33:56 started the sentence by saying at least one of the
16:33:59 following, right? You wouldn't expect an "and". I don't
16:34:10 think it's clear enough. I guess the next sentence
16:34:16 clarifies it. You need not unanimously agree as to which
16:34:18 one he possessed so long as -- I don't know whether that
16:34:24 should be all or either of you find that he possessed
16:34:28 one, if not more, of 1, 2 and 3.

16:34:31 MS. FREISMUTH: I'm not sure it is helpful, but
16:34:34 I did pull the jury instructions from the Workman case
16:34:38 that's one of the cases cited in our motion. I have a
16:34:41 copy if you would like to see it. I wouldn't say it is
16:34:46 particularly descriptive. I'm not sure the direction the
16:34:48 Court wants to go.
16:34:48 THE COURT: What Court is it out of?
16:34:50 MS. FREISMUTH: It's a district court case. One
16:34:53 that was the subject I believe of the First Circuit case
16:34:56 that we cited in our motion.
16:34:57 THE COURT: Do you have a copy for defense
16:34:59 counsel? If you can give that to my law clerk, I will
16:35:03 take a look at it.
16:35:05 Counsel, do you have any suggested language
16:35:08 about this particular charge? To me, this is key.
16:35:12 MS. FREISMUTH: We have some other instructions.
16:35:14 We thought, if you look at the instruction from the
16:35:19 Workman case. To save paper, we took the front page and
16:35:32 took the charge at issue. They, in essence, don't go
16:35:36 into details what the items are. Instead they stick with
16:35:40 just the instruction. The other proposal the Government
16:35:45 would have is that, at the end of your instruction, you
16:35:47 write if you find he possessed one, if not more of 1, 2,
16:35:50 or 3. The Government would request that you again spell
16:35:54 out what items 1, 2, 3 are so it is clear what those

16:36:00 items are.

16:36:00 THE COURT: I think I would probably change it.
16:36:02 You need not unanimously agree as to which of these items
16:36:11 Mr. Rivera possessed so long as each of you find he
16:36:14 possessed one, if not more, then iterate the three of
16:36:18 them.

16:36:18 MS. FREISMUTH: That makes sense.

16:36:18 THE COURT: I thought of that as I read it before
16:36:23 you even commented. Anything else on that one?

16:36:25 MS. FREISMUTH: No, Your Honor.

16:36:25 THE COURT: There's a little language in this
16:36:27 Workman one that I think I like. I will have to look at
16:36:31 it in a quiet moment.

16:36:33 Attorney Hayes, any comment as written or if you
16:36:36 had a chance to look at Workman. I guess let me just
16:36:45 tell you that what is the third paragraph "to return a
16:36:49 verdict of guilty", probably phrase that more like to
16:36:54 prove this element on Count One but that's really putting
16:37:00 it very clearly, but I don't know whether I need it or
16:37:05 how I would rework other thing to fit it in in the right
16:37:09 place. If you have any comment on that language or on
16:37:12 the existing charge?

16:37:17 MR. HAYES: Your Honor, I'm not even sure what
16:37:24 to say. I'm still stuck on my Motion to Dismiss.

16:37:27 THE COURT: I know you are and I went back last

16:37:31 night because of the issue of interrogatories and I read many cases, not all the ones I read at the time of that motion. I have to say -- I think Judge Lopez, whom I have who wrote the First Circuit, I have a lot of respect for Judge Lopez. I think his opinion was a really good and sound opinion and reflected in its adoption by everybody else that followed him. I'm not sure it is what I would have predicted, but when I dug in and looked at the underlying and principals he relied on and the language in the statute and the whole sort of development of the law as to lists of things. You know, when they are treated one way or another an element or not, I was persuaded that his analysis is correct so yeah, I think it is correct. So, you know, obviously this is an issue you have for appeal as well as the suppression ruling. If I'm wrong, I'm happy to hear from the circuit on it.

16:38:45 It is one of those questions which is this is what I think is the right result. I can see. I don't know. I'm not sure I could see the circuit going another way. In fact, I say I didn't because of those other cases the circuit has that kind of hinted what they would do and the Supreme Court cases the cite when they are hinting. So it is what it is, Attorney Hayes, and I understand you are struggling. It is what you got so if there's some way you want me to edit this to make it

clear, or clearer or fairer for your client, you need let me know.

MR. HAYES: The Court is not going to use the interrogatories?

THE COURT: I don't know. We're going to discuss that when we finish the charge.

MR. HAYES: Okay.

THE COURT: I haven't decided. I haven't heard from you really as to your position. If you do want it, what do you want by way of an interrogatory? It is easy to ask, but you need to tell me what your proposal is. It is not easy.

Judge Knapp out of the Southern District got reversed. He wanted to do a series of interrogatories. Somebody got an inconsistent verdict. I don't remember the name of the case I was reading. It is very easy I think.

My view is there's a benefit. A lot of people cite sentencing as a benefit did he possess one bullet or not. The problem for the defendant if he's convicted, at sentencing, I have to apply a preponderance. I've heard all of the evidence. I will decide that. Even if the jury -- if it was asked and didn't find that unanimously or whatever but the only advantage I see if I'm wrong on the motion to dismiss, Attorney Hayes, a proper set of

16:40:35 interrogatories could avoid the need for retrial, but I'm not sure it would eliminate it. Let's say I charge the jury wrong. You go up and get it set aside. I don't know.

16:40:51 Would the Government have the right to retry under the instructions of law that I received from the Circuit? It is not that there's an acquittal just because they found it wasn't unanimous. I told them they can return a verdict on less than unanimous. I believe the Government would get to retry. If it is the proper charge, one count, and I have done it correctly, then that's not going to get reversed. If I've done it wrong, I think what you get is retrial anyways. Unless I guess the only way you avoid a retrial is if they find one of the three categories unanimously all five was possessed. Let's say the single was in the pocket. If they believe that was in Mr. Rivera's pocket, but you could still argue that was harmful error. Some kind. I don't know what you would argue. I'm sure you would come up with something. I don't know if the Circuit would accept it or not. I think unlikely would avoid a retrial if I'm wrong on this issue and the Circuit adopts a contrary view so I don't know. We need to talk about interrogatories. I have not decided that yet.

16:42:11 Any comment on Charge 29?

16:42:20 MR. HAYES: At the moment, no.

16:42:24 THE COURT: How about 30, which is pages 38 through 40?

16:42:29 MS. FREISMUTH: Not from the Government, Your Honor.

16:42:31 MR. HAYES: No, Your Honor.

16:42:32 THE COURT: Thank you. 31, any comments, the interstate commerce? I noted that the -- do I use and foreign. I noticed in the picture of the firearm, there's a reference to Romania and Bulgaria.

16:42:52 MS. FREISMUTH: They are all actually foreign, Your Honor, even ammunition.

16:42:56 THE COURT: I use that consistently. In the precharge, there's one time I just said interstate. I hadn't focused on the fact that it was foreign. I didn't know the guns were from overseas.

16:43:05 MS. FREISMUTH: Your Honor, the interstate nexus that's coming in pursuant to stipulation will also explain it is foreign commerce as well as. I'm sorry I didn't raise it earlier. I would note that 30 and 31 also contain section references to other pages.

16:43:22 THE COURT: Please, Michael, delete the page number references, keep separate and can bold them so you need to search the charge for the word "section". And assuming it is not referring to the statute, you need to

16:49:55 the right phrase or I have just completely left out a
16:50:00 charge that you think is necessary. Anybody have
16:50:03 anything along those lines?

16:50:04 MS. FREISMUTH: Not from the Government.

16:50:06 We have no additional ones other than those
16:50:17 raised today.

16:50:17 THE COURT: For you, Attorney Hayes, anything
16:50:19 you requested that I did not include or that you think my
16:50:24 language -- like you did you think I could improve that
16:50:27 section. What is it that you like me to do?

16:50:31 MR. HAYES: Up until last night, I'm looking at
16:50:36 previous charges that we have requested in previous
16:50:39 cases. No is the short answer. Only what I raised
16:50:43 today.

16:50:44 THE COURT: You are all right with my use of the
16:50:48 ammunition. I know you don't like the ruling and I know
16:50:50 you will appeal it if there's a guilty verdict. Given
16:50:53 what I say the law is and that I'm applying here are you
16:50:57 all right with my use of "or"? Ammunition or firearm
16:51:01 except in the few situations?

16:51:03 MS. FREISMUTH: Yes, Your Honor. Especially
16:51:03 given the charge in the conjunctive and proven in the
16:51:09 disjunctive.

16:51:11 MR. HAYES: For now, I am. We were going to
16:51:13 tonight to try to put together an interrogatory, not that

16:51:17 late tonight, to send something to the Court.

16:51:19 THE COURT: If you want to propose something, go
16:51:22 ahead. I will tell you that a proposal was made in
16:51:27 chambers, shall I say, and I took a look at that and said
16:51:27 oh, that could be an inconsistent verdict. It is more
16:51:35 complicated than you think it is going to be. I would
16:51:38 really welcome. If the defendant wants me to give it, I
16:51:42 will be inclined to give it. I will not give it if I end
16:51:46 up with inconsistent verdict or some confusion or it is a
16:51:51 challenge. As I say, I would very much welcome if you
16:51:55 come up with something and you are ready to send it
16:51:58 tonight to Michael and send it to the Government. We can
16:52:02 maybe find a few minutes in the morning to discuss it or
16:52:06 I don't know if we have any other issues for tomorrow
16:52:11 morning, Michael? I don't think so that I can think of.
16:52:16 I did have an agenda. I think I covered everything this
16:52:20 morning. We haven't talked about the verdict form.
16:52:25 We'll get to that in a second. I talked to you about
16:52:28 exhibits. You don't think you will finish tomorrow.

16:52:45 MS. FREISMUTH: If we do finish, there will not
16:52:48 about a lot of time.

16:52:50 THE COURT: Do you have a witness available to
16:52:51 go with if we end up with half an hour, hour. Would Ms.
16:52:57 Julian be sufficient. Or who do you want to put on
16:52:59 first. You want an officer.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
) October 18, 2023
vs. ) 3:20cr168(JCH)
MIGUEL RIVERA ) 9:14 a.m.
Defendant. )
) 141 Church Street
New Haven, Connecticut

DAY 2 OF JURY TRIAL

B E F O R E:

THE HONORABLE JANET C. HALL, U. S. D. J.

FOR THE GOVERNMENT:

Natasha Freismuth
U.S. Attorney's Office
157 Church St., 25th Floor
New Haven, CT 06510

Patricia Stolfi Collins
United States Attorney Office
157 Church Street
New Haven, CT 06510

FOR THE DEFENDANT:

Tracy Hayes
Federal Public Defender's Office
265 Church St., Suite 702
New Haven, CT 06510-7005

Josh B Ewing
Federal Defender of Connecticut
10 Columbus Blvd.
Hartford, CT 06106

had it in there a lot, but it was maybe in the wrong order. I edited the language you liked that you wanted me to edit, and then I just moved the paragraph about deliberating to after to make more emphasis in that location. Does that satisfy you?

MR. HAYES: That's what I wanted.

THE COURT: Hopefully, if that's okay with you, that would be great.

MR. HAYES: Yes.

THE COURT: That's kind of not the biggest. And then the other one the closing remarks. I can't remember who raised that one.

MS. FREISMUTH: That was Attorney Hayes, Your Honor.

THE COURT: Is that one all right? Charge 33, page 42. I made a new paragraph.

And then the other one that's challenging is that unanimity one. What number is that one, Michael?

THE LAW CLERK: That is 29, Your Honor.

THE COURT: Thank you. The one about the gun and ammunition ones. I don't know if you folks can take a look at that and give me -- if you have a reaction. I can convene again after the trial, but I really don't plan to spend another long night here, so I did not want to have a long conference this afternoon. I don't know

whether you'll have time to look at them any better than now.

MS. FREISMUTH: Your Honor, the Government did look at the changes that you made, and we had no comments or suggestions.

THE COURT: Attorney Hayes, can you take a look at -- I edited the paragraph. At the bottom of page 36 is where the big change is. Again, it was a little bit of moving around not so much changing the substance, but it was sort of making it clearer.

MR. HAYES: We moved on from closing remarks? I'm not sure --

THE COURT: We're on Charge 29. I forget the page number. It's the one about possession charge, Element 1. It's the one we talked about that you can't get past the motion to dismiss. I don't say that in a critical sense. I understand that. But it's trying to get the jury to understand they have could be unanimous as to the object of the crime of possession, they don't have to be unanimous on any one object or another.

MR. HAYES: Mr. Ewing and I should talk about this particular charge this morning and --

THE COURT: If you have any suggestions, I am very open. I think we know the substantive is really the wordsmithing so it's clear to the jury, is really what I

think I'm worried about at this point.

MR. HAYES: I'm going to defer to the Court in terms of how it is written in this form. I want to make sure that we preserved our motion to dismiss.

THE COURT: You absolutely have. There's no question about that, is there, Attorney Freismuth?

MS. FREISMUTH: No, Your Honor.

THE COURT: It is a conviction, absolutely. You object. Anything that has to do with pretrial rulings that could, in turn, impact how I charge, yeah. You have just preserved any objection. Let's leave it at that. I don't know if you had to -- given the ruling, you don't have any suggestion for me how to say it better or if you think it is wrong the way given the assumption of the ruling. That's what I'm trying to get to.

MR. HAYES: No. thank you.

THE COURT: I understand you are preserving and I hope you understand that I don't -- I will make it clear, you can't go to the Court and -- I don't know how this would happen. I guess it could happen this way. They could say, no, Judge Hall got it right on the motion, but this charge is a terrible charge. But you are then there with your position that it would be plain error. Maybe it is an error fully reviewable. I'm not an expert on appeal at law. But what I'm trying to do

is -- you have a right to preserve on the fact that this is the charge the way it is given in light of the law I found in the motion to dismiss. If you assume the law I came to was correct, then you have a right to object how I'm giving the charge. That's what I want to give you the opportunity to do. I think you told me you don't have any comment or objection.

MR. HAYES: Correct, Your Honor.

THE COURT: I just realized the defendant is not here. Tatiana, it is 22 minutes past 9:00. I believe I announced we would start at 9:15. That is my error. Could we have appearances while Tatiana gets on the phone.

MS. FREISMUTH: I apologize, Your Honor. Assistant United States Attorney Natasha Freismuth and Tricia Stolfi Collins for the Government. Seated at counsel table is Special Agent Eric Ladyga.

THE COURT: Thank you all, and good morning. You were all here since I said the words Attorney Freismuth as you walked back --

MS. FREISMUTH: Yes, Your Honor. Thank you.

MR. HAYES: Thank you, Your Honor. Tracy Hayes, on behalf of Miguel Rivera. He should be here shortly. We just met with him earlier. With me is my co-counsel Josh Ewing and Tommy Craft, our investigator, and our

MS. STOLFI COLLINS: Have you published it, Tatiana?

BY MS. STOLFI COLLINS:

Q. Is it a two-page report?

A. Yes, it is.

Q. And you can see it in front of you?

A. Yes.

Q. Can you please tell the jury what the laboratory case number that was assigned to your analyses?

A. It is DSS-20-002984.

Q. When is that case number assigned at the lab?

A. It is assigned upon submission of the evidence.

Q. So when it actually comes to the Connecticut State Lab from the P.D.?

A. Yes, that's correct.

Q. What was the date of request? Is that when they bring it?

A. Yes.

Q. What was that date in this case?

A. It was July 15th of 2020.

Q. When did you complete your analysis?

A. I completed the report on March 22, 2022.

Q. That was two years after it was submitted?

A. Yes.

Q. And what was submitted to the lab?

A. Two swabs were submitted at that point for testing. It was Item 3 and Item 4.
Q. What was Item 3?
A. Item 3 were swabs of a handle and magazine.
Q. When you say handle and magazine, that would be from a firearm?
A. Yes.
Q. That's also in the Exhibit 30?
A. Yes.
Q. And then you mentioned there was another item. What number was that given?
A. Item 4.
Q. What was submitted under Item 4?
A. It was swabs of a trigger and a slide.
Q. Also from a firearm?
A. Yes.
Q. What steps did you take to get to your determinations?
A. So I analyzed the data. And during this point, I made sure that everything was processed appropriately, and gave an estimate number of a contributors associated with the DNA profile obtained from the swab submissions to the lab. Then I write up a report listing the item numbers. And the number of contributors does not get reported out until there is additional information to

THE COURT: No objection to Exhibit 31. Exhibit 31 is a full exhibit.

BY MS. STOLFI COLLINS:

Q. Did you have a chance to get the information that you were looking for and have a known sample to do the analysis on?

A. Yes.

Q. That was done by the police department brings to you the suspect's DNA, going through the same process that it's dropped off, and then eventually comes to the same person who did the initial testing?

A. That's correct.

Q. Does that routinely happen?

A. Yes.

Q. So you receive the data from the person who tested the swabs?

A. Yes.

Q. You did your analysis?

A. Yes.

Q. Did you generate another report?

A. Yes.

Q. Is that Exhibit 31?

A. Yes, it is.

Q. The date of that request was when?

A. February 7, 2023.

Q. That date would mean the date law enforcement would bring the known swab and bring it to the State of Connecticut Lab?

A. That's correct.

Q. And is the lab case number the same as your initial testing?

A. Yes, it is.

Q. What is that number?

A. It's DSS-20-002984.

Q. The swabs that you are testing are swabs that are taken by law enforcement and brought to the lab, correct?

A. That's correct.

Q. You can only look at that swab and then make a comparison, correct?

A. Correct.

Q. If they don't bring it to the lab, there's no DNA, you are just limited to what's given to you?

A. That's correct.

Q. When did you complete your report this second comparison?

A. March 16 of 2023.

Q. So the lab received it on February 7, 2023 and you completed your report on March 16, 2023?

A. That's correct.

Q. In this -- what were comparing in this report?
A. I was comparing the known item, Submission Number 5, a known buccal sample from Miguel Rivera.
Q. What did you do determine?
A. I determined that was he eliminated from both samples.
Q. So let's take each exhibit number. Number 3 is the same evidence that you talked about earlier?
A. That's correct.
Q. What is that?
A. It is a mixture profile from the handle of a magazine.
Q. You mentioned that you were able to determine how many people were in the mixture. How many did you determine Item Number 3 contained?
A. Three contributors.
Q. But the known sample from Miguel Rivera was eliminated?
A. Yes, the results indicated that he was eliminated.
Q. Was that done manually or through the STRmix?
A. That was done through the STRmix.
Q. Did you do a manual comparison?
A. I did on Item Number 4. I did a manual visual comparison at first and determined I needed the software

to assist me.
Q. Which item are we discussing? Sorry. I was talking about 3 and you mentioned 4.
A. I circled back. I did do a visual comparison to Item 3-1 with the known first before I used the software, yes.
Q. With Item Number 3, you did a manual comparison?
A. Yes.
Q. Could you determine from a manual comparison?
A. No.
Q. Why?
A. There was some similarities, but not enough for me to -- and some differences, but not enough for me to determine that he was eliminated or possibly included. So I needed the software to help give a statistic.
Q. So you did a manual comparison and there were some similarities to the defendant's DNA, or Miguel Rivera, but you couldn't make a determination it was him or wasn't him?
A. That's correct.
Q. Then you went to the STRmix statistical analysis and that's when you felt you had a probability he was likely eliminated?
A. Yes. I determined he was not a probable contributor to the profile.

Q. Then again -- I might have asked this. It was a mention to how many people in the DNA?

A. Three contributors.

Q. Moving on to Item 4. Did you do a manual comparison?

A. I did, yes.

Q. What did you determine from the manual comparison?

A. That he was eliminated.

Q. Did you do the STRmix after you determined it from the manual comparison?

A. I did not.

Q. And I'm not sure I asked this. Also, Number 4 was a mixture of multiple contributors?

A. Yes.

Q. How many contributors?

A. Two contributors.

Q. Then you signed your results and had a supervisor sign the results?

A. Yes.

Q. On Exhibit 31, that was your legal name?

A. Mandy Young.

MS. STOLFI COLLINS: May I have a moment, Your Honor?

THE COURT: Yes.

BY MS. STOLFI COLLINS:

Q. I'm going to turn your attention back to the explanation of DNA. When DNA is deposited on an item, what is it coming from?

A. It is coming from cells.

Q. I know we discussed this a little bit yesterday. Where on your body are the cells coming from?

A. They are from everywhere, but most of the time when they are deposited on evidence they come a biological fluid or surface cells or come from skin cells, saliva, sweat, blood, semen or vaginal.

Q. Does a person always leave their DNA when they touch something?

A. It is not like -- they won't always leave their DNA, no.

Q. Are there -- is it individual to the person if the DNA would come -- let me rephrase that.

So if I'm touching my pen, could I leave DNA on it?

A. It's likely that you would, yes.

Q. But there is a possibility that I would not?

A. That's possible, yes.

Q. Is every person different in the amount of DNA we shed from our fingertips?

A. Yes.

Q. Important enough that there's a backlog in your lab of many cases waiting for analysis, right?
A. It is getting better, but yes.
Q. I'm not complaining about the backlog. Just do you remember because more and more DNA samples are being taken from people, correct?
A. Yes.
Q. You would agree with me that when there is a match, it can be powerful evidence, correct?
A. It can, yes.
Q. Now, when my opponent was asking you questions, you were both talking about a limited amount of DNA being found. Do you remember that?
A. I do, yes.
Q. But you are not saying there's so little that you couldn't run your testing, right?
A. That's correct.
Q. Because you stand by your testing?
A. I do, yes.
Q. That means you had enough DNA to run your machine?
A. We run our testing regardless of how much DNA is in there. As long as we get a sample that is requested for us to do the testing, we'll go forward.
Q. You admit there was enough to go forward?

A. There was, yes.

Q. And I think I want to be real clear about this. You are not testifying here in a court of law that you found Mr. Rivera's DNA in those two samples, correct?

A. He was eliminated from the DNA profiles that we tested.

Q. You have no reason to believe the samples you were given were contaminated?

A. Correct.

Q. Or somehow deficient?

A. Correct.

Q. Okay. So I want to use some other simpler language to make sure that I understand this. You received two samples from the gun in this case that had DNA on it, correct?

A. Correct.

Q. One was swabbed from the trigger and the slide of the AK-47?

A. I don't believe the item number distinguished which gun was it from, nor was that in the report that I had. I just know that they are swabbings of a trigger and --

Q. And a slide?

A. Yes.

Q. And the other of a handle and a magazine?

A. Yes.
Q. And you found DNA in those samples?
A. DNA was detected in those samples, yes.
Q. From contributors, correct?
A. Correct.
Q. From people, correct?
A. Correct.
Q. I would like to turn your attention to what's been admitted as Government's Exhibit 31. I believe this is the second report you prepared in this case.
MR. EWING: If you can go to the second page, Tommy.
BY MR. EWING:
Q. I would like to call your attention to paragraph 1 and ask a question about that.
THE COURT: Hold on a second. Yes.
(Discussion Off the Record.)
BY MR. EWING:
Q. I need your help to dumb this down for me. The results are consistent with the DNA profile from Item 3 being a mixture of three contributors. That means there was DNA from three different people, correct?
A. Correct.
Q. And you know one of them was a male, correct?
A. Correct.

Q. Because men have a Y chromosome, correct?
A. Yes.
Q. And women do not?
A. That's correct.
Q. So at least one male human being's DNA was found in that mixture?
A. That's correct.
Q. And then when you say the results do not support the hypothesis that Miguel Rivera is a contributor to this profile, that means your hypothesis is that, oh, let's see if these things match, correct?
A. The hypothesis refers to a statistic generated from the STRmix. So it is actually -- that's not exactly the hypothesis. It is set up in regard to our stat and the likelihood that he may or may not be included.
Q. Let's turn to that last sentence then. We know there's DNA from three people found from in that swab, correct?
A. Correct.
Q. And Mr. Rivera's DNA was eliminated as a match?
A. That's correct.
Q. Now I would like to go to the other DNA sample. When it's blown up, it says the results are consistent with the DNA profile from Item 4, being a mixture of two contributors. That means DNA from two people was found

in this sample, correct?

A. That's correct.

Q. That's the DNA swab from the trigger and slide of the firearm?

A. That's correct, yes.

Q. Again, Mr. Rivera was eliminated?

A. That's correct.

MR. EWING: May I have a moment?

THE COURT: You may.

BY MR. EWING:

Q. Just one more thing. Anyone give you a DNA swab from a bullet to test in this case?

A. No.

MR. EWING: Thank you. No more questions, Your Honor.

THE COURT: Brief redirect?

MS. STOLFI COLLINS: May I have one moment, Your Honor?

THE COURT: You may.

MS. STOLFI COLLINS: I have a few questions, Your Honor.

REDIRECT EXAMINATION

BY MS. STOLFI COLLINS:

Q. You mentioned -- apologies. Can you hear me?

You mentioned -- when Attorney Ewing was asking

When you arrive, I ask if you would remain standing a moment so the clerk may administer an oath to you.

Thank you.

JOHN SANCHEZ,

Having been called as a witness, was first duly sworn and testified on his oath as follows:

THE WITNESS: So swear.

THE CLERK: Thank you. Please state your first and last name, and spell your last name for the record.

THE WITNESS: First name John. Last name Sanchez, S-A-N-C-H-E-Z.

THE CLERK: Thank you. And lastly, the city and state of employment.

THE WITNESS: City of Waterbury, Connecticut.

THE CLERK: Thank you.

THE COURT: You may be seated, sir, and good morning to you.

THE WITNESS: Good morning, Your Honor.

MS. STOLFI COLLINS: May I inquire, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. STOLFI COLLINS:

Q. Detective Sanchez, where are you currently employed?

A. With the City of Waterbury Police Department.

Q. How long have you been with Waterbury Police Department?
A. A little over 14 years.
Q. And what is your current title?
A. Detective.
Q. And how long have you been a detective with the Waterbury Police Department?
A. I started off as an acting detective in 2015, and then formally promoted in 2017.
Q. And you are a detective today?
A. Yes, ma'am.
Q. What were you before becoming employed in the police department as a detective?
A. I worked in the patrol division as a patrol officer.
Q. How long were you a patrol officer?
A. I was in the academy in 2008, and March of 2009 is when I officially began patrol.
Q. In the detective bureau, do you have any special assignments?
A. Currently assigned to the Waterbury Gang Task Force.
Q. Do you also have a federal role as a detective?
A. Yes.
Q. What is that role?

placed under arrest, is there a procedure you follow?

A. Yes.

Q. What is that procedure?

A. When somebody is under arrest with the Waterbury Police Department, we make sure they are not being charged with anything that's a Class A or B felony. Once that's determined, we can begin the interview process.

Q. And do you read someone who is under arrest their Miranda warnings?

A. Yes, ma'am.

Q. Turning your attention to July of 2020, were you working for the Waterbury Police Department?

A. Yes.

Q. And in 2020, you were a detective?

A. Yes, ma'am.

Q. How long had you been with the police department in 2020?

A. At that point, 11 years, give or take.

Q. Did you become involved in the investigation of a shooting and a firearm that was located on Williams Street?

A. Yes, ma'am.

Q. I'm going to turn your attention to that date, July 5, 2020. Were you working that day?

A. I was on call. We were on call that week.

Q. What does on call mean?

A. Part of being a detective in the detective bureau is we have to cover shifts -- we only cover shifts up to midnight. So after midnight, there's a rotating schedule. Detectives are on that on-call schedule, and that was my week.

Q. So if you are on call and something happens, do have to go in?

A. Yes, ma'am.

Q. Did you get a call to come in on July 5, 2020?

A. Yes.

Q. How did you learn that you needed to come in to the police department?

A. I received a phone call stating that there was a report of shots fired, somebody was placed under arrest for the incident and I had to come him and help investigate it.

Q. After you are called in, what kid you do?

A. Obviously, I'm home, I have to get ready. Drive to the police department, where I meet with Detective Modeen. Once we gather the minimum facts that we get, we went to the scene on Williams Street.

Q. So what would be your responsibilities once you came in from on call?

A. To respond to the scene. See if there's any

witnesses to the incident. If there were, they would be brought to the police station to be interviewed in this case. People only heard, they didn't see anything. Walked the scene, see if there is evidence that's located. If there was, try and look and see further evidence that might be located. We talked to the patrol officers that were there that had the road blocked.

Q. Take a step back. When you went to the P.D., what information did you know before you went to the scene?

A. We knew that shots fired definitely occurred. There's evidence on scene. We knew that prior to going there. We knew that there was a firearm recovered. We knew that someone was under arrest for that incident.

Q. Did you leave the Waterbury Police Department and go to the scene?

A. Yes, ma'am.

Q. Did you go to Williams Street?

A. Yes.

Q. What route did you take?

A. It is not too far from the police department, so we just took East Main, then turned from East Main down to Williams Street.

Q. You drove there?

A. Yes.

Q. Were you in a marked car?
A. Unmarked.
Q. And who was with you when you went to the scene?
A. Detective Modeen.
Q. Do you remember where you parked your vehicle?
A. Probably about halfway up. Like I said, the road was blocked so you were only able to get up a little bit of ways.
Q. You responded after the fact?
A. Yes, ma'am.
Q. What did you observe when you first got to the scene?
A. Like I said, patrol had the road blocked, and so we just started making our approach to the guys that were already there to see what they knew. Again, if there were any witnesses or anybody that came forward.
Q. What did you do after you spoke to the other officers?
A. We walked the scene to make sure there was no other evidence that could be located, any other witnesses to the incident. Once we determined that there nothing else we can do and it was turned it over to forensics, we reported back to the Waterbury Police Department.
Q. Was the person who was under arrest on scene on Williams Street when you arrived?

A. No, ma'am.
Q. Did you touch any of the evidence that was at Williams Street?
A. No, ma'am.
Q. After you left Williams Street, where did you go?
A. We went back to the Waterbury Police Department.
Q. What was your next step in your investigation?
A. Our next step, because someone was under arrest, we had to figure out whether they would be charged with any Class A or B felonies, which we did. And we determined there was no Class A or B felony being charged. So we determined that we were going to interview the person that was under arrest.
Q. And did you conduct -- did you meet Miguel Rivera on July 5, 2020?
A. Yes.
Q. Do you see the person that you met on July 5, 2020 that you learned was Miguel Rivera in the courtroom today?
A. Yes, ma'am.
Q. Can you indicate who that person is and an article of clothing that that person is wearing?
A. Sitting there at the desk with the blue mask between the two lawyers.

THE COURT: Has he risen, sir?
THE WITNESS: Yes.
THE COURT: The record will reflect that he's identified Mr. Rivera.
BY MS. STOLFI COLLINS:
Q. And this is the person that you met at the Waterbury Police Department on July 5, 2020?
A. Yes, ma'am.
Q. Where did you first meet him in the precinct -- in the P.D.?
A. In the booking area.
Q. What is a booking area?
A. It is where -- when someone is arrested, that's where they are brought into to be fingerprinted, processed, and determine whether they are going to be bonded out or not.
Q. When someone is placed under arrest, all of that happens before you --
A. In the booking area.
Q. In the booking area. So you went to the booking area to meet the person who was under arrest?
A. Yes, ma'am.
Q. You met the defendant?
A. Yes.
Q. What floor is the booking area on in the

Waterbury Police Department?

A. It is on the second floor.

Q. And after you met him, what was your goal -- what was your next -- after you met him, what were you going to do?

A. We explained that we wanted to speak with him about the incident that led up to him being arrested.

Q. Did you bring him somewhere to talk to him?

A. Yes. We brought him upstairs to the third floor, which is the criminal investigation bureau, also known as the detective bureau.

Q. When you brought him from the second to the third floor, was he handcuffed?

A. Yes.

Q. Did you go up the stairs or take an elevator?

A. No, took an elevator.

Q. And did you speak to him in English?

A. Yes.

Q. Did he understand what he was saying to you -- what you were saying to him? I apologize.

A. Yes, ma'am.

Q. How did you know that?

A. He replied back in English.

Q. You understood what he was saying to you?

A. Yes.

Q. Did he follow your directions as you moved him from the second to third floor?

A. Yes. He was very cooperative.

Q. Where did you bring him when you got to the second --

A. Third floor.

Q. -- I'm sorry, third floor?

A. We brought him into one of the interview rooms.

Q. What is an interview room?

A. It's kind of like a 10-by-10, 12-by-12ish room. They're all kind of set up the same. We have three of them. One is a little bigger than other one, but they usually have a metal desk, a chair that sets next to the desk facing this way (indicating), a chair at a desk with a computer kind of facing opposite. There may or may not be one or two chairs behind the other chair.

Q. The room that you brought the defendant in was set up with a desk and a chair as you just described?

A. Yes, ma'am.

Q. Where did you seat the defendant?

A. I sat Mr. Rivera in the chair next to the desk, facing this way (indicating). I sat in the chair directly at the desk, so we were like eye-to-eye.

Q. Was anyone else in the room?

A. Detective Modeen was there.

Q. What was Detective Modeen's role?
A. He was sitting behind me, kind of taking like an alternate role. We try and interview with at least two detectives just in case one detective misses something, the other can chime in.
Q. And where was Detective Modeen seated in relation to you and the defendant?
A. He was seated over my left shoulder. Same thing, facing Mr. Rivera.
Q. Is the room equipped with video cameras?
A. It is equipped with audio and video, yes.
Q. Does the Waterbury Police Department have a procedure with they videotape statements being taken and when they don't?
A. Yes, ma'am.
Q. Can you please describe what that procedure is?
A. Anyone charged with a Class A or B felony, Connecticut General Statute, those interviews are audio and video recorded. Anything other than that, they are not recorded.
Q. This is the procedure of the Waterbury Police Department for all people under arrest?
A. Yes, ma'am.
Q. Are there other reasons that you would not video a statement?

A. If somebody was cooperating and possibly coming -- you know, a cooperating informant or offering intel on another case, we wouldn't record it.

Q. Would you record a witness's statement?

A. No.

Q. Would you record if a victim came in to talk to the police?

A. Nope.

Q. When you were in the interview room that evening, what was the defendant's demeanor?

A. He was very cooperative. He didn't seem like he was going to be disruptive or anything like that. Seemed coherent. He kind of knew that was going on.

Q. Was he slurring his words?

A. No.

Q. He was speaking English?

A. Yes, ma'am.

Q. Did you record the statement that you took from the defendant that evening?

A. I typed a statement, yes.

Q. I'm sorry?

A. I typed a report of what we talked about.

Q. No, that wasn't my question.

A. Oh, if I recorded --

Q. Did you video --

A. No, it is not video and audio recorded.

Q. Why did you not record the statement?

A. Because he wasn't being charged with any Class A or B felonies.

Q. How did you start the interaction with the defendant?

A. I explained we wanted to talk to him about the events that led up to him being arrested and that we, obviously, had to read him his rights first.

Q. When you say his rights, what do you mean?

A. His Miranda rights.

Q. Is this routine practice when you are speaking to someone who is under arrest?

A. Yes, ma'am.

Q. Can you explain to me, were you reading them out loud to him?

A. So usually what happens is -- I have two cards, one I will give to the person that I'm interviewing, then one I will have with me. I will read out loud while the person follows along on a card in front of them.

Q. Do you ask them to do anything with the card that's in front of them?

A. Yes, ma'am.

Q. What do you ask them to do?

A. As I'm reading each right, I ask them if they

understood what I just read to them. If they do, they initial on the line next to each one.

Q. You are reading them aloud from a card or from memory?

A. No, from a card.

Q. On that night, did the defendant have a copy of what you were reading to him in front of him?

A. Yes, ma'am.

Q. And you read them aloud?

A. Yes.

Q. Did he -- as you read from them, did the defendant initial what you had just read to him?

MR. HAYES: I will object to leading. What, who, where, when?

THE COURT: That is a bit leading. Sustained.

BY MS. STOLFI COLLINS:

Q. As you read each of the Miranda warnings, what did the defendant do?

A. After I read each right to Mr. Rivera, I asked him if he understood the right. He said he did, and then he initialed next to each one.

Q. You observed him writing on a paper?

A. Yes, I observed him write -- initialing next to each one. And while doing so, I observed him having trouble with the pen.

Q. What do you mean he had trouble with the pen?
A. It seemed like he wasn't able to hold the pen correctly or where he'd write something, he seemed off. So if asked him if there was something wrong.
Q. What did he say?
A. He said he usually writes with the other hand, but he hurt it.
Q. Do you remember what hand he was writing with?
A. I do not.
Q. Did he ask for medical attention?
A. No.
Q. After you asked him about that, what happened next?
A. We continued to each right. I read the next one, asked him if he understood it. He said he did. He would initial next to that one. I just continued reading each one until he finished initialing next to each one.
Q. Did he also respond to you orally?
A. Yes.
Q. What did he say?
A. When I asked if he understood each right -- if he understood what I read to him, he said yes, then I asked him to initial next to the right.
Q. Did he agree to speak to you?
A. Yes. He waived his rights. I asked him if he

was willing to waive his rights to speak with us. That's one of the statements of the card. He said yes. I asked him to circle yes and initial next to that statement.

Q. After he agreed to speak with you, did you ask him to sign the card?

A. Yes.

Q. Did you preserve the card that --

MR. HAYES: I object.

THE COURT: Just --

BY MS. STOLFI COLLINS:

Q. What happened to the card after you completed reading him the --

A. After Mr. Rivera circled yes, signed and dated the card, I signed my name and badge number on the card, and it was later preserved and entered in as evidence.

Q. I am going to show you Exhibit 13.

MS. STOLFI COLLINS: Not in evidence.

THE COURT: Is there objection to Exhibit 13?

MR. HAYES: No, there's not.

THE COURT: Exhibit 13 is a full exhibit.

You may proceed.

MS. STOLFI COLLINS: Did you publish it?

BY MS. STOLFI COLLINS:

Q. Detective Sanchez, can you explain what Exhibit 13 is?

A. It's the Waterbury Police Department advisement of rights card, which has the Miranda warnings on it.

Q. And --

THE COURT: Can you enlarge it. I don't know. Maybe the juror screen is bigger than mean. But 50 percent of a picture is not the card.

MS. STOLFI COLLINS: I would ask my colleague to help me zoom in. I haven't learned that yet.

THE COURT: That's better. Thank you.

BY MS. STOLFI COLLINS:

Q. Turning your attention to Exhibit 13. Is this the Miranda card from July 5, 2020?

A. Yes, ma'am.

Q. The one that you were just testifying about?

A. Yes, ma'am.

Q. Did you also preserve the original?

A. I'm sorry?

Q. This is a photograph, correct?

A. Yes.

Q. What did you do with a original?

A. The original was entered in as evidence.

Q. I will show you Exhibit 18, after I show it to the defense attorney.

THE COURT: I'm sorry. You can't speak away from the mic. I didn't hear it.

MS. STOLFI COLLINS: I'm sorry, Your Honor. I'm going to show the witness Exhibit 18. I had the ATF agent open it for the Court. I'm going to show it to Attorney Hayes.

Attorney Hayes indicated no objection, Your Honor. May I approach the witness?

MR. HAYES: No objection, Your Honor.

THE COURT: Thank you, Attorney Hayes.

Go ahead.

BY MS. STOLFI COLLINS:

Q. I'm showing you Exhibit 18.

THE COURT: You can put it back up. He may be has to compare it. I don't know. Thank you.

A. Can I take it out of the bag?

BY MS. STOLFI COLLINS:

Q. Yes, you can take it out. Is that -- I'm showing you Exhibit 18 in evidence. What is that?

A. It is the advisement of rights card, the same one that's on the screen.

Q. Is that the original?

A. Yes.

Q. And --

THE COURT: Exhibit 18 is a full exhibit. I should say that specifically. Thank you.

BY MS. STOLFI COLLINS:

Q. Exhibit 13 that's on the screen that I showed you earlier, is that a photograph of the one that you have in your hand, Exhibit 18?

A. Yes, ma'am.

Q. So I will direct your attention -- you can leave the original in front of you. I will direct your attention to Exhibit -- on the screen, Exhibit 13. Can you indicate to the jury where the defendant's initials are?

A. Yes. So there's a little line next to each right. That's where Mr. Rivera initialed after I read each one. Just what it's saying on there, says, Do you understand these rights? There's another line. Do you wish to give up these rights and answer my questions? There's another line.

Q. Can you read the rights that you read to him that evening?

A. Yes. You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court. You've got the right to consult an attorney before any questioning. You may have him or her with you during questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning. If you wish to answer questions, you can stop answering at any time. If you

stop answering at any time and wish to talk to an attorney, you may have him or her with you during the questioning.

Number 6 didn't pertain to Mr. Rivera, but it is on the a card so I read it anyway. It says, If you are a juvenile under the age of 16, a parent or guardian must be present during any admission, confession or statement, written or oral. The last one says, Do you understand these right? Followed by, Do you wish to give up these rights and answer my questions?

Q. After the do you understand those rights, there is a mark. Is that yes? What is that above --

A. Right next to do you understand these rights, there's a yes and no. And then we usually have somebody circle yes and initial if they understand.

Q. Did the defendant circle it that evening?

A. Yes, ma'am.

Q. The markings that are to the right of the advisement card, whose markings are those?

A. All the lines next to each right, those the initials of Mr. Rivera.

Q. And then the last question, there's two -- there's two markings. Can you explain what those two markings are after, Do you wish to give up these rights and answer my questions?

A. It's yes or no again, and then a line for Mr. Rivera's initials.
Q. And did Mr. Rivera sign circle the yes?
A. Yes.
Q. And then there's a signature line. Whose signature is that?
A. Mr. Rivera's.
Q. You observed him write that?
A. Yes, ma'am.
Q. And then the date is indicated. Who wrote that?
A. He wrote his signature, Mr. Rivera did. Mr. Rivera wrote the date and Mr. Rivera wrote the time.
Q. What time is indicated on the card?
A. 3:59.
Q. The last line where it says officer signature, who wrote that?
A. That's my signature and with my I.D.
Q. And your I.D. number is your badge number?
A. It's my badge number and then my employer I.D. is different, but that's my badge number.
Q. After you filled out this Miranda card, what happened next?
A. We begin to have a conversation.
Q. When you say conversation, describe how the conversation occurred?

A. I asked Mr. Rivera to explain, you know, what happened prior to him being arrested.
Q. And were you speaking in English?
A. Yes, ma'am.
Q. Was it in narrative form?
A. No. Like I said, he was versus cooperative. I didn't have to ask a lot of questions. He just kind of filled it all in, pretty much.
Q. What did he say to you?
A. After I asked him to explain to me where he was and what he was doing prior to him being arrested, he said that he was at a female's house across from Domino's Pizza. I believe there's only one in town, so I took that to be like the Meriden, East Main area. He said he was walking from that female's house to his mother's house on Laurel Street.
Q. What else did he tell you?
A. He said when he was walking up Williams Street, he saw some guys in a parking lot to the right-hand side of Williams Street. And then as he kept walking up Williams Street, he saw somebody cross over and kind of walk to a wooded area.
Q. Did he continue to say anything else?
A. Yes. He heard what sounded like gunshots and thought the guy was shooting at him, so he started

running up Williams Street until he got to his mother's house on Laurel.

Q. Then what did he tell you happened?

A. He said that he was kind of angry about what happened, made some phone calls to some people. I asked him who he made the phone calls to, and he told me that -- he said in the beginning he was only going to talk about what he did and wasn't -- nobody else was involved.

Q. After he called those individuals, what does he say happened next?

A. He said the individuals showed up, they were all at the top of William Street, which is like facing down Laurel. They wanted to send a message to the people down the street, so they were shooting in the air.

Q. You can continue and say what else he told you.

A. So he said they were shooting in the air. He made sure to tell people that shoot in the air only because the gun is big and those bullets can go through anything. He said at that point there was -- the gun was handed over to him, at which point he started walking down Williams Street.

I asked him if at that point if you were only trying to send a message, why were you walking down Williams Street, you know, wearing a body armor? He said it was -- he told me it wasn't body armor, it was a

stabproof vest. He said he continued walking down Williams Street. As he was walking down Williams Street, he sees a police car or the cop car turn onto Williams Street. Once he sees the cop car turn onto Williams Street, he ducked on the side of a car to try and hide from the police officer.

He said he saw the cop car pull over. Cop gets out. At that point, he started running down a driveway and jumped over a fence. While jumping over that fence, he said he fell. He tried to grab the gun when he fell because he dropped it, but he couldn't get to it because the cop was pretty much right next to him. He continued running and left the gun behind. He said that he tried to jump another fence that was taller than the first fence, and at that point the cop grabbed a hold of him. He told me he tried to kick the cop off, but another cop got there and assisted. And that was when he fell off the fence and was placed under arrest.

Q. Did you ask him any other questions?

A. I asked him about the gun, where we got the gun from. He said he bought it for $1,000. Couldn't remember who the guy was or where he was from.

Q. Did you ask him any other questions related to items that he were seized?

A. So while we were talking, you know, he said

he wanted to help himself out as much as he could. He explained that the .223 rounds that he was arrested with in his pocket, he knew where that rifle was and that he could get it for us.

Q. What else did he say?

A. He began to talk about that rifle. He said he would have to make phone calls in order to get it for us because it was in the trunk of some female's car. Wouldn't talk about the female, where she was at or anything like that. But he did say that he bought that gun for $2,000 and believed it was a like a ghost gun because there's no markings on it.

Q. You mentioned he talked about two rifles. What firearm were you referring to in that last statement?

A. That's the second rifle that -- he explained that he could get that rifle for us, and that that rifle belonged to the .223 round that was in his pocket when he was placed under arrest. So not the original rifle that was recovered on scene.

Q. What else did he say about the body armor that he had on, the stabproof vest?

A. He said he bought it from some guy, but didn't remember.

Q. How long would say the conversation lasted?

A. Maybe an hour, hour and a half.

Q. How did you end the conversation?

A. So Mr. Rivera said that he would like a phone number, if he was to get out he would conduct us to let know where the rifle was going to be. I provided him the phone number and then brought him back out to the booking area where he remained.

Q. What else did he say about the firearm that was recovered behind the houses?

A. We talked about the rounds being fired on scene. I asked him about the magazine because the magazine that was recovered in the rifle was full. But there was over 20 shots fired on Williams Street itself, so math-wise, it didn't make sense. He said that he had another -- he had that magazine and that was full. He put that magazine in the rifle before walking down Williams Street. I asked him what he did with the other magazine that was then possibly empty, he said he handed it to another person that was there with him.

Q. Was there anything else that he said? You are shaking your head.

A. No, not during that interview, no.

Q. At the completion of your conversation that evening, did you give him a telephone number?

A. Yes.

Q. At any point during the conversation, did you

leave the room?

A. No.

Q. Did Detective Modeen leave the room?

A. No.

Q. And the whole conversation was in English?

A. Yes, ma'am.

Q. While you were speaking with the defendant on July 5, did you take notes?

A. Yes.

Q. Did Detective Modeen take notes?

A. No.

Q. Why don't you take notes?

A. It was one of the techniques that I learned when I took the interview and interrogation class for that two-week detective's course. They explained that some people as you are interviewing them, if you are sitting there trying to take notes while you're interviewing them kind of distracts them. So it's one of the things that we don't do.

Q. Was the defendant in handcuffs during the conversation?

A. I don't remember if he was still handcuffed or not during the interview.

Q. But he was able to fill out the card that you described?

A. Yes, ma'am.

Q. After you were done with the conversation, where did you bring him?

A. He was brought back down to the booking area.

Q. Why was that?

A. That's where -- when somebody is under arrest, that is where they are brought and held there until either brought to court or bond out.

Q. Did you ever talk to the defendant again?

A. Yes, ma'am.

Q. Was it on July 5, 2020?

A. Yes, ma'am.

Q. Why?

A. I came in to work for my shift for that day for on call. When you're on call, we have to work a Saturday and Sunday from 4 -- well, 8:00 to 4:00 or 4:00 to midnight. Mine was 4:00 to midnight. So I came in. I wanted to make sure we were still on the same page as far as himself possibly being able to help to get that other rifle off the street.

Q. For clarification, after you finished the conversation and returned the defendant to booking, did you go home for the evening?

A. I went home and tried to get some sleep, yes.

Q. Just for clarification, did you come back to the

Q. That's evidence of a crime?
A. I'm sorry.
Q. That's evidence of a crime, the statement?
A. Could be if he admitted to things, yes.
Q. To get to talk to him, you claim you took him out of the booking area. That's evidence, right?
A. That's your opinion.
Q. I'm asking you your opinion.
A. In my opinion, no.
Q. So you testified that you took Mr. Rivera to an interview room, right?
A. Yes, sir.
Q. Is that the same thing as an interrogation room?
A. I mean, if you want to put a spin on it that way. It is an interview room.
Q. You have -- during the course of your investigation or work on this case with Mr. Rivera, you have learned that he has TBI, correct?
A. I learned that way after the fact, sir.
Q. You learned that?
A. After the interview, after everything else, that's when I learned it. Are you asking me if I knew that prior to the interview? No.
Q. I didn't ask you that. I'm asking you -- you did learn it, right?

A. After the statement was taken, after -- I mean, this is like way after.

Q. You said that. I'm just asking you.

A. I learned it after, yes. I'm sorry.

Q. TBI is traumatic brain injury, right? That's what you learned?

A. Right. Mm-mmm.

Q. You have worked on this case initially starting July 5, 2020, right?

A. Yes.

Q. And that continued up until as recent as, I don't know, last week or this weekend, worked on the case?

A. Yes.

Q. You interviewed with Government counsel and the agent on this case?

A. Yes.

Q. More than once?

A. Yes.

Q. And you did that in preparation for the trial?

A. Yes.

Q. You have also done that preparation for a previous hearing?

A. Yes.

Q. And you described Mr. Rivera today to the

Government as he was cooperative, right?
A. Yes.
Q. And did you say coherent?
A. Yes.
Q. He seemed to understand what you are asking?
A. Yes.
Q. In your previous -- previous to today when you met with Government counsel and the agent, you described Mr. Rivera as slow, right? July 12, 2022, you met with Government counsel and the agent, and you described Mr. Rivera as slow, right?
A. Yes.
Q. Now, in your work when you're conducting interviews, taking statements, you said that you just don't take statements from suspects, but also victims, right?
A. Victims, witnesses, right.
Q. Witnesses as well. So when you said you have taken over 200 --
A. Approximately 200.
Q. -- statements, right, interviews, that's a mix of someone who is willing to talk to you who is a suspect, right?
A. Yes.
Q. Perhaps a victim?

A. Yes, sir.
Q. Did he offer Mr. Rivera anything to talk to you?
A. No, sir.
Q. Okay. At that time when you met with Mr. Rivera -- so you signed the Miranda form that we reviewed, it was signed a 3:59 a.m.?
A. Yes, sir.
Q. How long had you been in that room with Mr. Rivera?
A. Probably an hour, hour and a half or so.
Q. He didn't go to bathroom or anything, right?
A. I can't recall, sir.
Q. You didn't give him a soda or snack or sandwich?
A. I don't believe.
Q. The answer is no, right?
MS. STOLFI COLLINS: Objection.
THE COURT: The addition of the word "right" probably makes it marginally appropriate, but overruled. It was delayed, however. I understand the objection, but it's overruled.
BY MR. HAYES:
Q. So it's practically 4:00 a.m., you didn't buy him a coffee?
A. No, sir.
Q. No breakfast, right?

A. No.
Q. He just cooperated and talked to you, right?
A. Yes, sir.
Q. Detective, do you speak Spanish?
A. I'm not fluent in Spanish, no.
Q. Did you ask Mr. Rivera if he spoke Spanish?
A. I asked him -- no, I did not. I will say no. That's the answer to that question.
Q. When you previously testified, you testified that you spoke Spanish, right? You remember that? I'm sorry, Detective. Do you remember saying that you spoke Spanish?
A. No, sir.
Q. You said no?
A. I said definitely no, yes.
MR. HAYES: The Court's indulgence.
A. Like I said earlier when you asked earlier, I'm not fluent in Spanish. If you are asking me if I understand some Spanish.
BY MR. HAYES:
Q. I'm just going to ask you a question.
A. I'm sorry.
Q. Knowing that he was slow at the time -- this is what you perceive at the time. After you write each of the Miranda rights -- well, let's get it. Let's see.

A. Correct.

Q. Wasn't 16 or under?

A. No.

Q. Didn't need a guardian?

A. Huh-uh.

Q. But you perceived him as slow?

A. I read it because it was on the card.

Q. I know. But I'm asking you, you perceived him as slow?

A. I believe I answered yes several times, you know. Sorry, sir.

Q. And he initialed because you asked him if he understood?

A. Yes.

Q. You testified that, which is Number 6, on this advisement of rights card, does not pertain to Mr. Rivera?

A. Correct.

Q. He initialed it anyway?

A. Yes.

Q. Did he ask you he should initial it?

A. Nope.

Q. Did he ask you to help him with any of these rights as you read them to him?

A. No, sir.

Q. Did he ask Detective Modeen?
A. No, sir.
Q. Did Detective Modeen explain any of the rights to him?
A. No, sir.
Q. Government Exhibit 18 -- that's in evidence as full -- is the actual Miranda card; is that right?
A. Yes.
Q. The date, 7-5 -- I will hand it to you.
MR. HAYES: Your Honor, may I approach?
THE COURT: Yes, you may.
MR. HAYES: (Handing.)
BY MR. HAYES:
Q. What's the date under Mr. Rivera's name?
A. Appears to be 7-5, and then should be 2020.
Q. What does it look like? You said it should be?
A. Could be an 8, could be a 2.
Q. Did you question him about the date?
A. No.
Q. Did you tell him the date?
A. No.
Q. You have subsequently been informed that on that Miranda card it is written in three different blue inks or ink, right? You have been informed of that during your investigation?

A. Three different pens or three different blue inks.

Q. Three different sets of blue ink. I'm asking you, were you informed of that?

A. I'm sorry. Your question is, did somebody tell me that this card was filled out with three pens? Nobody told me formally that this card was filled out with three pens.

Q. Are you saying nobody told you?

A. No.

Q. Do you recall if you said you don't recall whether or not Mr. Rivera was handcuffed as you are talking to him?

A. That's correct.

Q. Sometimes when you are interviewing suspects, you uncuff them, right?

A. This is correct.

Q. You don't recall if that happened here?

A. No, I do not.

Q. However, you said that Mr. Rivera was cooperative and just gave you a confession?

A. Correct.

Q. I will take that back. Did you even ask Mr. Rivera if he could read?

A. Yes, I asked him if he could read, write and

understand English. He said he could.

Q. You didn't determine if he could by doing any other test, right?

A. No.

Q. And I'm sorry, did you say you asked him if he spoke Spanish or English?

A. I asked him if he could read, write and understand English. That's all I asked him.

Q. But you don't ask him about Spanish, though, is what you are saying?

A. No.

Q. Beyond his answers to when you read the rights and he said yes to each right, and you told him to initial, beyond that, that's all you knew as to whether or not he spoke -- I'm sorry -- he could read English, right?

A. Yes.

Q. Let's talk about your statement, the statement that you attribute to Mr. Rivera.

A. Are you referring to the report that I wrote?

Q. Yes, sir. Is it a report or a statement?

A. In the system it is considered like a supplemental report. To me, a statement is something that somebody is going end up signing saying this is the truth.

Q. So what you wrote in what you called a supplemental report is based on what you claim Mr. Rivera told you, right?

A. Our conversation, yes.

Q. He didn't write it?

A. No, sir.

Q. He didn't handwrite anything for you?

A. No, sir.

Q. Did you handwrite it at first?

A. No, I typed it.

Q. Typed it as he's talking to you in front of you?

A. No, sir.

Q. He didn't get a chance to read this supplemental report?

A. No.

Q. He didn't get a chance to say, I didn't say that, I said this, right?

A. Correct.

Q. He didn't get a chance to say I never told you I had the gun, right?

A. Correct.

Q. Everything that we have in that supplemental report is from you?

A. Correct, sir.

Q. So when you wrote the report, it wasn't on July

5, 2020, am I right?

A. Yes.

Q. In fact, it was four days later?

A. I'm not sure when it --

Q. The report is dated 7-9-20?

A. That could be the date it was signed off by the about supervisor. I'm not sure.

Q. You testified in the previous hearing that you wrote it four days earlier. Do you need me to find it?

A. I don't know that I put a date. I would admit days later I wrote that report. If it was four days, I don't recall saying it was four-days.

Q. So you don't do any handwriting as you are talking to Mr. Rivera?

A. No.

Q. You don't write down even bullet points?

A. No, sir.

Q. You don't write anything on a sticky note?

A. No, sir.

Q. And leave it on -- I don't know if your work area -- you have a computer in your work area, right?

A. Yes.

Q. You didn't write a sticky note?

A. No, sir.

Q. Did you write anything so that you can remember

anything Mr. Rivera told you four days prior?

A. No, sir.

Q. Did you tell or wait -- did you see Detective Modeen taking any notes?

A. No, sir.

Q. So I'm sorry. When you say that, are you saying that he did not take notes or you just didn't see him take notes?

A. You asked if I'd seen him take notes, I said no.

Q. So I'm sorry, you didn't see him take notes?

A. You asked me if I saw him take notes. No, I did not see him.

Q. Did you ask him if he took notes?

A. No.

Q. Did you ask him what he remembered about what this guy told us on July 5?

A. No.

Q. Did he help you with the report?

A. No.

Q. Do you know if he wrote anything down to help him remember what Mr. Rivera told you on July 5?

A. No.

Q. Do you know if Detective Modeen read your report and agreed that's what happened, that's what Mr. Rivera told us at any time?

A. No.
Q. So you didn't show it to him?
A. No.
Q. Before we talk about what he told you some more, you said that you were on duty -- I think that's the term you used. You were on duty on July 5, 2020?
A. On call.
Q. I'm sorry. On call. And in that type of situation, what we see here on that evening or that morning, on call means that if an incident similar to this happens, you are called to come to wherever the site --
A. It is usually to the police department.
Q. Oh, police department. Okay. I'm sorry. That's what happened here?
A. Yes.
Q. So that's why you went to the police department first?
A. Yes.
Q. Then you subsequently went to the scene?
A. Yes.
Q. And when you first got to the police department, do you recall what time that was?
A. No, I don't.
Q. Do you recall what time you received the phone

Q. In Waterbury?
A. Correct.
Q. On Laurel Street?
A. Yes.
Q. And, you know, there was a report of shots fired on July 5, earlier in the morning, right?
A. Yes.
Q. When you say a report, someone dialed 911?
A. Correct.
Q. And you are aware that Officer Porzio engaged or encountered Mr. Rivera around 1:57 a.m.?
A. I don't know the exact time. Yes, I know he engaged Mr. Rivera, yes.
Q. And you didn't ask Mr. Rivera, or you certainly did not put in the report, what did he do between 10:30 and 1:00 a.m. or 2:00 a.m.? Did you ask him that?
A. No, sir.
Q. But you thought it was important to record what you recalled he told you?
A. Correct.
Q. You thought it was important to say he was at a girl's house until 10:30, right?
A. I wrote the record as to what he said what he did prior to.
Q. You didn't ask him what did you do after you

left her house and on your way home until 2:00 a.m.? You didn't ask him that, no?

A. No.

Q. And you did -- after you took a statement or wrote the supplemental report, you didn't further investigate, right?

A. There was nowhere else to go with it.

Q. You claim that Mr. Rivera told you when he thought he was shot at, he called his boys?

A. Yes, sir, he did.

Q. You didn't call his boys to verify anything, did you?

A. He wouldn't talk about them.

Q. You didn't call his boys, that's what I asked you.

A. I don't have their numbers. I asked Mr. Rivera who he called and he said he wasn't going to talk about them. So you are correct, I did not call them.

Q. You could have seized his phone, right?

A. Could have.

Q. You didn't?

A. That's correct.

Q. You could have easily -- what did he do between 10:30 and 2:00 a.m., what boys did he call, right?

A. Correct.

Q. Because his boys, according to what you wrote in the supplemental report, shot in the air, right?

A. Correct.

Q. That's a crime, am I right?

A. Correct.

Q. You know, the Connecticut State statutes at least in part of your work as a detective, right?

A. Yes.

Q. You didn't investigate that crime, right?

A. There was nobody to speak to.

Q. But you didn't -- I'm asking you, did you investigate it?

A. No.

Q. You could have spoken to people, but you didn't do that, right?

A. Without Mr. Rivera's cooperation as to who was there and who actually shot.

Q. Without seizing his phone because you could have seized his phone?

A. The phone is not going to tell me who shot. Only Mr. Rivera could.

Q. As part of Mr. Rivera cooperating by talking to you, did you say, Mr. Rivera, let me see your phone? Did you tell him to show you his phone?

A. No, sir.

Q. I don't think I asked you this, Detective. After you wrote -- well, sorry. You couldn't have reread the report to him because you hadn't written it in front of him.

A. I'm sorry?

Q. You could not have read the report --

A. I could not have reread the report to Mr. Rivera?

Q. Yes.

A. That's correct.

Q. So he couldn't verify whether or not you had the information correct?

A. That's correct.

Q. So unfortunately, you never gave a him a chance to make any corrections, basically what I'm asking you.

A. He did not read the report, correct.

Q. And of course, he never got to sign any report?

A. That's correct.

Q. You testified that the interrogation room is equipped with video and audio equipment?

A. Yes.

Q. But you did not use it for this interrogation?

A. I did not use it with the interview with Mr. Rivera because it did not meet our procedure for the police department.

Q. Did you ask him if he wanted it recorded, just to be fair?
A. No.
Q. So you testified about Mr. Rivera told you he -- sorry. You testified that it seemed as though Mr. Rivera was having a hard time holding the pen?
A. Yes.
Q. And when you asked him why, what was wrong, he told you that he usually writes with his other hand?
A. That's correct.
Q. Because he hurt his hand?
A. Correct.
Q. Which hand was he writing with?
A. I said I don't remember.
Q. But you remember the details in the report, right?
A. Yes.
Q. Did you testify that he told you that he hurt his hand?
A. Yes.
Q. You said that when Mr. Rivera was shot at, he called his boys. You already said that, right?
A. Yes.
Q. And his boys shot the gun up in the air, right? You said that?

Q. He said that -- Mr. Rivera said that he stood still, but when the officer got out of the car, Mr. Rivera told you that he ran down a driveway, right?

A. Yes.

Q. And jumped a fence?

A. Yes.

Q. And he said -- Mr. Rivera said that when he jumped the fence, he ended up falling and dropped the gun?

A. Yes.

Q. So he jumps over the fence, falls, drops the firearm?

A. Yes.

Q. He said he tried to pick it back up but the cop was too fast and caught up to Mr. Rivera, right?

A. Yes.

Q. And so Mr. Rivera left the gun?

A. Yes.

Q. Right where he dropped it?

A. Yes.

Q. Right after he jumped over the fence?

A. Yes.

Q. He said that he tried to jump another fence but that fence was taller than the first fence?

A. Yes. That's the way it was described.

Q. As he's climbing that second fence, that's when Officer Porzio caught up to him and tried to engage Mr. Rivera?
A. I can't say if it was Officer Porzio. He just said that the cop.
Q. I'm sorry?
A. I apologize.
Q. The cop. And Mr. Rivera told you that he began kicking the cop, right?
A. Yes.
Q. And another cop arrived to help the cop who he was kicking?
A. Yes.
Q. That's what Mr. Rivera told you?
A. Yes.
Q. And Mr. Rivera also told you that the cops -- the two cops pulled him off of the second fence, where Mr. Rivera was taken to the ground and handcuffed, right?
A. Yes.
Q. Now, you did ask Mr. Rivera had he shot the firearm or that gun?
A. Yes.
Q. He said no?
A. He denied it, correct.
Q. He did tell you that he purchased that gun; is

that right?
A. Yes.
Q. Was that the one he bought for $2,00?
A. That was the one he said he bought for 1,000.
Q. Now, he said that that was -- the firearm that was recovered this evening the AK-47. According to what Mr. Rivera told you, that firearm would have been used earlier to shoot up in the air, right, the shots fired?
A. Yes.
Q. Do you know if it was tested for the shots fired for the earlier incident?
A. I believe the shell casings and test-fired cases were sent down to the lab.
Q. The firearm, et cetera?
A. Yes.
Q. The firearm was tested?
A. Yes.
Q. It was determined that was the same firearm?
A. I don't know. I didn't see the report for that one. I apologize.
Q. But you are -- are you the lead detective on this case when it was -- you -- after you took the statement, are you the lead detective?
A. I guess you could say that.
Q. Detective Modeen as well or is that --

A. Usually one person kind of takes lead on the case.

Q. You did not see a report regarding that AK-47 whether or not it was used earlier, right?

A. I did not see the report showing that the firearm matched the casings. Usually there is a mag report, I did not see that personally, no.

Q. You didn't try to verify that?

A. No.

Q. It is fair to say that -- you know that Mr. Rivera actually lives -- Williams Street is one long street. Let me ask you that.

A. Mm-hmm.

Q. It is perpendicular to East Main and Laurel Street?

A. East Main Street runs this way (indicating). Laurel Street runs this way (indicating). Williams runs that way (indicating). Mr. Rivera's house is probably a couple hundred feet from where the shell casings were found.

Q. It is going up a hill; is that right?

A. Yes.

Q. Mr. Rivera also told you that he didn't remember who he bought it from, he didn't remember the person's name, right?

A. Correct.
Q. You couldn't verify that?
A. (No audible answer.)
Q. You did --
THE COURT: I'm sorry. I was looking down, but I didn't hear an answer.
THE WITNESS: I said correct.
THE COURT: Thank you. I missed it. Sorry.
THE COURT REPORTER: I didn't hear it.
THE COURT: Thank you.
BY MR. HAYES:
Q. As you are talking to Mr. Rivera that evening -- let me ask you this. I'm sorry. Have you done any other investigations on Williams Street other than this case?
A. On Williams Street?
Q. Yes, sir.
A. Prior to that? I can't recall if I did. I know there's been investigations there, but whether or not I have been involved as a primary or lead, I can't recall.
Q. So you said there's been investigations?
A. There's been other reports of shots fired. Other reports of narcotics activity, you know, quite a lot of crime, but I just can't recall if I ever took part in those.
Q. Now during your interview of Mr. Rivera, you

asked him if he would be willing to provide a written statement of everything you spoke about, right?

A. Correct.

Q. And he said yes?

A. He said yes, I'm willing to do whatever.

Q. That didn't happen, right?

A. That's correct.

Q. He told you that about the .223 caliber round of ammunition that was found in his pocket, right?

A. Yes.

Q. He called it a .223, right?

A. Yes.

Q. We subsequently found out it is not a .223, right?

A. I'm not sure.

Q. You said that Mr. Rivera agreed to call you after he was released, right?

A. Yes.

MR. HAYES: The Court's indulgence.

BY MR. HAYES:

Q. And so -- I'm sorry. I asked you, Mr. Rivera agreed to call you once he was released?

A. Yes.

Q. And you claim that he called you hours later after he was released?

area between you and defendant on July 5, 2020?

A. No, ma'am.

Q. In your experience, interviews with individuals, how truthful are they about what happens?

A. Sometimes they are not truthful.

Q. What do you mean by that?

A. They are either giving you half truths or, you know, just enough to make you think they are telling the truth and then you have to figure out the rest.

Q. How much do they provide about activities that occur around what you already know?

THE COURT: I don't understand the question.

MS. STOLFI COLLINS: I'll rephrase.

BY MS. STOLFI COLLINS:

Q. On cross, you were asked about activities that occurred prior to the defendant's arrest. In general, when you discuss -- when you take arrestee's statements when they agree to talk to you, how truthful are they about things that happen around prior to the arrest?

MR. HAYES: Speculation.

THE COURT: Sustained. Not speculation, but it is not relevant. He's not an expert.

BY MS. STOLFI COLLINS:

Q. When you spoke to the defendant on July 5, did you discuss the activities that occurred on Williams

THE COURT: No, not the Government.

MR. EWING: No, Your Honor. I'm thanking everybody for the courtesy.

THE COURT: Oh, I didn't hear that. The witness's name is my question.

MR. EWING: We call Farrell Shriver.

FARRELL SHRIVER

Having been called as a witness, was first duly sworn and testified on his/her oath as follows:

THE WITNESS: I do.

THE CLERK: Please state your name and spell your last name. City and state of employment.

THE WITNESS: My name is Farrell Shriver and I will spell both names. F-a-r-r-e-l-l S-h-r-i-v-e-r.

THE COURT: Lastly, the city and state of employment.

THE WITNESS: I'm employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives. I work at the Forensic Science Laboratory in Atlanta, Georgia.

THE COURT: Thank you, Mr. Shriver and good afternoon to you. Whenever you are ready.

DIRECT EXAMINATION BY MR. EWING:

Q. Mr. Shriver, you have kindly flown in from Atlanta for this case. How did you become involved in the case?

A. As I said, I work for the Forensic Science Laboratory which is a laboratory of the ATF. That's a shortened version of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

So the agent in this investigation submitted various items of evidence for me to examine and I did that and prepared a report.

Q. Now, the parties have agreed you're an expert and we know that you are one of a preeminent handwriting experts in the country. I say that --

THE COURT: Can we have a question? Ask a question. Don't give a speech.

MR. EWING: I'm trying to save time.

THE COURT: I know that. Just ask a question.

BY MR. EWING:

Q. Can you give us the condensed version of your lengthy resume? Where did you go to school?

A. My undergraduate degree is from Jacksonville State University in Alabama, then I have a Master's degree from the Troy State University in Alabama.

Q. How long have you been with ATF?

A. For eight years.

Q. And where did you work before working for the ATF?

A. Prior to working for the ATF, I was a private

A. Yes, I used the VSC for examination of the inks on the document.

THE COURT: Tell me the number again.

MR. EWING: 13.

THE COURT: So Exhibit 13 that is a full exhibit. It may be published if you request it.

BY MR. EWING:

Q. When you first examined -- it is on the screen so the jury can see it. When you first examined the advisement of rights card, I think you said you had examples of known writing. Can you tell us what those were?

A. There were a lot of them. I had samples that he was asked -- Mr. Rivera was asked to write. There were four pages of samples and then there were submitted six other exhibits totaling about 26 pages I believe and of those 26 pages, I believe about 16 of them had signatures that were used for comparison.

Q. Did you reach any conclusions based on your analysis?

A. My conclusion was what I referred to as no conclusion. I was not able to make a determination whether Mr. Rivera was the writer or not the writer of the signature and initials on the advisement of rights card.

Q. Were you able to make any other conclusions about the type of ink on the card?

A. Yes. I determined through a microscopic examination and examination with the VSC that there were three inks used in preparing this card. The first ink was for the initials and associated markings on the card which are what's listed as one through six and the do you understand these rights just below, that was one -- excuse me -- and the next line do you wish to give up these rights. Through that point that was consistent with being one ink.

The next ink that was used was for the signature, date and time entry. That's a different ink than what appeared above and the third ink was the officer's signature and I.D. number.

THE COURT: Could I stop you, sir? You need to make sure that mike, see the little foam thing on the end of the microphone stand, that has to aim where your speech is exiting your mouth, if you are over here which is like this, looking at the jury to testify is perfectly proper but it can't be over here. Has to be here.

MR. EWING: Might the Court be so kind to see whether anything needs to be repeated.

THE COURT: I am not going to cross-examination them I guess. Do you want me to have the reporter read

back? How long has anybody had a problem hearing the witness fully? Anybody? No. Then let's go.

The record should reflect that people are shaking their heads no and otherwise not indicating that I should read back. I'm happy to have things read back. I just to know how long it's been an issue. I don't see anything. So let's continue.

BY MR. EWING:

Q. Can you just repeat again the results of your conclusion of your first report?

A. For the first report, my opinion was that that I would say is an inconclusive opinion or no conclusion opinion and that means that I could not determine one way or the other whether Mr. Rivera wrote the initials or signature on the documents -- signatures, sorry.

Q. But now I would like to turn your attention to what should be on your screen marked as Defendant's Exhibit 1008A. Can you tell us what that document is?

A. Yes. That's my report from March of this year.

Q. Do you recall what page your conclusion is on?

A. On the second page, second paragraph for the conclusion for the handwriting. Conclusions regarding the ink are in the paragraph just below that.

THE COURT: I should note for the record Defendant's Exhibit 1008A is a full exhibit.

MR. EWING: Can you pull up 1009? I would move for that to be admitted. I believe it has.

THE COURT: No objection. It is a full exhibit and can be published.

MS. FREISMUTH: Just for the record, I have no objection.

THE COURT: Thank you.

BY MR. EWING:

Q. Can you please identify what's marked as Defendant's Exhibit 1009 for the record?

A. This is my second report. This is from July of this year.

Q. I'm a little hard of hearing. You may have said this, but can you explain why you wrote two reports?

A. Yes. Earlier in the year, I received the document in question, the advisement of rights form along with some known samples for comparison and wrote a report.

Later I was submitted additional known writing samples of Mr. Rivera and I conducted a second examination with the additional known writing and wrote the report that we now have on the screen from July.

Q. Did you reach any conclusions in your second report?

A. It was the same opinion as the first report.

Inconclusive.

MR. EWING: I have no further questions at this time.

THE COURT: Cross-examination.

MS. FREISMUTH: Yes, Your Honor. Thank you.

CROSS-EXAMINATION BY MS. FREISMUTH:

Q. Mr. Shriver, how are you?

A. I'm fine. Thank you.

Q. Now, you had testified about the results in the two reports that we saw that were marked as Defendant's Exhibits, correct?

A. Yes.

Q. Based on your analysis, you can't tell one way or the other whether it was Mr. Rivera or was not Mr. Rivera who completed the settings at issue?

A. That's correct.

Q. And you are testifying today at the defendant's request, but your analysis was requested initially by the Government, correct?

A. Yes.

Q. That request was only after the defendant had hired his own private expert James Streeter who is not testifying today, correct?

A. I'm not sure the timing before or after, but yes, there was the second expert.

Q. You had identified in your first report, Defendant's Exhibit 1008, the use of a faulty pen. I believe you described them as having dry furrows?

A. Yes.

Q. Can you describe more about that?

A. The first pen that was being used, the one that I described for making the initials and the associated marks, the pen wasn't working very well. Sometime it was inking as placing ink on the paper as the writer was making the writing on the paper and sometimes just the dry indentations with no ink. So the pen was not working very well at all for the part of the form where the initials and those markings associated with the initials were located.

Q. During your prior testimony, do you recall describing a number of environmental factors that could have led to the poor quality of the handwriting on the questioned document that you were asked to examine?

A. There's several possibilities, yes.

Q. Do you recall discussing handcuffs being a potential reason for the poor quality of the signature?

A. Yes. If the person was wearing handcuffs that could be an explanation.

Q. Did you also list nerves or stress as being one of the environmental factors?

A. Did you ask if I had listed the handcuffs?

Q. During the prior hearing when you testified, you spoke about --

A. Yes, we talked about that.

Q. You also mentioned that nerves or stress could result in the poor guilty of the questioned document?

A. Yes, it could be.

Q. And did you also state that using the nondominant hand could result in the poor quality?

A. Yes. In this case, the defendant was right-handed -- excuse me, left-handed, so writing with the right hand could be a reason for it.

Q. As well as injury could also be a reason for the poor quality?

A. Yes.

Q. And I know you weren't asked to go through it today when you were called by the defendant, but during the hearing where you testified before, did you utilize a number of aids so that you can go through similarities that you had identified between the defendant's exemplars that he provided and the questioned document?

A. Yes. I provided some charts that showed some similarities between the defendant's handwriting and the questioned document and also some things that could not be accounted for.

12:52:18 THE WITNESS: Yes.

12:52:20 THE CLERK: Thank you. If you could state your first name, and spell your last name for the record.

12:52:21 THE WITNESS: Joseph Rainone, R-A-I-N-O-N-E.

12:52:21 THE CLERK: And lastly, the city and state of employment.

12:52:30 THE WITNESS: Meriden, Connecticut.

12:52:32 THE CLERK: Thank you.

12:52:32 THE COURT: You may be seated, sir.

12:52:35 THE WITNESS: Thank you, Your Honor.

12:52:36 DIRECT EXAMINATION

12:52:36 BY MS. FREISMUTH:

12:52:36 Q. Good afternoon, sir.

12:52:39 A. Good morning -- afternoon.

12:52:40 Q. Can you please tell us where you are currently employed?

12:52:45 A. I'm employed by the State of Connecticut Division of Scientific Services, Connecticut Forensic Lab.

12:52:50 Q. What is your current position there?

12:52:54 A. Title of my position is assistant lab director.

12:52:57 Q. What are some of your responsibilities?

12:52:58 A. I manage the latent print unit, the firearms unit, the computer crime unit, the lottery unit, the impression unit, impressions and footwear unit, and

computer crimes.

Q. And what did you do before going to the State Lab?

A. I was in law enforcement for 31 years, and most current, the Waterbury Police Department.

Q. Can you just tell us which police departments you worked for and approximately time for each?

A. I started off in the Waterbury Police Housing Authority. I was there for year as a housing police officer. Then went to the Town of Woodbridge for being a police officer for four years. I then went to the City of Bristol, and was a police officer there for a year. And my last 25 were in Waterbury.

Q. Now, with the 25 years that you were in Waterbury, were there periods of time that you were detailed to the State Lab?

A. Yes. From 2006 to 2009, I was assigned there at the forensic firearms tax force working on Waterbury cases and State of Connecticut cases.

Q. Were there also periods of time where you were then back in Waterbury P.D. working directly, for instance, as a lieutenant on patrol?

A. Yes. I was promoted to lieutenant in 2009 and from 2009 to 2015, I was a patrol lieutenant in Waterbury.

12:54:21 Q. What was your final rank or title when you left Waterbury P.D.?
12:54:25 A. It was the rank of lieutenant and I was the forensic -- or division commander of forensics.
12:54:32 Q. Now, when you were with the Waterbury Police Department, were you ever issued a body-worn camera?
12:54:38 A. Yes. Near the end of my career, yes.
12:54:41 Q. And around what year who would that have been?
12:54:45 A. Probably 2021, 2022, I think.
12:54:49 Q. And during your time with Waterbury P.D., did you ever have a ballistic vest or body armor?
12:54:55 A. Yes.
12:54:57 Q. Were you issued a service weapon?
12:55:00 A. Yes, I was.
12:55:00 Q. What kind was it?
12:55:03 A. We cared the Smith & Wesson, M&P40.
12:55:08 Q. Is that a standard issue for law enforcement?
12:55:11 A. The caliber. It just depends, but Smith & Wesson, there's several makes that the agencies use. That was standard for agencies in Connecticut, yes.
12:55:20 Q. And the types of bullets that you are issued, anything noteworthy about those?
12:55:25 A. The bullets are cartridges that are -- cartridges are a bullet and a canister filled with powder. Those are actually cartridges. We put those in

13:03:10 police department. Every case that comes into the police
13:03:15 department is assigned a case number. That's how we
13:03:18 identify it.
13:03:19 Q. What are the two dates, the date of request and
13:03:21 date of report? What do those indicate?
13:03:23 A. The date of request, it could be the date of the
13:03:26 incident or the date that I was requested to do analysis
13:03:31 on this. So that's that date. So again, date of
13:03:35 incident, date that someone wanted analysis done. And
13:03:39 the date of report is the date that the report was
13:03:49 generated.
13:03:53 Q. There are a couple of points I wanted to touch
13:03:57 on here. Can you describe the items you were requested
13:04:01 to examine?
13:04:01 A. The evidence requested was a Romar AK-47, which
13:04:07 was a 7.62 by 39 caliber semiautomatic rifle. And the
13:04:14 serial number was 1964.CD0611.
13:04:19 Q. And what did you determine with respect to the
13:04:24 firearm's operability?
13:04:24 A. The firearm function.
13:04:26 Q. What does that mean?
13:04:28 A. The firearm worked. So just by looking at the
13:04:31 firearm, it was in good condition. There was in
13:04:35 obstructions in the barrel. It was fired since last
13:04:40 cleaned. It was measured and it was in good cosmetic

condition. And when ammunition was added to the firearm and the firing process occurred, the firearm functioned as designed.

Q. And is there other information you noted here, for instance, the barrel length?

A. Yes. The barrel length was measured at 15 and 3/8 inch.

Q. What's a caliber of a firearm?

A. The caliber is 7.62 by 39.

Q. And what is the model?

A. The model we call an AK-47 type.

Q. Anything particular about the firearm that distinguishes it as that type?

A. It is distinguishable really by the magazine. The magazine is unique and noticeable, so that's something that's is distinguishing to the firearm when it is inserted into the magazine wall.

MS. FREISMUTH: All right. And I'm going to switch and use the Elmo. Just one moment.

THE COURT: What are you going to place on there?

MS. FREISMUTH: Just a minute, Your Honor, I'm going to place some physical evidence I'll call up specifically.

THE COURT: You will tell us what it is and

13:07:26 there wasn't a bullet or there's no obstruction in the barrel to make sure it is safe to handle.

13:07:33 BY MS. FREISMUTH:

13:07:33 Q. So even though Government Exhibit 4 is inserted inside the firearm, it is not capable of firing anything?

13:07:39 A. Right now. Well, correct. Right now in this condition, right, you would have to take this out.

13:07:46 Q. Do you recognize Government's Exhibit 1 and 4?

13:08:03 A. Yes.

13:08:04 Q. What do you recognize them to be?

13:08:06 A. This is a firearm based on the serial number that I examined.

13:08:11 Q. And this was a firearm you determined to be operable?

13:08:14 A. Yes.

13:08:15 Q. And in terms of being operable, is it also required that the firearm be capable of accepting a magazine?

13:08:23 A. In this case, no, you don't need a magazine to fire this firearm, no.

13:08:28 Q. But in this case, does the firearm accept the magazine?

13:08:32 A. Oh, yes, it does.

13:08:33 Q. And what was your determination in terms of a capacity of a magazine?

13:08:36 A. I didn't inspect the capacity. Just looking at the magazine itself, these magazines are marketed for 30 cartridges.

13:08:52 MS. FREISMUTH: I'm just going to take Government's Exhibit 1 and 4 back for a moment.

13:09:21 BY MS. FREISMUTH:

13:09:21 Q. During your experience conducting forensic analysis of firearms, have you examined firearms that appear to have been outside for an extended period of time?

13:09:32 A. Yes.

13:09:32 Q. What kind of features do you see on those firearms?

13:09:36 A. Firearms that have been out for an extended period of time, you see a large amount of rust and corrosion on the outside.

13:09:44 Q. When you examined Government Exhibit 1, the firearm you just saw moments ago, did you see any of those characteristics?

13:09:49 A. No, I didn't note any of that, no.

13:09:51 Q. In connection to your examination, did you clean the firearm?

13:09:56 A. No.

13:09:58 MS. FREISMUTH: Now, Your Honor, I would like to show the witness Government's Exhibit 2 that's in

13:10:04 evidence.

13:10:04 THE COURT: Yes, you may show it.

13:10:27 BY MS. FREISMUTH:

13:10:27 Q. Do you recognize Government Exhibit 2?

13:10:44 A. Yes. I didn't examine them, but they were
13:10:48 submitted with the firearm -- they were admitted as
13:10:52 evidence, but I didn't examine them at the time.

13:10:54 Q. Are they the ammunition that is in the magazine
13:10:59 that was recovered with the firearm?

13:11:05 A. It says that, yes.

13:11:08 Q. Now, can you tell us the caliber of that
13:11:12 ammunition, please?

13:11:13 A. Yes. This as 7.62 by 39 caliber.

13:11:16 Q. So the same caliber as the rifle?

13:11:20 A. Yes.

13:11:23 Q. From your examination of the bullets there in
13:11:27 Government Exhibit 2, are they live rounds?

13:11:30 A. Yes.

13:11:31 Q. Can you tell us whether or not they are hollow
13:11:34 point rounds?

13:11:34 A. No.

13:11:34 Q. You can't tell us or they are not?

13:11:37 A. I'm sorry. Yes, they are not hollow points.
13:11:40 Are not.

13:11:42 MS. FREISMUTH: I'm going to retrieve Government

13:11:45 Exhibit 2 and show the witness Government's Exhibit 7A
13:11:52 through S.
13:11:52 THE COURT: All of those exhibits are in
13:11:54 evidence, I believe.
13:12:09 MS. FREISMUTH: The answer to your question was
13:12:11 yes, Your Honor.
13:12:12 THE COURT: Thank you.
13:12:14 BY MS. FREISMUTH:
13:12:14 Q. Would you mind to take one of these smaller
13:12:18 envelopes out of Government Exhibit 7A through S.
13:12:30 A. Just one.
13:12:32 Q. Okay. But can you tell us the caliber of that
13:12:36 bullet?
13:12:36 A. This is Item 5, and but --
13:12:41 Q. I'm sorry, I said bullet, but I meant shell
13:12:44 casing.
13:12:45 A. This is 7.62 by 39.
13:12:48 Q. So it's the same caliber as the rifle that you
13:12:52 examined?
13:12:53 A. Yes.
13:12:54 MS. FREISMUTH: I'm now going to retrieve
13:12:57 Government Exhibit 7A through S, and approach with
13:13:01 Government Exhibit 3.
13:13:25 BY MS. FREISMUTH:
13:13:25 Q. In examining Government Exhibit 3, which is a

13:13:28 single bullet, correct?
13:13:29 A. Yes.
13:13:29 Q. Is it a live round?
13:13:31 A. Yes.
13:13:32 Q. What is the caliber of the bullet?
13:13:34 A. This is a 5.56, which is also called a .223.
13:13:40 Q. And is that the same caliber as a rifle you
13:13:45 examined?
13:13:46 A. No, it is not.
13:13:47 Q. Could it be fired from that rifle?
13:13:49 A. No.
13:13:50 Q. Would it fit inside?
13:13:52 A. It's smaller, so it would fit inside but it
13:13:53 wouldn't chamber properly.
13:13:57 Q. In examining that bullet, can you tell us
13:13:58 whether or not it is a hollow point bullet?
13:13:59 A. It is not a hollow point bullet, no.
13:14:03 MS. FREISMUTH: Your Honor, I'm going to
13:14:05 retrieve Government Exhibit 3, and I'd like to put
13:14:07 Government Exhibit 1 on the Elmo. I am conscious -- I
13:14:11 don't remember what time Your Honor is breaking. I
13:14:13 wasn't sure if you --
13:14:13 THE COURT: We're going to break in a minute.
13:14:16 MS. FREISMUTH: Okay. I will take my minute.
13:14:38 I would like to have the witness examine it --

14:16:39 Q. Do you recognize that?
14:16:40 A. Yes.
14:16:40 Q. And is it part of evidence that you took custody of?
14:16:44 A. Yes.
14:16:45 Q. Now, did you make the firearm safe?
14:16:46 A. Yes.
14:16:47 Q. How is that done?
14:16:48 A. It was done by putting a bolt catch inside the chamber so nothing can go down the barrel.
14:16:55 Q. During the investigation, did you learn that the firearm had been reported stolen in Massachusetts in October of 2013?
14:17:02 A. Yes.
14:17:02 Q. And had it been purchased in January of 2010 in Massachusetts by a man who is now in his 60s or 70s?
14:17:10 A. That's correct.
14:17:11 Q. I will take back Government Exhibit 1 and 4 and hand the witness Government Exhibit 2 and 3.
14:17:57 Looking first at Government Exhibit 2. Just for confirmation, is this also some of the information that you collected?
14:18:06 A. Yes.
14:18:06 Q. What is it?
14:18:08 A. This is the 30 rounds on live ammunition found

14:18:12 in the magazine.
14:18:12 Q. And is it the same caliber as the firearm that was recovered?
14:18:17 A. Yes.
14:18:18 Q. Looking at Government Exhibit Number 3. What is that?
14:18:22 A. That's is the single round of 5.56 ammunition.
14:18:27 Q. And what is the caliber of that ammunition?
14:18:29 A. It's 5.56 by 45.
14:18:32 Q. How does that compare to a .223?
14:18:36 A. It's very similar. One is measured in inches and one is measured in millimeters.
14:18:42 Q. Can those be fired interchangeably from the same firearms?
14:18:48 A. A .223 can be fired in both chambered .223 rifles and 5.56 rifles, but a 5.56 cannot be chambered in a .223 rifle.
14:19:00 Q. So works one way but not the other?
14:19:03 A. Correct.
14:19:03 Q. Can either of those be fired in a caliber of firearm we have in this case?
14:19:07 A. No.
14:19:14 MS. FREISMUTH: Your Honor, I would now like to -- one second, Your Honor.
14:19:21 THE COURT: Yes.

14:53:42 ATTORNEY HAYES: That's what I'm doing, Your Honor.

14:53:44 THE COURT: Okay. Good.

14:53:46 MR. HAYES: Based on the evidence that was before this Court, in particular the jury, I would ask that the Court direct a verdict of acquittal. There is no way that the jury based on what we heard from the different witnesses, their testimony, the evidence that was presented that the jury could find a guilty verdict on Count One.

14:54:17 THE COURT: All right. Briefly, Government's counsel wish to respond?

14:54:21 MS. FREISMUTH: Yes, Your Honor. We respectfully disagree. Based on the stipulations, there's really only one element at issue here. The Government has offered both credible direct and credible circumstantial evidence to establish his possession of all three of the items. That was done through evidence and testimony that the jury has seen. A reasonable jury can return a verdict of guilty.

14:54:42 THE COURT: The Court denies the motion for a directed verdict. There are three elements in order to prove Count One, which the burden is on the Government. As to two of these elements, the prior conviction and knowing he was previously convicted. That's one element.

14:54:59 Element two is I'm charging. And the third which -- it was effecting interstate of foreign commerce, are both the subject of stipulations.

14:55:09 I will tell the jury they don't have to accept the stipulation. The fact of the matter is that's uncontested evidence on that. As to the first element, which, of course, is the heart of the case here, that Mr. Rivera knowingly possessed a firearm or ammunition, as charged. In other words, the three things that are particularly charged.

14:55:29 First, we have the confession as reported by the detective. Now, I understand Mr. Rivera protests that he didn't give that statement, he never said those things. I ruled on that issue. So the recounting of those statements by the party opponent defendant are before the jury and they were heard. Whether or not the jury will accept it or not is not the issue for me on a directed verdict motion. The issue if is there is evidence before the jury that, if believed by the jury, would be sufficient to convict. That would be sufficient.

14:56:04 Second, we have evidence of the patrol officer coming on the scene, there having been shots fired, seeing the defendant who then flees, climbs a couple fences. Before or at the time of doing that, the officer, before he turns down the driveway, hears a loud

14:56:29 clanging noise, and eventually discovers an AK-47 in the vicinity of the path that -- I heard the evidence, the path that the defendant took, the officer went a little bit around, but eventually went down that same path before he apprehended him at the third tallest fence.

14:56:46 Again, the jury doesn't have to believe it. It might be impeached by Porzio's testimony or the timing. Whatever it is the defense is going to argue, that is the question. The question is, was evidence heard, which is -- well, as to the firearm and the attached bullets, whatever, cartridges, it is circumstantial evidence, but I believe very reasonably the jury can draw an inference that the defendant in that environment and fleeing and the noises, et cetera, and the finding of the firearm on the path that the defendant traveled, that he had previously possessed it.

14:57:25 And that -- in my view, those two items, the jury will either find that he possessed the firearm and the enclosed ammunition on the magazine, or he didn't. But I think there is clearly evidence from which the jury could reasonably infer that he did possess both of those.

14:57:42 Lastly, there is a charged single piece of ammunition in his pocket. There is direct testimony from Officer Porzio that he searched him and he found the bullet. He put it back in the defendant's pocket. The

14:57:55 next officer, whose name I'm going to forget, who
14:57:56 transported him, in effect, from the scene to the booking
14:58:01 officer, found that bullet, I believe, if I'm recalling
14:58:06 correctly, and entered it into evidence as it appears
14:58:09 with no challenge to the chain of custody.

14:58:12 So again, whether the jury believes these people
14:58:14 or not, I don't know, but the -- that isn't my question.
14:58:17 My question that I have to answer is, is there evidence
14:58:20 upon which they could find the first element of
14:58:23 possession of a firearm or ammunition. And to the Court,
14:58:27 it is clear they could so find. Whether they will or
14:58:30 not, I don't know. That is the jury's job.

14:58:32 My job on the motion is to decide is there
14:58:35 evidence sufficient, and the Court's conclusion is that
14:58:38 there is such evidence.

14:58:41 So now, Attorney Hayes, I guess you want to call
14:58:46 -- Ms. Julian is here in the building? Is she?

14:58:49 MR. HAYES: Your Honor, it was mistaken. Her
14:58:51 name is actually Amalia, A-M-A-L-I-A. The last name is
14:58:51 Rivera. She's is the sister of Angelic Julian.

14:59:05 THE COURT: I see. Well, it's not a name I -- I
14:59:06 introduced to the jury. I'm hopeful on the jury knows
14:59:09 this witness, but that would be only, you know, par for
14:59:16 the course maybe.

14:59:17 But she is Ms. Julian's sister even though she

15:40:42 good afternoon to you.
15:40:42 Whenever you are ready, Attorney Hayes.
15:40:44 DIRECT EXAMINATION
15:40:44 BY MR. HAYES:
15:40:44 Q. Ms. Rivera, you have introduced yourself to the
15:40:53 jurors -- or please introduce yourself to the jurors?
15:40:57 A. Amalia Rivera.
15:40:59 Q. Where do you reside? Where do you live?
15:41:00 A. In Norwich, Connecticut.
15:41:01 Q. How long have you lived in Norwich, Connecticut?
15:41:05 A. Over -- about 20 years.
15:41:08 Q. Are you familiar with Miguel Rivera?
15:41:12 A. Yes.
15:41:13 Q. Are you related to him?
15:41:16 A. No.
15:41:17 Q. How are you familiar with Miguel Rivera?
15:41:21 A. He's my brother-in-law.
15:41:23 Q. About how long would you say he's been your
15:41:26 brother-in-law?
15:41:26 A. I know him before that, but he's been my
15:41:28 brother-in-law maybe five, six years or more.
15:41:32 Q. You say that you have known him before that?
15:41:34 A. Well, yeah, when he was a kid. When he was
15:41:37 little.
15:41:37 Q. Do you see Miguel Rivera in the courtroom today?

15:41:43 A. Yes.
15:41:44 Q. Could you point him out and tell us what he's wearing?
15:41:48 A. He's wearing a black suit. Nice haircut.
15:41:52 THE COURT: Is he standing up?
15:41:54 THE WITNESS: Yes.
15:41:55 THE COURT: The witness has identified her brother-in-law.
15:41:58 MR. HAYES: Thank you.
15:42:00 BY MR. HAYES:
15:42:00 Q. Has Miguel Rivera ever been to your home in Norwich, Connecticut?
15:42:09 A. Yes.
15:42:10 Q. I want to draw your attention specifically to July 5, 2020 -- I'm sorry, July 4, 2020. Do you recall that date?
15:42:23 A. Yes.
15:42:24 Q. Why do you recall that date?
15:42:25 A. I was having a July 4 party at my house.
15:42:31 Q. And when you say party, who attended, do you recall?
15:42:35 A. Family and friends.
15:42:40 Q. Was Mr. Rivera at your party?
15:42:42 A. Yes.
15:42:42 Q. Do you recall who he arrived at the party with?

15:42:47 A. With my sister and my mother.
15:42:54 Q. Do you recall around what time of day he would
15:42:58 have arrived?
15:42:59 A. They came in the afternoon time.
15:43:02 Q. And do you recall how long your party lasted?
15:43:08 How long did your party last?
15:43:11 A. Maybe about midnight or a little over midnight.
15:43:16 Q. And do you recall how long Mr. Rivera remained
15:43:25 or stayed at your party?
15:43:27 A. From the time he came to the end.
15:43:31 Q. Do you recall if Mr. Rivera left alone or who
15:43:38 did he leave with?
15:43:39 A. He left with my sister and my mother.
15:43:43 Q. Were you -- is there anything else -- other than
15:43:50 your memory, is there anything else that would help you
15:43:54 recall what happened at the party or -- the party?
15:43:59 A. The video.
15:44:01 Q. When you say the video, do you know who took a
15:44:05 video?
15:44:07 A. We always take a video, but my sister had a
15:44:11 video.
15:44:11 Q. How do you know your sister had a video?
15:44:13 A. I saw the video.
15:44:15 Q. And how do you recall -- or how do you know that
15:44:22 video was taken July 4, 2020?

15:44:25 A. Because I was there in the video.
15:44:27 Q. You saw yourself in the video?
15:44:29 A. I myself in the video.
15:44:30 Q. Did you see Mr. Rivera in the video?
15:44:32 A. Yeah, he was there, too.
15:44:35 MR. HAYES: Your Honor, I would offer
15:44:40 Defendant's Exhibit 1007.
15:44:44 THE COURT: Yes. Is there any objection to the
15:44:47 playing of it?
15:44:50 BY MS. FREISMUTH: May I have a moment, Your
15:44:52 Honor?
15:44:52 THE COURT: Yes, but not much more.
15:45:07 MS. FREISMUTH: Well, the Government doesn't
15:45:09 think the foundation has been laid properly, but we're
15:45:13 not going to object to the admission of the video.
15:45:16 THE COURT: That's fine. My understanding,
15:45:17 Counsel, is the video is about 90 seconds.
15:45:21 MR. HAYES: Thirty-four.
15:45:21 THE COURT: Sorry. I misremembered. Ladies and
15:45:22 gentlemen, it is 3:45. I don't know if I ever said, it's
15:45:25 not really hard and fast. But if somebody had a 4:00
15:45:29 appointment, I would accommodate you. I'd just as soon
15:45:31 play it and let you see it today, if that's okay. So
15:45:34 let's go ahead and play it, assuming we don't have any
15:45:35 technical glitches.

15:45:54 MS. FREISMUTH: Your Honor, we don't --
15:45:55 THE COURT: I'm sorry. Is it a problem, ma'am?
15:45:55 MS. FREISMUTH: Our screen isn't up?
15:45:55 THE COURT: Oh, the screen is dead.
15:45:55 Let's put the video up so we can see if it's
15:45:57 actually giving a feed. It might not be waking up.
15:46:00 THE CLERK: Is everybody's screen on?
15:46:10 THE COURT: Wait a minute. Everybody else's
15:46:11 screen on? How about yours, 5 and 6? No.
15:46:11 A JUROR: Yes.
15:46:11 THE COURT: It fell asleep, unlike the rest of
15:46:14 us this afternoon, it fell asleep.
15:46:16 Go ahead, Attorney Hayes.
15:46:17 (Playing the video.)
15:46:54 THE COURT: That completes the video, Attorney
15:46:56 Hayes?
15:46:56 MR. HAYES: It does, Your Honor. The parties
15:46:58 agreed to show 107 [sic], the actual image.
15:47:06 THE COURT: That's fine. Can you bring it up to
15:47:08 the point in the video? Is that correct, Attorney --
15:47:08 MR. HAYES: That's when we see Mr. Rivera.
15:47:12 MS. FREISMUTH: We agreed to the still and
15:47:12 object to that.
15:47:12 THE COURT: Can you bring that up? Is it your
15:47:17 evidence, Attorney Hayes?

15:47:22 The parties agree that what you are about to see
15:47:24 on the screen is like one shot from this 30 something
15:47:27 second video. So in other words, it is a frozen --
15:47:32 there's a word for that--
15:47:34 THE CLERK: Still image.
15:47:39 THE COURT: Still image.
15:47:39 THE CLERK: Screenshot.
15:47:40 THE COURT: Screenshot. Thank you. -- of
15:47:41 this -- from this video. Excuse me. Just so you know
15:47:45 that's what the parties agree to.
15:47:46 Can you bring that one up, please, sir.
15:47:50 BY MR. HAYES:
15:47:51 Q. I'm showing you, Ms. Rivera, what's been marked
15:47:56 as Defendant's Exhibit 107 [sic]. Have you seen this
15:48:03 image before?
15:48:05 A. Yes, on a video.
15:48:08 Q. Who is that that we see?
15:48:10 A. That's Miguel, Miguel Rivera.
15:48:13 Q. And could you tell -- could you read what it
15:48:17 says on the top of a video?
15:48:19 A. July 4 at 10:42 p.m. in Norwich.
15:48:25 Q. Is this an accurate depiction of what we saw in
15:48:30 the video?
15:48:30 A. Yes.
15:48:32 Q. And what you observed firsthand that evening?

15:48:35 A. Yes.
15:48:37 Q. And you have seen the video prior to today?
15:48:41 A. Yes.
15:48:43 Q. Did you see yourself in the video?
15:48:46 A. I did.
15:48:46 Q. How do you know that was you?
15:48:50 A. The tattoos on my back. --
15:48:54 MR. HAYES: Your Honor, I move Defendant's Exhibit 1007, both the video and the image as full.
15:49:02 THE COURT: Any objection?
15:49:06 MS. FREISMUTH: No, Your Honor.
15:49:07 THE COURT: Defendant's Exhibit 107 [sic] is a full exhibit.
15:49:10 MR. HAYES: I have no further questions.
15:49:14 THE COURT: Does the Government have cross? And if so, could somebody give me an estimate of how long?
15:49:21 MS. FREISMUTH: I would say longer than direct.
15:49:24 THE COURT: All right. I think I'm going to have to excuse the jury. I don't want to impose on your generosity unless the direct was about seven minutes. Let's assume it's double that. Is the jury okay with staying or should we just continue tomorrow?
15:49:38 Thumbs up if you're okay. Thumbs down if you're not. And please feel free to put your thumb down. It's not a problem. We've got tomorrow. Actually, you have

15:52:56 THE COURT: She said she's not familiar. I mean, really.
15:52:57 BY MS. STOLFI COLLINS:
15:52:58 Q. Did anyone else live with them?
15:53:00 A. No.
15:53:03 Q. At that time, did they have a child?
15:53:06 A. No -- I don't know. I don't think so. I don't know.
15:53:11 Q. Did you ever visit them in Waterbury?
15:53:14 A. Yes.
15:53:18 Q. And you have known the defendant since he was little, so 20 years?
15:53:23 A. Yeah, over 20 years.
15:53:34 Q. Ms. Rivera, have you ever been convicted of a crime?
15:53:37 A. Yes.
15:53:39 Q. Were you convicted of -- let me just get this right -- evading a death, in violation of Statute 14-224A in the Connecticut Superior Court?
15:54:01 A. Evading responsibility, yes.
15:54:03 Q. And there was a death or a serious injury?
15:54:07 A. A serious injury, I know that.
15:54:12 Q. And were you convicted of that?
15:54:16 A. Yes.
15:54:17 Q. And were you sentenced to eight years with a

15:54:22 year suspended and three years probation?
15:54:24 A. Correct.
15:54:25 Q. And did you violate your probation?
15:54:27 A. Yes.
15:54:27 Q. So you had conditions and you did not meet those
15:54:31 conditions?
15:54:31 A. No. I evaded.
15:54:32 Q. Did you serve another sentence for that
15:54:35 violation?
15:54:35 A. Yup.
15:54:36 Q. Were you sentenced to seven years with 20 months
15:54:39 suspended and 969 days of probation?
15:54:41 A. Yup.
15:54:42 Q. And in relation to the conviction, when -- you
15:54:47 left the scene of when you hit two people; isn't that
15:54:51 correct?
15:54:51 A. Correct.
15:54:52 Q. And then when the officers talked to you, you
15:54:54 told them that you hit a dog; isn't that correct?
15:54:56 A. Correct.
15:54:57 Q. One of the people who was injured that you left
15:55:01 at the scene actually lost her legs; isn't that correct?
15:55:04 THE COURT: Is this proper? I'm sorry. Strike
15:55:09 that.
15:55:09 THE WITNESS: I don't know.

Q. Did the officer speak to you about what you did and did you lie to the officer?
A. I didn't lie.
Q. You said you have driven from Norwich to Waterbury before; is that correct?
A. Yes.
Q. It is about an hour, hour and 15, to drive from Norwich to Waterbury?
A. About. Over an hour.
Q. And the time stamp on the image -- and I can show it to you if you want me to refresh your recollection -- said 10:42 p.m.; is that correct?
A. Yes.
Q. And that's well --
THE COURT: All right. You don't argue with her. It is not going to be a proper question. They are numbers. You don't have to do the math, okay, unless there's some other question.
BY MS. STOLFI COLLINS:
Q. And that was on July 4, 2020, correct?
A. Yes.
Q. Not on July 5, 2020?
A. Correct.
MS. STOLFI COLLINS: Thank you, Your Honor.
THE COURT: Any redirect, Attorney Hayes?

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA) | |
| ) | October 19, 2023 |
| vs. ) | 3:20cr168(JCH) |
| MIGUEL RIVERA ) | 8:30 a.m. |
| Defendant. ) | |
| ) | 141 Church Street |
| | New Haven, Connecticut |

DAY 3 OF JURY TRIAL

(VERDICT)

B E F O R E:

THE HONORABLE JANET C. HALL, U. S. D. J.

FOR THE GOVERNMENT:

Natasha Freismuth
U.S. Attorney's Office-NH
157 Church St., 25th Floor
New Haven, CT 06510

Patricia Stolfi Collins
United States Attorney Office -CT
157 Church Street
New Haven, CT 06510

FOR THE DEFENDANT:

Tracy Hayes
Federal Public Defender's Office
265 Church St., Suite 702
New Haven, CT 06510-7005

Josh B Ewing
Federal Defender of Connecticut
10 Columbus Blvd.
Hartford, CT

08:34:01 Form. No objection to that?

08:34:02 MR. EWING: Correct.

08:34:03 MS. FREISMUTH: Good morning, Your Honor,
08:34:06 Assistant United States Attorney Natasha Freismuth for
08:34:06 the Government as well as USA Collins. We have no
08:34:11 objection to the Verdict Form or the Court's final
08:34:14 instruction.

08:34:15 THE COURT: I should note we're here in United
08:34:17 States of America versus Miguel Rivera 20CR168. Mr.
08:34:21 Rivera has been here early like everyone this morning and
08:34:25 I do wish to thank the deputies for the diligence in
08:34:30 doing so. Not always been the case. I applaud your
08:34:36 diligence. Attorney Ewing, also for defense.

08:34:39 MR. EWING: Yes.

08:34:40 THE COURT: Any objection about the
08:34:42 interrogatory, not the interrogatory, the Verdict Form?

08:34:46 MR. EWING: No, Your Honor.

08:34:47 THE COURT: I just want to briefly put on the
08:34:50 record that I'm not doing an interrogatory or multiple
08:34:52 interrogatories. I had initially thought after all the
08:34:58 research we did on the motion to dismiss question that it
08:35:01 might be a good idea. I think primarily I was driven by
08:35:04 the idea of if I got answers to interrogatories and let's
08:35:06 say the answers were they were unanimous on one or more
08:35:12 of the objects, then it would avoid a retrial if I was

later found to have given them the wrong instruction about unanimity or no need for unanimity on the subject of the object of the possession.

However, as I reflected on it and went back and reread the cases and we talked about it, I realize the interrogatories are not so simple in this case. It would take I think at least two, if not three, maybe more questions per item to get to the information that we needed to make sure that the verdict was consistent. In other words, we didn't get an inconsistent verdict with the interrogatory but also that we got the answer that I thought would be a good objective.

I further concluded if I'm wrong about this, I think we'll be retrying it anyways.

Further, when you look at the cases, interrogatories they are not disfavored at the circuit, but they are favored in cases like continuing criminal enterprises, RICO cases, VICAR, those kinds of cases where they are very complicated, many overt acts, et cetera.

Lastly, the cases talk about how it might be helpful in the sentencing. I'm puzzled by that. First it sounded like a good idea. As I thought about it, I sat through all of the evidence.

At sentencing, the standard is not the juror

08:36:34 standard. It is the preponderance unfortunately for defendants and I've listened to all of the evidence and watched the witnesses. It seems to me I don't know that the jury applying the beyond a reasonable doubt as to how many people found which object is going to be terribly informative on sentencing for me.

08:36:55 For all of those reasons, I determined it was not appropriate or a good thing to do interrogatories. So now we're here and I think we're ready to talk about the PowerPoint that the defense wishes to use. I was puzzled when the law clerk came in and he talked about the defendant's PowerPoint. Aren't you misspeaking because there wasn't a word mentioned yesterday at 4:00 in the courtroom. That's fine. Other than the defense runs the risk if I have a problem with it, it won't get used because of the late hour.

08:37:38 I guess you can tell me first, Attorney Freismuth, just so I'm clear because I had come confusion with the clerk. Is your objection to the slide that has -- it is like a gas tank measurement and the top says burden of proof?

08:37:56 MS. FREISMUTH: It is, Your Honor. For clarification, I did tell Attorney Hayes yesterday during a break that if he did want to submit a PowerPoint after the Court's deadline, I did not intend to object provided

15:14:52 about a certain date, and the evidence indicates that, in fact, it was on another date.

15:14:52 The law only requires a substantial similarity between the date alleged in the Indictment and the date proven beyond a reasonable doubt.

15:14:52 I will now turn to the charge against Mr. Rivera. In Count One, the Indictment charges that, on or about July 5, 2020, Miguel Rivera, knowing that he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly and intentionally possessed a firearm and ammunition that had been shipped and transported in interstate and foreign commerce.

15:14:52 Mr. Rivera has pled not guilty to the count with which he is charged. Thus, the government has the burden of proving the charge beyond a reasonable doubt.

15:14:52 Count One of the Indictment charges Mr. Rivera with unlawful possession of a firearm and ammunition by a person who has previously been convicted of a crime punishable by imprisonment for more than one year, in violation of Sections 922(g)(1) and 924(a)(2) of Title 18 of the United States Code.

15:14:52 Specifically, Count One reads as follows: "On or about July 5, 2020, in the District of Connecticut, the defendant Miguel rivera having been, and

15:14:52 knowing that he had been, previously convicted of a crime punishable by imprisonment for a term exceeding one year in the Superior Court of the State of Connecticut, . . . did knowingly and intentionally possess a firearm and ammunition in and affecting interstate and foreign commerce, that is: (a) one romarm/Cugir WASR 10, AK Type Model, 7.62x39mm caliber, semi-automatic rifle bearing serial number 1964-CD0611; (b) approximately 30 rounds of Tula 7.62x39mm ammunition; and (c) one round of Prvi Partizan (PPU) 5.56x45mm ammunition, all of which had been shipped and transported in interstate and foreign commerce." "In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2)." Mr. Rivera has pled not guilty to the charge in Count One.

Count One of the Indictment charges Mr. Rivera with unlawful possession of a firearm and ammunition by a person who has previously been convicted of a crime punishable by imprisonment for more than one year, in violation of Sections 922(g)(1) and 924(a)(2) of Title 18 of the United States Code.

Section 922(g)(1) provides, in relevant part: It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to]

possess in or affecting commerce, any firearm or ammunition.

Section 924(a)(2) governs the penalties for various crimes that violate Section 922, including the unlawful possession of a firearm or ammunition by a person who has previously been convicted of a crime punishable by imprisonment for more than one . year. The court does not charge you on Section 924(a)(2) because the penalty and sentence, if any, are not to be considered by the jury.

I will now discuss the elements of Count One that the Government must prove beyond a reasonable doubt. In order for you to find Mr. Rivera guilty of Count One, the government must prove beyond a reasonable doubt that:

(1) Mr. Rivera knowingly possessed a firearm or ammunition, as charged;

(2) Mr. Rivera is a person who had previously been convicted, and he knew he had been convicted, of a crime punishable by imprisonment for a term exceeding one year; and

(3) The possessed firearm or ammunition was in or affecting interstate or foreign commerce.

I will now explain these elements in more detail.

The first element that the Government must

prove beyond a reasonable doubt is that, on or about the date set forth in the Indictment, Mr. Rivera knowingly possessed a firearm or ammunition, as charged in the Indictment.

A "firearm" is any weapon that will or is designed to or may be readily converted to expel a projectile by the action of an explosive. The firearm need not be loaded, and it need not be capable of firing. "Ammunition" is defined to include ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm.

"Possession" means that the defendant either had physical possession of the firearm or ammunition on his person or that he had dominion and control over the place where the firearm or ammunition was located and had the power and intention to exercise control over the firearm or ammunition.

To satisfy this element, you must also find that Mr. Rivera knowingly possessed the firearm or ammunition. This means that he possessed the firearm or ammunition purposely and voluntarily, and not by accident or mistake. The Government is not required to prove that the defendant knew that he was breaking the law.

You must unanimously agree that Mr. Rivera possessed a firearm or ammunition.

However, each member of the jury need not agree with every other member of the jury as to which of the items named in the Indictment Mr. Rivera possessed. So long as each of you finds he possessed either one or more of (1) one Romarm/Cugir WASR 10 AK Type Model, 7.62x39mm caliber, semi-automatic rifle bearing serial number 1964 cD0611; (2) approximately 30 rounds of Tula 7.62x39mm ammunition; or (3) one round of Prvi Partizan (PPU) 5.56x45mm ammunition, you, the jury, will have found this element.

That completes my instruction on the first element of Count One. If you find that the Government has failed to prove the first element of Count One beyond a reasonable doubt, then your deliberations are complete, and you must return a verdict of not guilty on Count One. However, if you find that the Government has proven beyond a reasonable doubt the first element of Count One, then you should continue to the second element.

The second element that the Government must prove beyond a reasonable doubt is that Mr. Rivera knew that he had previously been convicted of a crime . punishable by imprisonment for a term exceeding one year. To satisfy this element, you need to find beyond a reasonable doubt that Mr. Rivera was, in fact, convicted of a crime punishable by imprisonment for more than one

year, and that the conviction was before his possession of the firearm or ammunition as charged in Count One. The parties have stipulated that Mr. Rivera was convicted of a crime in state court and that this crime is punishable by imprisonment for a term exceeding one year. It also has been stipulated that this conviction occurred prior to the time that the defendant is alleged to have possessed the firearm and ammunition charged in Count One of the Indictment. I instruct you, in this connection, that the prior conviction that is an element of the charge here (and is not disputed) is only to be considered by you for the fact that it exists, and for nothing else. You are not to consider it for any other purpose. You are not to speculate as to what it was for. You may not consider the prior conviction in deciding whether Mr. Rivera was in knowing possession of the firearm or ammunition that is charged, which is a disputed element of the offense. It is only to be considered in connection with the second element of the charge in Count One, and nothing more.

Moreover, the Government also must prove beyond a reasonable doubt that, on or about the date set forth in Count One, Mr. Rivera knew that his prior conviction was for an offense punishable by a term of imprisonment for more than one year. The parties have stipulated that

Mr. Rivera knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year. That completes my instruction on the second element of Count One. If you find that the Government has failed to prove the second element of Count One beyond a reasonable doubt, then you must return a verdict of not guilty on Count One. However if you find that the Government has proven beyond a reasonable doubt the second element of Count One, then you should continue to the third element.

The Government also must prove beyond a reasonable doubt the third element of Count One, that is, that the firearm or ammunition Mr. Rivera possessed was in or affecting interstate or foreign commerce. This means that the Government must prove that, at some time before Mr. Rivera's possession, the firearm or ammunition had traveled in interstate commerce. It is sufficient for the Government to satisfy this element by proving that at any time prior to the date charged in Count One, the firearm or ammunition crossed United States' state lines or a border of the United States. It is not necessary that the Government prove that Mr. Rivera himself carried the firearm or ammunition across a state line, nor must the Government prove who carried the firearm or ammunition across or how it was transported.

It is also not necessary for the Government to prove that Mr. Rivera knew that the firearm or ammunition had previously traveled in interstate commerce.
The parties have stipulated that the firearm and ammunition allegedly possessed by Mr. Rivera had been shipped and transported in interstate and foreign commerce.

If you have found that the Government has proven beyond a reasonable doubt all three elements of Count One, you should find Mr. Rivera guilty on this Count. If, on the other hand, the Government has failed to prove beyond a reasonable doubt any one or more of the three elements of Count One, then you should find Mr. Rivera not guilty on this Count.

I have now concluded the Instructions relating to the specific crime charged in this case. In closing, I must add a few general Instructions concerning your . deliberations. You were permitted to take notes during the course of the trial. Any notes you have taken should be used only as memory aids; do not give your notes precedence over your independent recollection of the evidence. If you did not take notes, you should rely on your own recollection of the proceedings and should not be influenced by the notes of other jurors.

Let me now say a few words about your


GOVERNMENT
EXHIBIT
EX_008
3:20cr168(JCH)
ATF_000454


NO PARKING
USA
GOVERNMENT EXHIBIT
EX_010
3:20cr168(JCH)
ATF_000456


U.S.A.
HAULING & RECYCLING
GOVERNMENT EXHIBIT
EX_011
3:20cr168(JCH)
ATF_000458




GOVERNMENT EXHIBIT
EX_013
3:20cr168(JCH)
PENGAD 800-631-6989

# STATE OF CONNECTICUT

DEPARTMENT OF
EMERGENCY SERVICES AND PUBLIC PROTECTION
DIVISION OF SCIENTIFIC SERVICES

**Guy M. Vallaro, Ph.D.**
**Director**

## SUPPLEMENTAL DNA REPORT

| Laboratory Case | Submitting Agency | Date of Request |
|---|---|---|
| DSS-20-002984 | Bureau of Alcohol, Tobacco, Firearms, and Explosives - Hartford<br>21 Oak St, Suite 303<br>Hartford, CT 06106<br>Xref: Waterbury Police Department | 2/7/2023 |

**Agency Case**
762010-20-0045
Xref: 2000072274

**Date of Report**
3/16/2023

## EVIDENCE DESCRIPTION

#003-001 Swabs - "handle/mag item #1"
#004-001 Swabs - "trigger/slide item #1"
#005 (#7) Known buccal sample, Miguel Rivera

## TESTING SUMMARY

DNA was previously extracted and analyzed using the GlobalFiler STR DNA amplification kit from items #003-001 and #004-001 (see DNA Report dated 3/22/2022).

| Item # | Profile Obtained[1] | CODIS Entry |
|---|---|---|
| | GF | |
| 005 | Yes | |

[1]GF = GlobalFiler STR DNA amplification kit

## CONCLUSIONS SUMMARY

| Item # | Description | Type | Miguel Rivera (#005) |
|---|---|---|---|
| 003-001 | Swabs - "handle/mag item #1" | Mixture | Eliminated |
| 004-001 | Swabs - "trigger/slide item #1" | Mixture | Eliminated |

GOVERNMENT EXHIBIT
EX_031
3:20cr168(JCH)
PENGAD 800-631-6989

278 Colony Street, Meriden, Connecticut 06451
Phone (203) 639-6400 Fax (203) 639-6485
*An Affirmative Action / Equal Opportunity Employer*

**SUPPLEMENTAL DNA REPORT**

**CONCLUSIONS**

1. #003-001 (Swabs - "handle/mag item #1")
The results are consistent with the DNA profile from item #003-001 being a mixture of three contributors with at least one of them being male. The results do not support the hypothesis that Miguel Rivera is a contributor to this profile. Assuming three contributors, Miguel Rivera is eliminated as a contributor to the DNA profile from item #003-001.[1]

2. #004-001 (Swabs - "trigger/slide item #1")
The results are consistent with the DNA profile from item #004-001 being a mixture of two contributors. Miguel Rivera is eliminated as a contributor to the DNA profile from item #004-001.

[1]Profile analyzed and comparison made using STRmix™ analysis software.

**REMARKS**

The testable portion from item #005 was retained at the laboratory. Item #005 was returned to the submitting agency. Any remaining DNA extracts are retained at the laboratory.

A known sample from any additional suspect developed is requested for comparison to the evidentiary results.

**Results apply to the evidence as received by the Division of Scientific Services and relate only to the items tested. This report reflects the test results, conclusions, interpretations, and/or the findings of the analyst as indicated by their signature below.**

Mandy A. Young (Analyst)
Forensic Science Examiner 1

Dahong Sun, M.D., Ph.D. (Technical Reviewer)
Forensic Science Examiner 3


PRIVATE
PARKING
GOVERNMENT
EXHIBIT
EX_038
3:20cr168(JCH)




DEFENDANT'S EXHIBIT
1007
3:20-CR-168 (JCH)

OCT 19 2023 PM4:42
FILED-USDC-CT-NEW HAVEN

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 3:20-CR-00168 |
| | : | |
| MIGUEL RIVERA, | : | |
| Defendant. | : | |

## VERDICT FORM

### I. FELON IN POSSESSION OF A FIREARM AND/OR AMMUNITION (COUNT ONE)

1. As to the charge in Count One of knowingly possessing a firearm and/or ammunition in and affecting interstate or foreign commerce, having been, and knowing that he had previously been, convicted of a crime punishable by a term of imprisonment exceeding one year, we the jury unanimously find the defendant MIGUEL RIVERA:

Not Guilty __________ Guilty ____√______

**You have now completed the Verdict Form. Please have your foreperson sign and date below.**

*/s/*
**FOREPERSON**

**Dated at New Haven, Connecticut on this __19th__ day of October 2023.**

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

USA

V.

Miguel Rivera

## WITNESS LIST

Case Number: 3:20-cr-168 JCH

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Janet C. Hall | Natasha Freismuth & Patricia Collins | Tracy Hayes & Josh Ewing |
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
| 10/17/2023 | Terri Fidanza | Tatihana Murphy |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| * | | 10/17/2023 | | | Anthony Porzio |
| * | | 10/17/2023 | | | Sergey Babakov |
| * | | 10/17/2023 | | | Lee Frederick |
| * | | 10/17/2023 | | | Mandy Young |
| * | | 10/18/2023 | | | John Sanchez |
| * | | 10/18/2023 | | | Ferrell Shiver |
| * | | 10/18/2023 | | | Joseph Rainone |
| * | | 10/18/2023 | | | Eric Ladyga |
| * | | 10/18/2023 | | | Amalia Rivera |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.



New Page

Print | Save As... | Export as FDF | Retrieve FDF File | Reset

**Judge:** Janet C. Hall
**Court Reporter:** Terri Fidanza
**Courtroom Deputy:** Tatihana Murphy

# Exhibit List

United States District Court
District of Connecticut
Exhibits Log: 3:20-cr-168 JCH, USA v. Miguel Rivera 3:20-cr-168 JCH, USA v. MIguel Rivera, 10/17/2023 -10/19/2023

**Plaintiff's Counsel:** Natasha Freismuth & Patricia S. Collins

**Defense Counsel:** Tracy Hayes & Josh Ewing

| EXHIBIT | DESCRIPTION | RLS | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| Gov-1-EX | 001 - Placeholder-Romarm Cugir Rifle | Yes | 10/17/2023 1:06 PM | 10/17/2023 1:06 PM |
| Gov-2-EX | 002 - Placeholder-Tula Bullets from Magazine (30 Rounds) | Yes | 10/17/2023 1:06 PM | 10/17/2023 1:06 PM |
| Gov-3-EX | 003 - Placeholder-Prvi Partizan Bullet | Yes | 10/17/2023 2:57 PM | 10/17/2023 2:57 PM |
| Gov-4-EX | 004 - Placeholder-Magazine | Yes | 10/17/2023 1:07 PM | 10/17/2023 1:07 PM |
| Gov-5-EX | 005 - Placeholder-Ballistics Vest | Yes | 10/17/2023 12:01 PM | 10/17/2023 12:00 AM |
| Gov-6-EX | 006 - WPD Inventory and Waiver of Medical Treatment_Redacted | Yes | 10/17/2023 11:39 AM | 10/17/2023 11:39 AM |
| Gov-7-AS | 007a-s Placeholder-Spent Shell Casings | Yes | 10/18/2023 12:00 AM | 10/17/2023 12:00 AM |
| Gov-8-EX | 008 - Photo_Scene 1 | Yes | 10/17/2023 11:39 AM | 10/17/2023 11:39 AM |
| Gov-9-EX | 009 - Photo_Scene 2 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-10-EX | 010 - Photo_Scene 3 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-11-EX | 011 - Photo_Scene 4 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-12-EX | 012 - Nexus Report-Signed-_Redacted | Yes | 10/18/2023 2:18 PM | 10/18/2023 2:18 PM |
| Gov-13-EX | 013 - Photo_Written Rights Waiver Card_1 | Yes | 10/18/2023 10:36 AM | 10/18/2023 10:36 AM |
| Gov-14-EX | 014 - Photo_Scene 5 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-15-EX | 015 - Photo_Prvi Partizan Bullet_2 | Yes | 10/17/2023 2:57 PM | 10/17/2023 2:57 PM |
| Gov-16-EX | 016 - Photo_Tula Bullets_1 | Yes | 10/17/2023 2:10 PM | 10/17/2023 2:10 PM |
| Gov-17-EX | 017 - Photo_Scene 6 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-18-EX | 018 - Placeholder-Signed Notice of Rights Card | Yes | 10/18/2023 10:39 AM | 10/18/2023 10:39 AM |
| Gov-19-EX | 019 - Photo_Scene 7 | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-20-EX | 020 - Photo_Scene_29 Williams back entrence | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-21-EX | 021 - Photo_Romarm Cugir Rifle_3 | Yes | 10/17/2023 2:10 PM | 10/17/2023 2:10 PM |
| Gov-22-EX | 022 - Photo_Romarm Cugir Rifle_4 | Yes | 10/17/2023 2:10 PM | 10/17/2023 2:10 PM |
| Gov-23-EX | 023 - Photo_Scene_ 35 Williams and Garages | Yes | 10/17/2023 11:40 AM | 10/17/2023 11:40 AM |
| Gov-25-EX | 025 - Photo_Romarm Cugir Rifle_7 | Yes | 10/17/2023 2:10 PM | 10/17/2023 2:10 PM |
| Gov-27-EX | 027 - Photo_Vest_Label_2 | Yes | 10/17/2023 3:03 PM | 10/17/2023 3:03 PM |

| EXHIBIT | DESCRIPTION | RLS | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| Gov-28-EX | 028 - Photo_Vest_3 | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-30-EX | 030 - 20-2984 DNA REPORT | Yes | 10/18/2023 9:49 AM | 10/18/2023 9:49 AM |
| Gov-31-EX | 031 - 20-2984 SUPPLEMENTAL DNA REPORT | Yes | 10/18/2023 10:13 AM | 10/18/2023 10:13 AM |
| Gov-32-EX | 032 - DPS Operability report | Yes | 10/18/2023 1:04 PM | 10/18/2023 1:04 PM |
| Gov-34-EX | 034 - Photo_Scene_Area between 29 and 35 Williams from Street | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-35-EX | 035 - Photo_Scene_Closeup Metal and Barbwire Fence 29 and 35 Williams (2) | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-36-EX | 036 - Photo_Scene_Corner of Williams and Laurel | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-37-EX | 037 - Photo_Scene_Front Street View 35 Williams | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-38-EX | 038 - Photo_Scene_Gate and Parking Entrance between 29 and 35 Williams | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-41-EX | 041 - Certificate of Authenticity_Waterbury PD 911 call | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-42-EX | 042 - Waterbury PD Call Summary Report_Redacted | Yes | 10/17/2023 11:41 AM | 10/17/2023 11:41 AM |
| Gov-043-EX | 043 - William_Laurel st 20_72274 911 | Yes | 10/17/2023 11:42 AM | 10/17/2023 11:42 AM |
| Gov-45-EX | 045 - Photo_Scene_Street View down Williams | Yes | 10/17/2023 11:42 AM | 10/17/2023 11:42 AM |
| Gov-48-GOVEX | 048 - Stipulation - Prior Convictions | Yes | 10/18/2023 12:00 AM | 10/18/2023 12:00 AM |
| Gov-49-GOVEX | 049 - Stipulation - Prior Convictions | Yes | 10/18/2023 12:00 AM | 10/18/2023 12:00 AM |
| Gov-50-GovEX | 50-Printed Photo of Mr Rivera | Yes | 10/18/2023 12:00 AM | 10/17/2023 12:00 AM |
| Def-1007-Dx | 1007 - Video Image or Video from July 4, 2020 | Yes | 10/18/2023 3:50 PM | 10/18/2023 3:50 PM |
| Def-1008A-Dx | 1008a - Shiver`s Testing Results Excerpt (1) | Yes | 10/19/2023 9:47 AM | 10/18/2023 12:00 AM |
| Def-1009A-Dx | 1009a - Shiver`s Testing Results Excerpt (2) | Yes | 10/18/2023 12:43 PM | 10/18/2023 12:43 PM |
| Def-DX1007A-IMG | Video of Miguel Rivera 7/4/2020 | Yes | 10/18/2023 3:50 PM | 10/18/2023 3:50 PM |
| Court-1-CourtEX | 1 - Stipulation - Prior Convictions | Yes | 10/19/2023 8:39 AM | 10/18/2023 12:00 AM |
| Court-2-CourtEX | 2 - Stipulation - Prior Convictions | Yes | 10/19/2023 8:40 AM | 10/18/2023 12:00 AM |
| Court-3-CourtEX | 3-stipulation- Letter re Witness | No | 10/19/2023 8:40 AM | 10/17/2023 12:00 AM |
| Court-4-CourtEX | jury note | No | 10/23/2023 1:09 PM | 10/19/2023 12:00 AM |
| Court-5-CourtEX | Govt Exhibit List | No | 10/23/2023 1:09 PM | 10/19/2023 12:00 AM |
| Court-6-CourtEX | Defense Exhibit List | No | 10/23/2023 1:09 PM | 10/19/2023 12:00 AM |

UNITED STATES DISTRICT COURT
District of Connecticut

**JUDGMENT IN A CRIMINAL CASE**

UNITED STATES OF AMERICA

v.

**MIGUEL RIVERA**

Case Number: **3:20-CR-00168-JCH(1)**

USM Number: 16529-509

**Natasha Freismuth, Patricia Stolfi Collins**
Assistant United States Attorney

**Tracy Hayes**
Defendant's Attorney

The Defendant was found guilty by a jury verdict of Count 1 of the Superseding Indictment.

Accordingly, the defendant is adjudicated guilty of the following offense(s):

| Title & Section | Nature of Offense | Offense Concluded | Count |
|---|---|---|---|
| Title 18, United States Code, §922(g)(1) and 924(a)(2) | Unlawful Possession of a Firearm and Ammunition by a Felon | 7/5/2020 | 1 |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984. The sentence imposed is a variance sentence based upon the nature and circumstances of the offense, including the seriousness of the offense, balanced against the defendant's extraordinary family circumstances.

**IMPRISONMENT**
The Defendant is ordered committed to the custody of the Federal Bureau of Prisons for 60 months on Count One.

**SUPERVISED RELEASE**
Upon release from imprisonment, the Defendant shall be on Supervised Release for a total term of 3 years.

The Mandatory and Standard Conditions of Supervised Release as attached are imposed. In addition, the following Special Conditions are imposed:

(1) You must participate in a program recommended by the Probation Office for outpatient mental health treatment to include TBI-specific treatment and medication management, as prescribed by medical professionals. You must follow the rules and regulations of that program. The Probation Office will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.
(2) You must participate in a cognitive-behavioral treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.
(3) You must participate in a program recommended by the Probation Office and approved by the Court for substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation

officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the Probation Office and approved by the Court.

(4) You must participate in a vocational services program and follow the rules and regulations of that program. Such a program may include job readiness training and skills development training.

(5) You must submit your person, residence, office, or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; you must inform any other residents that the premises may be subject to searches pursuant to this condition.

(6) You must participate in speech therapy and follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

**CRIMINAL MONETARY PENALTIES**

The Defendant must pay the total criminal monetary penalties under the schedule of payments as follows:

| | | |
|---|---|---|
| **Special Assessment:** | $100.00 | to be paid immediately |
| **Fine:** | $0.00 | |
| **Restitution:** | $0.00 | |

It is further ordered that the Defendant will notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are paid.

The following counts have been dismissed: Count One of the Indictment

**JUDICIAL RECOMMENDATION TO THE BUREAU OF PRISONS**

The court makes the following recommendations to the Bureau of Prisons: the defendant be designated to FCI Danbury or to FCI Allenwood for its inmate programs as follows: residential drug treatment program, challenge program, dialectic behavioral program, occupational educations program, and parenting program.

Date of Imposition of Sentence: **November 22, 2024**

/s/ Janet C. Hall
Janet C. Hall, United States District Judge

Date: **11/26/2024**

## CONDITIONS OF SUPERVISION

**In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:**

## MANDATORY CONDITIONS

(1) You shall not commit another federal, state or local crime.

(2) You shall not unlawfully possess a controlled substance.

(3) You shall refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

(4) ☐ You must make restitution in accordance with 18 U.S.C.§§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

(5) ■ You must cooperate in the collection of DNA as directed by the Bureau of Prisons or probation officer. *(check if applicable)*

(6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

(7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

## STANDARD CONDITIONS

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

(1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
(2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
(3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
(4) You must answer truthfully the questions asked by your probation officer.
(5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
(6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
(7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
(9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
(10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
(11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
(12) You must follow the instructions of the probation officer related to the conditions of supervision.

Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) ______________________________ ______________
Defendant Date

______________________________ ______________
U.S. Probation Officer/Designated Witness Date

**CERTIFIED AS A TRUE COPY ON THIS DATE:** ______________

By: ____________________________

Deputy Clerk

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _______________ to ______________________________ a __________________________, with a certified copy of this judgment.

______________________________
Lawrence Bobnick
Acting United States Marshal

By ______________________________
Deputy Marshal

**Criminal Notice of Appeal - Form A**

# NOTICE OF APPEAL

**United States District Court**

District of CONNECTICUT

Caption:
UNITED STATES v.

MIGUEL RIVERA

Docket No.: 3:20CR168(JCH)
The Hon. Janet C. Hall
(District Court Judge)

Notice is hereby given that Miguel Rivera appeals to the United States Court of Appeals for the Second Circuit from the judgment [✔], other [ ] ______ (specify)
entered in this action on 11/26/2024 (date).

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✔] Other [ ]

Defendant found guilty by plea [ ] trial [✔] N/A [ ]

Offense occurred after November 1, 1987? Yes [✔] No [ ] N/A [ ]

Date of sentence: 11/22/2024 N/A [ ]

Bail/Jail Disposition: Committed [✔] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes [✔] No [ ] If yes, provide the following information:

Defendant's Counsel: Tracy Hayes, Assistant Federal Defender

Counsel's Address: Federal Defender Office
265 Church Street, Suite 702, New Haven, CT 06510

Counsel's Phone: 203-498-4200

Assistant U.S. Attorney: Natasha Freismuth and Patricia Stolfi Collins, Assistant U.S. Attorneys

AUSA's Address: United States Attorney's Office
157 Church Street, 25th FL, New Haven, CT 06510

AUSA's Phone: 203-821-3700

/s/ Tracy Hayes
Signature